14-CV-6377 (SMG)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

THOMAS JENNINGS,

                                                            Plaintiff,

            -against-

Police Officer ANDREW YURKIW Shield No. 13610,
Police Officer JOSEPH SOLOMITO Shield No. 14389,
Police Officer AMBER LAGRANDIER Shield No. 5373,

                                                            Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' POST-TRIAL MOTIONS PURSUANT TO RULES 50 AND 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

*ZACHARY W. CARTER*
*Corporation Counsel of the City of New York*

*Attorney for Defendants Andrew Yurkiw,*
*Joseph Solomito, and Amber LaGrandier*
*100 Church Street, 3rd Floor*
*New York, N.Y. 10007*
*Of Counsel: Aimee Lulich*
*Tel: (212) 356-2345*
*Matter #: 2014-039904*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

PRELIMINARY STATEMENT ............................... **ERROR! BOOKMARK NOT DEFINED.**

PROCEDURAL HISTORY...................................... **ERROR! BOOKMARK NOT DEFINED.**

EVIDENCE PRESENTED....................................... **ERROR! BOOKMARK NOT DEFINED.**

STANDARD OF REVIEW ...................................... **ERROR! BOOKMARK NOT DEFINED.**

POINT I

PLAINTIFF FAILED TO ESTABLISH THAT
OFFICERS SOLOMITO OR LAGRANDIER
WERE PERSONALLY INVOLVED IN ANY
USE OF EXCESSIVE FORCE ...........**Error! Bookmark not defined.**

POINT II

THERE IS INSUFFICIENT EVIDENCE TO
SUPPORT THE JURY'S FINDING THAT
PLAINTIFF WAS SUBJECTED TO
EXCESSIVE FORCE BY OFFICERS
SOLOMITO AND LAGRANDIER OR THAT
PUNITIVE DAMAGES SHOULD BE
AWARDED AGAINST ANY DEFENDANT**Error! Bookmark not defined.**

POINT III

PLAINTIFF'S COUNSEL'S DELIBERATE
MISCONDUCT CAUSED A SERIOUSLY
ERRONEOUS VERDICT ...................**Error! Bookmark not defined.**

POINT IV

SEVERAL OF THE COURT'S RULINGS
CONTRIBUTED TO A SERIOUSLY
ERRONEOUS RESULT AND A
MISCARRIAGE OF JUSTICE ...........**Error! Bookmark not defined.**

**Page**

    A.    The Inconsistent Rulings Regarding Admissibility of the Circumstances of Plaintiff's Arrest Led to a Seriously Erroneous Verdict ........................**Error! Bookmark not defined.**

    B.    Defendants Were Not Allowed to Introduce Evidence Directly Contradicting Plaintiff's Testimony that He Would "Never Put His Hands on a Police Officer" ............................**Error! Bookmark not defined.**

    C.    Permitting Plaintiff to Deviate from the Joint Pre-Trial Order and to Disregard Court Orders Allowed Plaintiff's Counsel's Impermissible Gamesmanship**Error! Bookmark not defined.**

POINT V

    THE JURY'S DAMAGE AWARD IS NOT SUPPORTED BY THE EVIDENCE AND MUST BE SET ASIDE, OR, MUST BE REMITTED ..........................................**Error! Bookmark not defined.**

    A.    Compensatory Damages .............**Error! Bookmark not defined.**

    B.    Punitive Damages ........................**Error! Bookmark not defined.**

CONCLUSION........................................................... **ERROR! BOOKMARK NOT DEFINED.**

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                                    <u>**Pages**</u>

Alexander Spillman v. City of Yonkers,
    No. 07-CV-2164 (DAB) (KNF) 2011.........................................................................34

Angela Hollins v. City of New York,
    14-CV-6519 (WFK).................................................................................................25

Bender v. City of New York,
    78 F.3d 787 (2d Cir. 1996)....................................................................................30

Blackwell v. Town of Greenburgh,
    2017 U.S. Dist. LEXIS 44404 (S.D.N.Y. 2017)....................................................8

Blissett v. Coughlin,
    6 F.3d 531 (2d Cir. 1995).......................................................................................30

BMW of N. Am. V. Gore,
    517 U.S. 559 (1996)...............................................................................................37

Cash v. Cnty. Of Erie,
    654 F.3d 324 (2d Cir. 2011)....................................................................................4

Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.,
    No. 09-CV-5251 (JFB)(AKT),
    2013 U.S. Dist. LEXIS 105040 (E.D.N.Y. July 24, 2013)....................................12

Corley v. Nabeel Shahih,
    89 F. Supp. 3d 518 (E.D.N.Y. 2015) .....................................................................5

Davis v. Klein,
    2013 U.S. Dist. LEXIS 153469 (S.D.N.Y. 2013)...................................................8

DiSorbo v. Hoy,
    343, F.3d 172 (2d Cir. 2003)...........................................................28, 29, 30, 31, 36, 39, 41

DLC Mgmt. Corp. v. Town of Hyde Park,
    163 F.3d 124 (2d Cir. 1988)....................................................................................4

Earl v. Bouchard Transp. Co.,
    917 F.2d 1320 (2nd Cir. 1990)..............................................................................26

Edmin Alicea v. City of N.Y.,
    13-CV-7073 (JGK) (S.D.N.Y. August 11, 2016) ..................................................31

**Cases**                                                                                                              **Pages**

In re Fosamax Prods. Liab. Litig.,
   742 F. Supp. 2d 460 (S.D.N.Y. 2010).................................................................12

Guzman v. Jay,
   303 F.R.D. 186 (S.D.N.Y. 2014) ...........................................................26, 27

Henry v. Brown,
   2016 U.S. Dist. 69930 (E.D.N.Y 2016) ..................................................8

Hopson v. Riverbay Corp.,
   190 F.R.D. 114 (S.D.N.Y. 1999) .......................................................15, 17

Hygh v. Jacobs,
   961 F.2d 359 (2d Cir. 1992)...............................................................30, 36

Ismail v. Cohen,
   899 F.2d 183 (2d Cir. 1990)...............................................28, 30, 37, 39, 40, 41

Ivan Benjamin v. City of N.Y.,
   15-CV-2319 (FB) (E.D.N.Y. June 7, 2017).........................................31, 36

Jackson v. City of New York,
   939 F. Supp. 2d 219 (E.D.N.Y. 2013) .................................................5

Jeffreys v. Rossi,
   275 F. Supp. 2d 463 (S.D.N.Y. 2003)
   aff'd Jeffreys v. City of New York, 426 F.3d 549 (2d Cir. 2005) ........................5, 8

Jenkins v. Town of Greenburgh,
   2016 U.S. Dist. LEXIS 5362 (S.D.N.Y. 2016)........................................8

Karen Brim v. City of N.Y.,
   13-CV-1082 (SJ) (RER),
   2016 U.S. Dist. LEXIS 109534 (E.D.N.Y., August 16, 2016) ........................32, 36

King v. City of N.Y.,
   No. 92-CV-7738 (JGK),
   1996 U.S. Dist. LEXIS 19017 (S.D.N.Y. Dec. 24, 1996) .....................................35

King v. Macri,
   993 F.2d 294 (2d Cir. 1993)...............................................................41

Kirsch v. Fleet St. Ltd.,
   148 F.3d 149 (2d Cir. 1998).............................................................26, 27

**Cases**                                                                 **Pages**

Koufakis v. Carvel,
    425 F.2d 892 (2d Cir. 1999)................................................................17

Lee v. Edwards,
    101 F.3d 805 (2d Cir. 1996)........................................................39, 40

Levitant v. N.YC. Human Res. Admin.,
    914 F. Supp. 2d 281 (E.D.N.Y. 2012) ..................................................12

Manley v. AmBase Corp.,
    337 F.3d 237 (2d Cir. 2003)..................................................................5

Mark Fullerton v. City of N.Y.,
    14-CV-6029 (BMC) (E.D.N.Y. Apr. 1, 2015)........................................33

Mathie v. Fries,
    121 F.3d 808 (2d Cir. 1997)........................................................28, 39

Michelman v. Clark-Schwebel Fiber Glass Corp.,
    534 F.2d 1036 (2d Cir. 1976)................................................................8

Morales v. City of N.Y.,
    No. 99-CV-10004 (DLC),
    2000 U.S. Dist LEXIS 18711 (S.D.N.Y, January 2, 2001) ....................35

Morse v. Fusto,
    No. 07-CV-4793 (CBA)(RML),
    2013 U.S. Dist. LEXIS 123823 (E.D.N.Y. Aug. 27, 2013)....................12

Munafo v. Metropolitan Transp. Auth.,
    381 F.3d 99 (2d Cir. 2004)..................................................................26

Newton v. City of N. Y.,
    171 F. Supp. 3d 156 (S.D.N.Y. 2016)..................................................27

O'Neill v. Krzeminski,
    839 F.2d 9 (2d Cir. 1988)........................................................29, 36, 40

Pappas v. Middle Earth Condo Ass'n,
    963 F.2d 534 (2d Cir. 1992)................................................................15

Payne v. Jones,
    711 F.3d 85 (2d Cir. 2012)....................................................39, 40, 41

Philip Morris USA v. Williams,
    549 U.S. 346 ................................................................................37, 38

**Cases**                                                                                                    **Pages**

Rasanen v. Brown,
    841 F. Supp. 2d 687 (E.D.N.Y. 2012) ...................................................................5

Ronald Walker v. City of New York,
    No. 11-CV-0314, 2013 Jury Verdicts LEXIS 10892 (E.D.N.Y. Aug. 7, 2013) ......................34

Schneider v. Kings Highway Hosp. Ctr., Inc.,
    67 N.Y. 2d 743 (1986) ...................................................................8

Sean Thomas v. City of New York,
    No. 09-CV-3162 (ALC) (S.D.N.Y. Mar. 18, 2015)...................................................................33

Shu-Tao Lin v. McDonnell Douglas Corp.,
    742 F.2d 45 (2d Cir. 1984)...................................................................26

State Farm Mut. Auto. Ins. Co. v. Campbell,
    538 U.S. 416 (2003)...................................................................37

Tesser v. Bd. of Educ. of City Sch. Dist. of City of N.Y.,
    190 F. Supp. 2d 430 (E.D.N.Y. 2002) ...................................................................4

Turner v. White,
    443 F. Supp. 2d 288 (E.D.N.Y. 2006) ...................................................................8

Walker v. City of New York,
    2014 U.S. Dist. LEXIS 197314 (E.D.N.Y. 2014)...................................................................5, 6

Wheatley v. Ford,
    679 F.2d 1037 (2d Cir. 1982)...................................................................31

**Statutes**

42 U.S.C. § 1983...................................................................2, 28

Fed. R. Civ. P. 50...................................................................1, 2, 4, 5, 6

Fed. R. Civ. P. 50(a) ...................................................................2

Fed. R. Civ. P. 50(a)(1)...................................................................4

Fed. R. Civ. P. 59...................................................................1, 2, 4, 7, 32

Fed. R. Civ. P. 59(a) ...................................................................4, 5, 12, 17, 18

Fed. R. Civ. P. 59(e) ...................................................................26

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------  x

THOMAS JENNINGS,

                                                   Plaintiff,

                    -against-                                    14-CV-6377 (SMG)

Police Officer ANDREW YURKIW Shield No. 13610,
Police Officer JOSEPH SOLOMITO Shield No. 14389,
Police Officer AMBER LAGRANDIER Shield No. 5373,
                                                   Defendants.
-------------------------------------------------------------------  x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' POST-TRIAL MOTIONS PURSUANT TO RULES 50 AND 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE

### Preliminary Statement

The jury verdict and award represent a manifest injustice, and the Court must set aside the verdict and grant a new trial as to all defendants pursuant to Fed. R. Civ. P. §§ 50 and 59. Specifically, pursuant to Rule 50, defendants contend that plaintiff failed to establish that Officers LaGrandier or Solomito were personally involved in any use of force. In addition, pursuant to Rule 59, defendants contend that: (1) there is insufficient evidence to find that Officers Solomito and LaGrandier used excessive force against plaintiff, thus, the jury's verdict, including responses to the Special Interrogatories, must be set aside; (2) deliberate misconduct by plaintiff's counsel caused a seriously erroneous result; (3) the Court's evidentiary rulings caused a seriously erroneous result; (4)  the jury's damage award finding is not supported by the evidence and must be set aside or, alternatively, the jury's damage awards were intrinsically excessive and not within a reasonable range of comparable jury verdicts and must be substantially reduced.

**Procedural History**

Plaintiff Thomas Jennings brought this action pursuant to 42 U.S.C. § 1983 against defendants Police Officers Andrew Yurkiw, Joseph Solomito, and Amber LaGrandier, alleging that he was subjected to excessive force on April 23, 2014.[1]  The trial of this matter commenced before the Honorable Steven M. Gold on May 29, 2018.  Plaintiff called the defendant officers on his case-in-chief.  At the close of plaintiff's case-in-chief, defendants moved for judgment as a matter of law as to each of plaintiff's claims pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.  Plaintiff voluntarily dismissed Sergeant Shaun Brown as a defendant.  The Court reserved decision on the remaining claims. On June 1, 2018, the jury returned a verdict in favor of plaintiff.  The jury awarded $500,000 in compensatory damages, $1 million in punitive damages as to Officer Yurkiw, $750,000 in punitive damages as to Officer LaGrandier and $750,000 in punitive damages as to Officer Solomito.  After the verdict was read, defendants renewed their motions pursuant to Rule 50 and moved to set aside the judgment as excessive and unsupported by the evidence pursuant to Rule 59 of the Federal Rules of Civil Procedure (the "Federal Rules").  The Court reserved decision pending briefing.  Judgment was entered on June 11, 2018.

**Evidence Presented**

The relevant evidence pertaining to plaintiff's injuries and the cause thereof is contained in his own trial testimony, his medical records, and the testimony of Dr. Hussein Matari, Dr. Frank Flores, and EMT Sade Noel.  Plaintiff testified that he called 911 following an argument with his child's mother at 1560 Fulton Street. (Lulich Decl., Ex. B at 472:05-08.)  Four officers

---

[1] Plaintiff's false arrest, malicious prosecution, denial of a right to a fair trial, and municipal liability claims, and his claims pursuant to New York State Law, were dismissed prior to trial.

- 2 -

responded, including Officers Solomito, Yurkiw, LaGrandier, and Sergeant Brown.  (Id. at 473:14-15, 25; 474:1-7; 476:3-14.) Sergeant Brown and Officer LaGrandier had entered the mother's apartment while plaintiff waited outside in the hallway with his son and Officers Solomito and Yurkiw. (Id. at 476:19-25; 477:02-10.)  Officer LaGrandier emerged from the apartment alone, took plaintiff's son away from him, and directed the child to go to the mother's apartment. (Id. at 477:11-12, 22-25.)  She grabbed onto plaintiff's clothing, then Officer Yurkiw punched plaintiff two times in the face and eye area, and plaintiff fell to the floor.  (Id. at 479:03-04, 24-25; 480: 01; 481:04-17.)  While "curled up" on the floor, plaintiff was dealt "all kinds of blows coming from everywhere." (Id. at 481:20-21.)  Plaintiff was punched, kicked, stomped, and pummeled so severely that he blacked out.  (Id. at 604:06-15.)  Plaintiff denied attempting to run away from the officers or throwing any punches at them. (Id. at 483:04-06.)

He was taken from the precinct to Woodhull Hospital in an ambulance.  (Id. at 486:07, 12; 486:10-11.)  EMT Sade Noel[2] completed a Prehospital Care Report Summary documenting her observations and treatment. (Lulich Decl., Ex. E.)  Plaintiff was treated at the Woodhull Hospital Emergency room, where two CT scans were done of his head which were read by Dr. Hussein Matari.  (Lulich Decl., Ex. F.)  Plaintiff was next treated on Rikers Island between April 25, 2014 and April 28, 2014, including an exam on April 25 by Dr. Frank Flores.  (Lulich Decl., Ex. G.)  The last time plaintiff sought medical treatment was on May 3, 2014, at Brookdale University Medical Center. (Lulich Decl., Ex. H.)

Plaintiff's injuries consisted of a black eye and bilateral fracture of the nasal walls. (Lulich Decl, Ex. B at 487:01-488:20; Lulich Decl., Ex. F.)   The broken nose was treated with

---

[2] At the time she completed the report, EMT Noel's last name was Jeannot-Monchik. (Lulich Decl., Ex. C at 640: 10-11)

over-the-counter pain and allergy medication, and no surgery was recommended. (Id.) By May 2, 2014, his nose was not visibly injured and the black eye was largely healed. (Lulich Decl., Ex. E.) He did not seek any further medical treatment after May 2, 2014, and there was no evidence presented to indicate that he will need any further treatment. (Lulich Decl., Ex. B.) Plaintiff testified that he believes his nose looks "crooked" compared to before the injury; however, plaintiff's nose does not appear abnormal or damaged upon casual observation. (Lulich Decl., Ex. B at 487.) Plaintiff had no pecuniary or economic damages such as loss of income or medical bills, and did not set forth any evidence of emotional damages. Accordingly, plaintiff's damages consist entirely of temporary physical injuries to his nose and right eye.

## STANDARD OF REVIEW

Under Rule 50, judgment as a matter of law is available when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." F. R. Civ. P. 50(a)(1); see also Cash v. Cnty. Of Erie, 654 F.3d 324, 333 (2d Cir. 2011).

Pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, "[t]he court may, on motion, grant a new trial on all or some of the issues – and to any party…after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). "A motion for a new trial, pursuant to Rule 59, may be granted when the district court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Tesser v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 190 F. Supp. 2d 430, 440 (E.D.N.Y. 2002) (citation and quotation marks omitted). Put another way, "[a] new trial may be granted…when the jury's verdict is against the weight of the evidence." DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1988). This standard is

"less stringent…than [the standard under] Rule 50 in two significant respects: (1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." Manley v. AmBase Corp., 337 F.3d 237, 244-45 (2d Cir. 2003) (citation and quotation marks omitted). "Accordingly, it is appropriate to grant a new trial where the jury's verdict is against the weight of the evidence or otherwise manifestly erroneous." Rasanen v. Brown, 841 F. Supp. 2d 687, 697 (E.D.N.Y. 2012); see also Manley, 337 F.3d at 246.

## POINT I

### PLAINTIFF'S TESTIMONY FAILED TO ESTABLISH THAT OFFICERS SOLOMITO OR LAGRANDIER WERE PERSONALLY INVOLVED IN ANY USE OF EXCESSIVE FORCE

Officers LaGrandier and Solomito are entitled to judgment as a matter of law pursuant to Fed. R. Civ. P. 50 because plaintiff failed to present legally sufficient evidence that Officer Solomito or Officer LaGrandier were personally involved in any use of excessive force against him. A police officer is personally involved in a use of excessive force if he either (1) directly participates in an assault; or (2) was present during the assault, but did not intervene on behalf of the victim even though he had a reasonable opportunity to do so. See, e.g., Jeffreys v. Rossi, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003); Corley v. Nabeel Shahih, 89 F. Supp. 3d 518, 523 (E.D.N.Y. 2015). The two theories of personal involvement – direct participation and failure to intervene – should not be treated as interchangeable. See Walker v. City of New York, 2014 U.S. Dist. LEXIS 197314, FN11 (E.D.N.Y. 2014); Jackson v. City of New York, 939 F. Supp. 2d 219, 232 (E.D.N.Y. 2013) ("The Court has already concluded [that the two officers] both may

- 5 -

be held liable under a theory of direct participation, therefore neither would be held liable for failure to intervene.").

Plaintiff's testimony at trial fails to establish that either Officer Solomito or Officer LaGrandier directly participated in any use of force against him. Plaintiff's testimony shows that he was not subjected to any excessive force before he was punched by Officer Yurkiw. Plaintiff's direct testimony about what force was used after Officer Yurkiw punched him is very sparse and only consists of a handful of vague sentences: "[ ] they continuously beat me in front of my son" (Lulich Decl, Ex. B at 481: 4-5); "I remember all kind of blows coming from everywhere" (Id. at 481: 20-21); "I just, like I said, I curled up so I couldn't tell exactly who was throwing the extra blows at the time" (Id. at 481: 21-22); "They beat me really bad in front of my son" (Id. at 484: 21-22).

Even viewing this testimony in the light most favorable to plaintiff, it fails to establish who struck plaintiff after Officer Yurkiw. Plaintiff testified that Officers Solomito and LaGrandier were in his vicinity before he was allegedly struck by Officer Yurkiw; whether they remained after he was struck is unclear from the testimony. Furthermore, plaintiff did not state who hit him between being taken to the elevator and reaching the lobby. Accordingly, the "they" who plaintiff alleges beat him could refer to any combination of two or three of the officers; indeed, it could even have been only one officer, as plaintiff himself testified that he "couldn't tell exactly who was throwing the extra blows." (Id. at 481: 21-22.) Accordingly, to find that Officers Solomito and LaGrandier *directly participated* in any use of excessive force amounts to the sort of "sheer surmise or conjecture" that Rule 50 prohibits. See Walker, 2014 U.S. Dist. LEXIS at 15.

Moreover, plaintiff cannot fall back on a failure to intervene theory of personal involvement to salvage his testimony.  Plaintiff did not make a timely failure to intervene claim, and the Court expressly refused to issue such a charge to the jury.  (Lulich Decl, Ex. C at 676: 2-4.)  It would be inconsistent with that decision and unfair to defendants to now permit plaintiff to argue that Officers Solomito and LaGrandier were personally involved merely because they did not intervene on behalf of plaintiff, particularly since that would require an unproven assumption that they had a reasonable opportunity to do so under the circumstances.

## POINT II

### THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THE JURY'S FINDING THAT PLAINTIFF WAS SUBJECTED TO EXCESSIVE FORCE BY OFFICERS SOLOMITO AND LAGRANDIER OR THAT PUNITIVE DAMAGES SHOULD BE AWARDED AGAINST ANY DEFENDANT

For the reasons described in Point I, *supra*, defendants are at least entitled to a new trial pursuant to Fed. R. Civ. P. 59.  At the very least, the Court must set aside the punitive damages in their entirety.  The only scenario in which Officers Solomito and LaGrandier can be liable for excessive force is if the jury believed they punched and kicked plaintiff multiple times as he lay curled up on the floor or as they took him from the hallway to the lobby of the building.  However, there is no documented injury to support such a finding.  Rather, the medical records and the medical witnesses' testimony directly and irrefutably contradict plaintiff's story.  The jury's finding was accordingly wholly against the weight of the evidence submitted at trial.

Indeed, Your Honor instructed the jury that they could only find for plaintiff if he established that one or more of the defendants committed an act or acts *alleged by plaintiff*.  (Lulich Decl., Ex. D at 753:16-17.)  A jury's verdict cannot be speculative.  "The jury's role as the finder of fact does not entitle it to return a verdict based only on confusion, speculation or

prejudice; its verdict must be reasonably based on evidence presented at trial." Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1042 (2d Cir. 1976). It must be based on the evidence presented and reasonable conclusions to be drawn therefrom. Turner v. White, 443 F. Supp. 2d 288, 297 (E.D.N.Y. 2006) (citing Schneider v. Kings Highway Hosp. Ctr., Inc., 67 N.Y. 2d 743, 744 (1986). The jury could not have reasonably concluded that plaintiff was assaulted as he alleged in light of the complete lack of corroborating injuries, and thus could not have found that plaintiff met his burden of proving his case.

When "undisputed medical records directly and irrefutably contradict a plaintiff's description of his injuries attributed to an alleged use of excessive force, no reasonable jury could credit plaintiff's account of the happening." Henry v. Brown, 2016 U.S. Dist. 69930, *5 (E.D.N.Y 2016) (citations and quotation marks omitted) (quoting Davis v. Klein, 2013 U.S. Dist. LEXIS 153469, at *4 (S.D.N.Y. 2013); see also, Jenkins v. Town of Greenburgh, 2016 U.S. Dist. LEXIS 5362, at *17 (S.D.N.Y. 2016); Blackwell v. Town of Greenburgh, 2017 U.S. Dist. LEXIS 44404, at *26-*27 (S.D.N.Y. 2017); see also, Jeffreys v. Rossi, 275 F. Supp. 2d 463, 475 (S.D.N.Y. 2003) (finding plaintiff's testimony was so replete with inconsistencies and improbabilities that a reasonable jury could not find that excessive force was used), aff'd Jeffreys v. City of New York, 426 F.3d 549, 550 (2d Cir. 2005).

Plaintiff specifically attributed the injuries to his nose and eye to the first two punches thrown by Officer Yurkiw:

> Q: When the first blow landed, what part of your face did it make contact with?
> A: With the first blow it landed right on my face in my eye area here.
> Q: On the right side?
> A: Right here. Then he, then it was like a bing-boom. It came on this side, *that's where you see the damage from my face and eye.*

(Lulich Decl., Ex. B at 481: 6-13.)

Similarly, the first medical provider to encounter plaintiff was EMT Noel, who transported plaintiff from the precinct to Woodhull Hospital. Plaintiff testified that told the EMTs "everything that was wrong with me." (Id. at 612: 15-25; 613: 1-8; 615: 20-21; 616: 8.) However, the only injuries documented in the Prehospital Care Report Summary completed by EMT Noel are a black eye, swelling to the right orbit, and deformity to the nose with minor bleeding. (Lulich Decl., Ex. E.) No loss of consciousness or dizziness was noted, and the report summary reflects a "non-critical injury." (Id.) EMT Noel further testified that she based the information in her report on what plaintiff told her, and if she had seen any other injuries she would have documented them. (Lulich Decl., Ex. C at 647: 5-14, 649: 2-5.) There is thus no supporting evidence for plaintiff's claim that he told the EMT his body hurt, or that he had any injury other than those he testified were caused by Officer Yurkiw.

Plaintiff testified that at Woodhull Hospital, he was in pain and told medical staff "everything was wrong" with him. (Lulich Decl, Ex. B at 487:13-15; Lulich Decl., Ex. C at 619:18; 621: 11-12.) The records show that there were no bruises, lacerations, or abrasions to plaintiff's skin, and an exam of his midline cervical, thoracic, and lumbar spine revealed no tenderness. (Lulich Decl., Ex. F at DEF 48.) A head CT scan showed no injuries to the bones in plaintiff's face, jaw, or eyes. (Id. at DEF 59.) Ultimately, plaintiff was only diagnosed with two injuries at Woodhull Hospital – a hematoma to the right orbit, and a nasal fracture with swelling. (Id. at DEF 45.) Plaintiff specifically testified that these injuries were caused when Officer Yurkiw punched him in the face. Accordingly, if the plaintiff's testimony is to be believed, he was viciously pummeled to the point where he passed out – yet suffered only some swelling to the side of his head as a result, with no injuries to any other part of his body. Such a result is

completely improbable, and the medical records thus directly refute plaintiff's testimony concerning what happened after he was first punched by Officer Yurkiw.

Plaintiff was seen by additional medical providers on Rikers Island, and their assessments and diagnoses further undermine his testimony. On April 25, 2014, plaintiff was treated by a Physician's Assistant and Dr. Flores. Plaintiff did not complain to either provider about any pain or injury except in his nose and eye. (Lulich Decl., Ex. G at DEF 650, 656.) A very extensive physical examination on April 25 of plaintiff's entire body revealed no bruising, swelling, discoloration, or other injury except for his nose and eye. (Id. at DEF 657 – 659.) Dr. Flores further testified that plaintiff had ecchymosis only in a localized area around his right periorbital area and some swelling over the bridge of his nose; there was no ecchymosis or other visible injury anywhere else on his face. (Lulich Decl., Ex. C at 562: 25; 563: 1-2, 9-10; Lulich Decl., Ex. G at 652 –653.) In fact, the only injuries Dr. Flores diagnosed were a contusion to the eye and a closed fracture of the nasal bone. (Lulich Decl., Ex. C at 573:04-09.) Neither the Rikers medical records nor plaintiff's behavior are at all consistent with someone who was savagely beaten into unconsciousness. Rather, they show the only injury plaintiff proved he suffered was caused when he was punched by Officer Yurkiw. There is no evidence to find that plaintiff proved that he had any other injuries, nor any injuries caused by Officers LaGrandier or Solomito.

The last time plaintiff sought medical treatment was on May 3, 2014 at Brookdale Hospital, and he again only complained of pain to his nose. (Lulich Decl., Ex. H at 27.) Plaintiff then missed, and never rescheduled, an appointment with a specialist because he went "down south" instead. (Lulich Decl., Ex. C at 632:08-12.) Ultimately, the medical records directly and irrefutably contradict plaintiff's testimony that he was brutally beaten after he fell to the floor. It

is entirely against the weight of the evidence and manifestly erroneous to find that any officer punched, kicked, or pummeled plaintiff after he was punched by Officer Yurkiw.  No reasonable jury could credit plaintiff's account of what happened in light of the irrefutable contradictions present between his testimony and in the extensive medical records and testimony that were presented at trial.  The jury's verdict and responses to the Special Interrogatories for the purposes of making a Qualified Immunity determination are seriously erroneous, and must be set aside.

Even if the Court were to find a new trial was not warranted, the punitive damages awards against Officers Yurkiw, LaGrandier and Solomito must be vacated because there is no evidence upon which a jury could find that plaintiff proved punitive damages against them.  As Your Honor instructed the jury, "[t]o recover punitive damages, plaintiff must prove by a preponderance of the evidence that one or more of the defendants acted maliciously or wantonly with regard to his rights."  (Lulich Decl., Ex. D at 764:02-05.)  This means that each defendant against whom punitive damages were awarded must have "acted with malicious intent to violate the plaintiff's rights or injure him unlawfully" or "acted with callous or reckless disregard of the plaintiff's rights."  (Id. at 764:06-10.)   Here, plaintiff did not prove that the defendants acted with actual malice or reckless indifference to his civil rights, i.e., with a malicious or reckless state of mind.  Plaintiff elicited considerable testimony about the officers' size relative to plaintiff's size to create the impression that Officers Yurkiw and Solomito could inflict substantial physical injury on plaintiff.  However, the medical records reflect only a black eye and broken nose, with no bruising, abrasions, or other injury to the rest of his body.  In fact, plaintiff testified that he was working out and doing calisthenics within a week of the injury, and that the swelling and bruising was substantially healed by May 2, 2014. (Lulich Decl. Ex. C at 630:03-13 & 631:03-18.)  Plaintiff did not allege emotional damages.  For the reasons described

above, including the lack of evidence that any force was used, or any injuries caused, by anyone

other than Officer Yurkiw, a reasonable jury could not have found that defendants acted

maliciously or wantonly in using excessive force against plaintiff, thus, the punitive damages

award against them cannot stand.

### POINT III

### PLAINTIFF'S COUNSEL'S DELIBERATE MISCONDUCT CAUSED A SERIOUSLY ERRONEOUS VERDICT

The Court should order a new trial in this matter under Rule 59(a) of the Federal Rules

because plaintiff's counsel's deliberate misconduct caused a seriously erroneous result and a

miscarriage of justice.  "[A] court addressing a motion for a new trial based on trial counsel's

misconduct must consider such a claim in the context of the trial as a whole, examining, among

other things, the totality of the circumstances, including the nature of the comments, their

frequency, their possible relevancy to the real issues before the jury, and the manner in which the

parties and the court treated the comments."  Morse v. Fusto, No. 07-CV-4793 (CBA) (RML),

2013 U.S. Dist. LEXIS 123823, **47-48 (E.D.N.Y. Aug. 27, 2013) (citing Claudio v. Mattituck-

Cutchogue Union Free Sch. Dist., No. 09-CV-5251 (JFB) (AKT), 2013 U.S. Dist. LEXIS

105040 (E.D.N.Y. July 24, 2013)) (internal quotation marks omitted); see also Levitant v. N.YC.

Human Res. Admin., 914 F. Supp. 2d 281, 311 (E.D.N.Y. 2012); In re Fosamax Prods. Liab.

Litig., 742 F. Supp. 2d 460, 477 (S.D.N.Y. 2010).

From the very start of trial, in the opening, plaintiff's counsel engaged in inflammatory

argument stating, for example, "[t]he evidence will show that the defendants made a conscious

decision not to tell the truth about what happened here… They will take the stand and they will

claim ignorance.  They will mislead you…"  (Lulich Decl., Ex. A at 22:20 – 23:03.) Among

other things, counsel argued that "[o]n April 23rd of 2014, our client Mr. Jennings, was in the

middle of a very contentious battle with the mother of his child, complete with lots of ill-will and lots of hurt feelings and accusations flying around between the two exes, accusations that we won't get into in this trial so as not to waste your time." (Id. at 23:12-17.)  She blatantly ignored the Court's *in limine* rulings and made statements the Court had previously ruled would be inadmissible.  So much so that the Court directed the parties to a sidebar where Judge Gold indicated, "[w]e had a lot of discussion prior to the trial about the nature of the relationship between the two people and whether we were going to get into the history of the domestic violence allegation, and I am telling you that you are getting very close to opening the door to it.  This case is about the police response.  You have not even gotten to any – you have been opening for 15 minutes and you have not even mentioned the police yet." (Id. at 26:02-09.)  Plaintiff's counsel had indeed opened the door, but defendants were not permitted to testify at any point in the trial concerning what they knew about the plaintiff and his relationship with the mother of his child, a fact that impacted their conduct at the scene, and consequently were seriously prejudiced.

Second, plaintiff's counsel repeatedly asked the defendant officers inflammatory questions without a good faith basis for doing so.  While the Court sustained objections to these questions on most occasions, the damage was done when the question was posed in front of the jury.  For example, plaintiff's counsel implied that Officer Yurkiw was "afraid of the population that he police[s]", and that NYPD "wasn't [his] "first choice" of job. (Id. at 100:05-24.)  This line of questioning was particularly problematic because plaintiff sought, and received, a ruling that precluded Officer Yurkiw from testifying that he was proud of his family history of NYPD service, which was part of the reason he joined the NYPD.  (Lulich Decl., Ex. J at 32.)  Plaintiff's counsel further questioned Officer Yurkiw on the idea that NYPD policy required

officers to report any arrestee injury to supervisors or IAB, violating the Court's Motion *in limine* decision against referencing NYPD rules and regulations and incorrectly characterizing NYPD policy at the time. (Lulich Decl., Ex. A at 100:05-24; 151:11-155:02.)   In addition, plaintiff's counsel questioned Officer Yurkiw about probable cause to detain plaintiff at the building prior to his arrest, leading up to a question about how there was no "probable cause" to detain plaintiff. (Id. at 218:19-220:07.)  This line of questioning was clearly out of bounds given there was no false arrest claim to be tried. It was particularly egregious questioning because plaintiff never claimed he was detained prior to his arrest; rather, he testified at his deposition that he did not leave the hallway because he wanted to stay and see what was going to happen to Ms. Henry.   Additionally, plaintiff's counsel asserted that Officer Solomito kicked Officer Yurkiw in the head, causing his head injury, and repeatedly insisted that Officer Solomito had a fracture in his ankle prior to April 23, 2014, going so far as to assert the medically-incorrect premise that "once you have a fracture, you always have it, right? It's still there." (Lulich Decl, Ex. B at 244:01-249:10, 250:07-251:09, 289:12-19.)  There was no basis in the record for either contention.  Further, plaintiff's counsel asked Officer LaGrandier a question about why she went to the scene of plaintiff's 911 call, and then objected to Officer LaGrandier's response and angrily called for the officer to "be admonished not to violate [the Court's] Order" *despite the fact that Officer LaGrandier had simply tried to accurately answer the question posed by counsel*. (Lulich Decl., Ex. B at 377:01-09.) Finally, plaintiff's counsel stated that Sgt. Brown was "distracted" at the scene because Daquanna Henry was "an attractive woman."  (Lulich Decl, Ex. B at 435:05-16.)  These inflammatory, prejudicial, and offensive lines of questioning were fabricated by plaintiff without any support in the evidentiary record. However, despite sustained objections, it is highly likely that the jury believed counsel had some basis for asking

the questions, assumed there was some truth to them, and factored these fabrications by counsel into their assessment of the defendants' credibility, depriving them of a fair trial.

Plaintiff's counsel also made unsupported assertions in summation, arguing that plaintiff was not unconscious, as he had testified, but rather "concussed", although none of the medical records admitted into evidence remotely supported such an assertion. (Lulich Decl., Ex. C at 701:09-19.) Further, counsel speculated that Officer Yurkiw's motive for punching plaintiff was that plaintiff was a "wife-beater." (Id. at 702:19-25.) Apart from being spectacularly inflammatory, this assertion was without any basis in the record. Rather, it was contradicted by plaintiff's deposition testimony that there were no allegations that plaintiff had physically abused Daquanna Henry on or before April 23, 2014. Plaintiff was accused of violating an order of protection by his mere presence at the building. The existing order of protection was not related to allegations of physical abuse of Ms. Henry, but rather charges arising out of the contentious custody proceedings. Plaintiff unfairly sought to capitalize on the Court's rulings precluding defendants from introducing evidence relating to the contentious relationship between plaintiff and Ms. Henry and his arrests/contempt convictions for violating orders of protection. When the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict, a new trial should be granted. Pappas v. Middle Earth Condo Ass'n, 963 F.2d 534, 540 (2d Cir. 1992); see also Hopson v. Riverbay Corp., 190 F.R.D. 114, 118 (S.D.N.Y. 1999).

Similarly, plaintiff's counsel repeatedly made themselves "unsworn witnesses" by impermissibly inserting their own interpretations of facts, evidence, and testimony throughout the trial, often misrepresenting prior testimony or evidence. Again, this behavior was done with such frequency there can be no doubt the jury was influenced by counsel's improper comments. For example, in questioning Officer Solomito, counsel said that Officer Yurkiw had testified

earlier in the trial that Ms. Henry struck plaintiff. (Lulich Decl., Ex. B at 269:18-23.) Officer

Yurkiw did not testify to that. (Lulich Decl., Ex. A at 52 – 218.) Rather than asking questions of

the defendant, counsel simply told the jury what they should believe without evidence or basis in

the record. Additionally, in response to the Court's instruction that plaintiff's witness Dr. Flores

could not testify as to his opinion because he was not called as an expert, plaintiff's counsel

retorted, in front of the jury, "he's an expert, but not an expert in this case." (Lulich Decl., Ex. C

at 561:10 – 562:04.) Dr. Flores had already given an "opinion," prior to defendants' objection,

so this comment was particularly prejudicial.

Further, counsel blatantly testified as to her own, demonstrably false, interpretation of

Officer LaGrandier's deposition testimony:

> Rameau:        So you just testified that Officer Yurkiw was defending himself?
> LaGrandier:   Yes.
> Rameau:        That runs completely contrary to your deposition transcript where you said
>                      you knew nothing

(Lulich Decl., Ex. B at 419:22 – 420:01.) This was improper both because it was a

statement of counsel's own opinion, rather than a question to the witness, and because Officer

LaGrandier's deposition testimony was consistent with her assertion that Officer Yurkiw was

defending himself. (Id. at 421:20 – 422:08.) Shortly thereafter, counsel testified:

> Rameau:        So you saw him sprinting backwards, right?
> LaGrandier:   I don't think you can sprint backwards.
> Rameau:        *You can't. It's not possible, right?*

(Id. at 421:06-11) (emphasis added). Again, counsel's response to the witness set forth

her own opinion rather than eliciting testimony from the witness.

Most notably, the entire direct examination of plaintiff was done through leading

questions, resulting in an "examination" entirely reflective of his lawyer's, rather than his own,

testimony. (Lulich Decl., Ex. B at 460 – 493.) Plaintiff's attorneys usurped the role of the jury

as arbiters of the evidence, and of plaintiff as witness, consistently throughout the trial, and made it impossible for the jury to fairly assess the credibility of the witnesses. "Where the number and gravity of counsel's improprieties reach the level presented by this record, the admonitions by the trial judge in the charge and in response to specific objections cannot possibly serve to cure all the prejudice." Hopson, 190 F.R.D. at 122-23 (quoting Koufakis v. Carvel, 425 F.2d 892, 904 (2d Cir. 1999).

Additionally, plaintiff's counsel's use of the video screen exposed the jury to information and documents that were not properly admitted to the record. Plaintiff unilaterally arranged for a large video screen to be placed in front of the jury box during lunch on the first day of trial. (Lulich Decl., Ex. A at 221:05-25.) The screen was connected directly to the laptop of plaintiff's counsel's paralegal, and, when on, showed whatever was visible on the screen of the laptop. It became apparent as the trial progressed that the laptop was not being used solely to display the exhibits that had been admitted by the Court. As a result, on numerous occasions, the screen displayed other documents that had not been, and would not be, entered into evidence, notes, and copies of documents that had been highlighted or written upon, presumably by plaintiff's attorney. (See, e.g., Lulich Decl, Ex. B at 292, 296, & 365.) The placement of the screen was such that defendants' counsel could not see it without walking across the room and standing near the jury. However, the screen was directly in front of the jury. Therefore, the jury saw at least some of the documents that were not admitted into evidence and were influenced by their contents.

Plaintiff's counsels' unfair practices prevented defendants from receiving a fair trial, which can only be described as a seriously erroneous result and a miscarriage of justice. Thus, a new trial is warranted under Rule 59(a) of the Federal Rules.

## POINT IV

## SEVERAL OF THE COURT'S RULINGS CAUSED A SERIOUSLY ERRONEOUS RESULT AND A MISCARRIAGE OF JUSTICE

In addition to the misconduct by plaintiff's counsel noted above, the following rulings by the Court resulted in a seriously erroneous result and a miscarriage of justice: (1) the decisions as to admissibility of evidence and testimony regarding the circumstances of plaintiff's arrest; (2) the denial of defendants' motion to allow cross-examination of plaintiff about his convictions for resisting arrest and criminal contempt after he opened the door; and (3) the decisions allowing plaintiff to disregard the JPTO and witness list by adding new witnesses at the 11th hour, calling new witnesses in the middle of defendants' and plaintiff's testimony, and allowing a doctor to testify by telephone. Thus, a new trial is warranted under Rule 59(a) of the Federal Rules of Civil Procedure.

### A. The Inconsistent Rulings Regarding Admissibility of the Circumstances of Plaintiff's Arrest Led to a Seriously Erroneous Verdict

At the final pre-trial conference, the Court limited testimony about the circumstances of plaintiff's arrest to the interactions between the defendants and plaintiff, including the facts known to the defendants on the scene, leading up to the alleged use of force.  (Lulich Decl., Ex. J at 24:07 – 28:22.) The Court further ruled that Officer LaGrandier could testify that she knew the plaintiff and Daquanna Henry because she had been involved in prior incidents involving the individuals in her role as a Domestic Violence Officer. (Id.) However, the Court found that any discussion of the previous incidents, complaints, or allegations made by plaintiff and Daquanna Henry against each other was inadmissible, including plaintiff's three prior convictions for criminal contempt for violating the same order of protection he was alleged to be violating during the incident at issue. (Id. at 12:08 – 15:19.)

- 18 -

Once the trial began, the Court revised or clarified the intent of its earlier ruling regarding Officer LaGrandier's reason for going to the scene of arrest, preventing the officers from testifying that they were aware of the order of protection before they even arrived on the scene because they spoke to Officer LaGrandier *en route*, preventing Officer LaGrandier from testifying what her responsibilities were as a Domestic Violence Officer, and preventing her from explaining why she went to the scene of the 911 call in the first place. (Lulich Decl., Ex. A at 48:14 – 51:01, 166:14-167:06; Lulich Decl., Ex. B at 377:07-19, 410:22-25, & 411:16-19.) The preclusion of this testimony was prejudicial to defendants because it prevented them from giving the jury a clear picture of what they knew while they were interacting with plaintiff. This was particularly damaging to Officer LaGrandier, who could not even provide general background about her job or the context of her response to the jury. In addition, plaintiff's counsel asked Officer Yurkiw questions about Officer LaGrandier's presence on scene that were calculated to raise suspicion about why she was there and the interaction between the officers. (Lulich Decl., Ex. A at 216:07-12; Lulich Decl., Ex. B at 377:01-19.) Notwithstanding, defendants were never able to provide a complete picture about Officer LaGrandier's role to the jury. In contrast, plaintiff was permitted to testify extensively regarding irrelevant pedigree and background information about himself, (Lulich Decl., Ex. B at 460:17 – 472:24), including irrelevant and inflammatory testimony about his devotion to his son. Yet, Officer LaGrandier was prevented from adequately describing her role and from providing any glimpse into who she was as a Domestic Violence Officer.

As the trial progressed, defendants were consistently precluded from questioning the defendants and plaintiff about the order of protection for which he was arrested. This was particularly important because plaintiff's counsel was allowed to question the defendant officers

and plaintiff about the order of protection and the purported "modification"[3] to the order of protection in much greater detail, to question plaintiff about the events prior to the police officers' arrival at 1560 Fulton Street, and to question the officers about the arrest and prosecution and thereby imply that there was no probable cause to arrest plaintiff.  (Lulich Decl., Ex. A at 100:25 – 101:14, 108:25 – 116:19, 121:03-18, 126:13 – 129:15, 205:05 – 206:22, 215:22 – 216:06, 216:07-16, & 218:19 – 220:11; Lulich Decl., Ex. B at 269:09 – 271:06, 273:21-24, 276:07-09, 278:14 – 279:08, 280:15-21, 231:08 – 324:01, 366:21-24, 368:15 – 370:03, 373:03-18, 375:03-25, 376:16-25, 379:10-13, 394:03 – 395:04, 465:22 – 466:18, 467:09 – 468:07, 472:03 – 473:20, & 479:05-19.)  Conversely, the Court stopped defense counsel from questioning the defendants about the order of protection and circumstances of the arrest on direct examination. (Lulich Decl., Ex. A at 169:15 – 170:21 & 173:04 – 174:03; Lulich Decl., Ex. B at 303:20 – 304:03, 304:18 – 305:11, 305:17-22, 411:16-17, & 447:20 – 448:07.)  The sheer number of pages of testimony regarding the order of protection during the cross of defendants versus the direct of defendants is instructive as to this point.   As a result, defendants were not able to refute the incorrect assumptions arising out of plaintiff's counsel's line of questioning on these topics. This was particularly prejudicial because plaintiff's counsel made misleading arguments that were possible only because certain evidence had been excluded.  For example, plaintiff's counsel opened and closed on the idea that plaintiff called 911 for help and was instead "attacked" by the officers, thus making relevant the specific circumstances leading up to plaintiff's arrest.  (Lulich Decl., Ex. A at 29:06-30:05.)

---

[3] Which was simply a Family Court Order awarding joint custody and stating that "physical custody of the child will be determined by the parties outside of Court."

Further, plaintiff had voluntarily withdrawn his false arrest claim prior to trial. Despite defendants' requests, the Court would not instruct the jury that plaintiff's arrest was lawful. Instead, the Court advised the jury that the arrest was not at issue in this trial. However, merely advising the jury that the arrest was not at issue simply increased the potential for the jury to assume that plaintiff was falsely arrested by the defendant officers. That, coupled with the Court's repeated instructions that the charges were dismissed, surely raised the spectre of a false arrest even though there was no false arrest claim in the case.

Similarly, the Court denied defendants' motion to allow Officer Yurkiw to testify to certain probative statements made by plaintiff prior to his arrest, including plaintiff's statements "I can't go back to Rikers" and "I have too much beef there", and that there was some discussion between Officer Yurkiw and plaintiff about plaintiff's prior incarcerations for violating the order of protection. (Lulich Decl., Ex. J at 9:09 – 15:25.) The Court sanitized the actual record and directed Officer Yurkiw to testify that plaintiff said "I can't go [ ] to Rikers", requiring Officer Yurkiw to alter his testimony about what was said between plaintiff and himself leading up to the use of force that was at issue, and denying the jury the opportunity to hear actual facts. (Id.) This put Officer Yurkiw at a disadvantage because, pursuant to the Court's ruling, he was required to edit his testimony notwithstanding the fact that the jury was assessing his credibility as he testified. In fact, the jury's assessment of the credibility of Officer Yurkiw was of paramount importance in this trial, but Officer Yurkiw was not able to fully testify as to his conversation with plaintiff in the hallway. It is highly likely that the jury discounted his credibility as a result. Plaintiff's counsel also capitalized on this disadvantage, placing a great deal of emphasis on Officer Yurkiw's necessarily disjointed description of the conversation by insisting that the Officer intended to link the statement "I can't go to Riker's" with a crown tattoo that plaintiff

had below his eye.  (Lulich Decl., Ex. A at 173:15-20, 199:16 – 201:06, & 204:14—205:03.) The reality is that those were the only two parts of the discussion Officer Yurkiw was permitted to describe.  Officer Yurkiw's attempts to adhere to the Court's rulings unfairly undermined his credibility.

As the Court itself observed "[w]e can't have it both ways.  We're either going to have to tell the jury the whole story of what happened… and the whole story has to come out or we're going to have to craft a cabined version of the events that leaves out the prior interactions, the prior knowledge, and just focuses on, we approached, the plaintiff did this, we reacted this way, the force we used was reasonable." (Lulich Decl., Ex. J at 4:21 – 5:13.) "If you want the whole history… if you want to tell the whole story, we'll tell the whole story, but it's going to open the door to the prior interactions and how they worked out for the plaintiff.  I can't do it both ways… I'm not going to let you tell half the story.  You can either tell the story of the day of what happened or you can tell the whole story, but you can't tell the pieces of the story that you like." (Id. at 27:02-14)  However, as described above, and in Point IV(B), *infra*, plaintiff's counsel siphoned out those pieces of the story that they wanted the jury to hear.  Plaintiff repeatedly opened the door by introducing testimony about the order of protection, the family court order, his habit of picking his son up at Ms. Henry's home, and his own 911 call and allegations that Ms. Henry had hit him on the head.  Notwithstanding, defendants were not allowed to introduce testimony about their knowledge of the history between Ms. Henry and plaintiff, and plaintiff's related past arrests and convictions.  This was manifestly prejudicial to defendants, and resulted in a seriously erroneous jury verdict.

### B. Defendants Were Not Allowed to Introduce Evidence Directly Contradicting Plaintiff's Testimony that He Would "Never Put His Hands on a Police Officer"

In deciding the motions *in limine*, the Court ruled that defendants could not cross plaintiff on any prior criminal convictions, including his three convictions for criminal contempt and one conviction for resisting arrest. (Lulich Decl., Ex. J at 9:09-15:25.) During his direct examination, plaintiff was asked whether he threw any punches at any police officer, and plaintiff responded "I never would, never put my hands on a police officer.  My father was a cop; I would not, I would not do that." (Lulich Decl., Ex. B at 483:05-07.) Thereafter, the Court denied defendants' motion to cross plaintiff on his convictions for resisting arrest and criminal contempt. (Id. at 490:14 – 25, & 497:06 – 499:09.) The convictions go to veracity as they directly contradict plaintiff's testimony.  Plaintiff did, in fact, "put his hands on" an officer, and he admitted doing so by pleading guilty to resisting arrest.  Even if the facts of the previous convictions did not directly contradict the testimony, plaintiff's statement that he "would never put his hands on a cop" because his "father was a cop" was calculated to demonstrate to the jury that plaintiff has a high level of respect for law enforcement.  This testimony is belied by his convictions for resisting arrest and criminal contempt, but defendants were not allowed to put this evidence before the jury. The prejudice was compounded by plaintiff's arguments in summation that it was ridiculous to think that plaintiff would go to Ms. Henry's home with an order of protection in place, or that he would try to flee arrest.  (Lulich Decl., Ex. C at 718:15 – 719:12.)  However, plaintiff *had violated the order of protection on three previous occasions* and *had attempted to actively avoid a previous arrest*.  In and of itself, this denial of defendants' motion to cross plaintiff on the resisting arrest and criminal contempt convictions contributed to a miscarriage of justice.  Plaintiff's denial of punching Officer Yurkiw and fleeing goes to the

absolute heart of the issue at trial – plaintiff's credibility and plaintiff's denial that he punched or attempted to flee from the officers.

### C. Permitting Plaintiff to Deviate from the Joint Pre-Trial Order and to Disregard Court Orders Allowed Plaintiff's Counsel's Impermissible Gamesmanship

Prior to trial, the parties filed a JPTO, including a witness list. Thereafter, on May 21, 2018, the Court directed plaintiff to file a revised witness list narrowing the lengthy list in the JPTO. At a telephone conference on May 23, 2018, plaintiff's counsel told the Court that the witness list contained in her letter dated May 22, 2018 was final, and that she understood no other witnesses could be called by plaintiff. Notwithstanding, in the middle of trial, on May 30, 2018, plaintiff's counsel told the Court that plaintiff's mother, Dedria Jennings, who was not on the May 22nd witness list, was present to testify. (Lulich Decl., Ex. B at 231:12 – 234:08.) Over defendants' objections, the Court allowed this witness to be added, and provided the defendants with the opportunity to depose Ms. Jennings that evening. (Id.) Defendants spent the evening of May 30, 2018 deposing Ms. Jennings. The next morning, plaintiff's counsel told the Court that Ms. Jennings would not be called as a witness after all. (Lulich Decl., Ex. C at 551:13 – 18.)

Similiarly, plaintiff's counsel's witness list did not include Sergeant Sean Brown, and defendants planned to call him during their case-in-chief. On May 30th, in the middle of trial, plaintiff called Sgt. Brown as a witness. (Lulich Decl., Ex. B at 425:05 – 426:25.) The Court allowed plaintiff to do so over defendants' objections. (Id.) Also on May 30th, plaintiff's counsel represented to the Court that they would call Ms. Jennings, several doctors, non-party Detective Pelocka Binns, and Norbert Cox the next day, and agreed with the Court's assertion that it was likely summations would take place on Friday. (Id. at 535:24 – 539:06.) Defendants spent the evening, in part, deposing Ms. Jennings and preparing for the witnesses to be called the next day. However, the next morning, plaintiff's counsel stated that they would not be calling Ms.

Jennings or Mr. Cox, and that they recognized that meant summations would likely happen that afternoon. (Lulich Decl., at Ex. C at 549:24 – 551:23.) Notwithstanding their objections, the Court directed defendants to sum up with two hours' notice. (Id. at 678.) Defendants were prejudiced in that plaintiff's counsel were permitted to vacillate about whether or not to call witnesses during trial, and engaged in gamesmanship by providing misleading information about the timing of plaintiff's case to their advantage.[4]

Defendants were further prejudiced by the Court's decision to allow Dr. Matari to testify by telephone, over defendants' objections. (Lulich Decl., Ex. C at 240:01-19, 330:02 – 331:12.) The testimony by telephone was problematic in part because defendants were deprived of the opportunity to question him in person. Most importantly, however, Dr. Matari testified on a speakerphone placed under a microphone about four feet from the jury. As a result, Dr. Matari could not hear the Court's rulings on objections. (Id. at 339:14 – 340:03, 341:21 – 342:14.) On several occasions, he was asked improper questions that he was directed not to answer. (Id.) However, he could not hear the objection or Court's decision, and both times talked at length in response, while the Court and counsel attempted to stop him. (Id.) The doctor's responses are not memorialized in the transcript because the court reporter was transcribing the Court's and counsel's statements during that time. (Id.) Thus, although it is clear that Dr. Matari opined at length regarding his opinion of the cause of plaintiff's injury, his exact testimony is lost. Given the proximity of the telephone to the jury, it is inconceivable that they did not hear at least some of the testimony, which should not have been admitted at all.

---

[4] Defendants note that this is not the first time counsel has used this ploy. In Angela Hollins v. City of New York, 14-CV-6519 (WFK), plaintiff's counsel announced her intention to call an Emergency Medical Technician for the first time after trial began. After defense counsel deposed the EMT the next morning before proceedings started for the day, counsel decided not to call the EMT after all.

Finally, allowing plaintiff to call Dr. Flores between plaintiff's direct examination and cross examination allowed plaintiff to tailor his testimony during cross to fit Dr. Flores' testimony. Plaintiff's direct examination occurred on May 30th at the end of the day, and his cross was to begin the next morning. Instead, plaintiff's counsel asked to be allowed to call Dr. Flores first. Over defendants' objections, the Court allowed Dr. Flores to be called prior to plaintiff's cross. (Lulich Decl., Ex. C at 545.) As a result, plaintiff heard Dr. Flores' testimony that plaintiff had reported he had not lost consciousness, and walked back his assertions that he "blacked out" during the incident. (Lulich Decl., Ex. C at 605:12 – 607:07.) Similiarly, the Court allowed plaintiff to call Physician's Assistant Darryl Hercules in the middle of Officer LaGrandier's testimony, breaking up her cross examination. (Lulich Decl., Ex. B at 381.)

<u>**POINT V**</u>

**THE JURY'S DAMAGE AWARDS MUST BE EITHER SET ASIDE COMPLETELY AS NOT SUPPORTED BY THE RECORD, WARRANTING A NEW TRIAL, OR, ALTERNATIVELY, REMITTED BECAUSE THEY WERE INTRINSICALLY EXCESSIVE AND NOT WITHIN A REASONABLE RANGE OF COMPARABLE JURY VERDICTS**

Pursuant to Rule 59(e) of the Federal Rules, a court can grant a motion to alter or amend a judgment "to correct a clear error of law or prevent manifest injustice." <u>Guzman v. Jay</u>, 303 F.R.D. 186, 197 (S.D.N.Y. 2014) (quoting <u>Munafo v. Metropolitan Transp. Auth.</u>, 381 F.3d 99, 105 (2d Cir. 2004)). Pursuant to this authority, the trial court is empowered to "enter a conditional order of remittitur, compelling a plaintiff to choose between reduction of an excessive verdict and a new trial." <u>Kirsch v. Fleet St. Ltd.</u>, 148 F.3d 149, 165 (2d Cir. 1998). Remittitur "is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." <u>Earl v. Bouchard Transp. Co.</u>, 917 F.2d 1320, 1328 (2nd Cir.

1990) quoting Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 49 (2d Cir. 1984). In

calculating a remittitur of an excessive jury award, a district court should remit the jury's award

to the maximum amount that would be upheld by the district as not excessive. See Earl, 917

F.2d at 1330.

"While calculating damages is traditionally the province of the jury, the Second Circuit

has held that an award can be amended or set aside as 'excessive'" in at least two circumstances:

> (1) where the court can identify an error that caused the jury to
> include in the verdict a quantifiable amount that should be stricken,
> . . . and (2) more generally, where the award is "intrinsically
> excessive" in the sense of being greater than the amount a
> reasonable jury could have awarded, although the surplus cannot
> be ascribed to a particular, quantifiable error.

Guzman, 303 F.R.D. at 197 (quoting Kirsch, 148 F. 3d at 165). See Newton v. City of N. Y.,

171 F. Supp. 3d 156, 164-165 (S.D.N.Y. 2016):

> Where there is no particular discernable error, [the Second Circuit
> has] generally held that a jury's damage award may not be set aside
> as excessive unless the award is so high as to shock the judicial
> conscience and constitute a denial of justice. A verdict shocks the
> judicial conscience only if it surpasses an upper limit, and whether
> that has been surpassed is not a question of fact with respect to
> which reasonable persons may differ, but a question of law. In
> making this determination, courts canvass the amounts awarded in
> comparable cases and determine whether the award falls within the
> reasonable range. The key is comparability: whether the
> counterpart cases involve analogous facts, similar measures of
> damages, and are otherwise fairly congruent. Further, in making a
> determination as to excessiveness, the court is free to weigh the
> evidence and need not view it in the light most favorable to the
> verdict winner.

(internal quotations and citations omitted).

The jury's verdict of $500,000 in compensatory damages, $1 million in punitive damages

against Officer Yurkiw, and $750,000 in punitive damages against each of Officers LaGrandier

and Solomito, for a total of $3 million dollars, is grossly excessive and should clearly "shock the

judicial conscience" of this Court. The amounts awarded as damages are untethered to the evidence presented at trial and well beyond any affirmed or sustained verdict in any comparable Section 1983 case with similar facts. The award must be substantially reduced.

### A. Compensatory Damages

In determining whether a compensatory damages award is excessive, the Court must consider the amounts awarded in other, comparable cases. <u>Mathie v. Fries</u>, 121 F.3d 808, 813 (2d Cir. 1997); <u>see also</u> <u>DiSorbo v. Hoy</u>, 343, F.3d 172, 183 (2d Cir. 2003); <u>Ismail v. Cohen</u>, 899 F.2d 183, 187 (2d Cir. 1990). Here, plaintiff's sole claim was excessive force, thus, he can only be compensated for the injuries stemming from the use of force. Plaintiff's compensable injuries are a broken nose and black eye that healed without surgical intervention. Given the compensable injuries, the jury's compensatory award of $500,000 dollars is a manifest injustice that shocks the judicial conscience. The verdict is unsustainable and cannot be justified based on any comparable case. A canvass of cases involving similar injury and similar force allegations in this Circuit demonstrates the unreasonableness of the award in this case.

The Second Circuit's decision in <u>DiSorbo</u> is particularly instructive as to both the process by which a reasonable damages award is determined and the unreasonableness of the jury's award at trial. In <u>DiSorbo</u>, plaintiff alleged an officer yanked her arm behind her back and handcuffed her. <u>Id</u>. at 176. She further alleged that, after arriving at the police station, she was pushed against a wall, grabbed around the throat, slammed against a wall and choked with such force that she was unable to breathe and began to lose vision. <u>Id</u>. at 177. She further alleged she was thrown to the ground and struck repeatedly. <u>Id</u>. Further, plaintiff's version of events included the fact that the officer (who was off duty) arrested and assaulted plaintiff because she resisted the officer's advances at a bar after 2:30 a.m. <u>Id</u>. at 176-178.

Ms. DiSorbo's injuries consisted of two large hematomas on the head, bruises to plaintiff's upper body, pressure point bruises behind the neck and ear consistent with choking, and bruises on the head, right forehead, mandible, right shoulder, hands, left elbow, spine and the area behind the left ear. Id. at 179.  These injuries did not require surgery. Id.  After three jury trials, Ms. DiSorbo prevailed on her excessive force/battery and abuse of process claims.  Id. at 175.  On the excessive force and battery claim, the jury awarded $400,000 in compensatory damages and $625,000 in punitive damages.  Id. at 181.  On the abuse of process claim, the jury awarded nominal damages and $650,000 in punitive damages.  Id.  The total punitive damage award was therefore $1.275 million (excessive force and abuse of process) along with the $400,000 compensatory award on the excessive force claim.  Id.

Canvassing the awards in comparable cases, the DiSorbo Court found that the $400,000 compensatory award on the excessive force claim fell far outside a reasonable range and ordered plaintiff to remit $150,000 of the excessive force compensatory award, bringing the compensatory award down to a total of $250,000.  Id. at 185.  The Court also ordered plaintiff to remit $1.2 million in punitive damages and accept $75,000 total for punitive damages.  Id. at 189.  The Court found these reduced numbers more accurately reflected comparable awards in police excessive force claims.

Specifically, the DiSorbo Court cited as instructive its decision in O'Neill v. Krzeminski, 839 F.2d 9 (2d Cir. 1988), where it affirmed an $80,000 compensatory damage award in an excessive force case where plaintiff alleged he was struck in the face repeatedly and, while bleeding, dragged across the detention area by his throat.  DiSorbo, 33 F.3d at 184; O'Neill, 839 F.2d at 10.   In that case, the plaintiff sustained a fractured nose, lacerations to his forehead and

eyebrow and tenderness in his throat but experienced no permanent physical disability.  O'Neill, 839 F.2d at 10, 13.

The DiSorbo Court also cited to the following cases as instructive:

- Blissett v. Coughlin, 6 F.3d 531 (2d Cir. 1995) (upholding an award of $75,000 in compensatory damages in an excessive force case where plaintiff was assaulted by prison guards and alleged that several guards punched him, struck him repeatedly with a baton, kicked him, choked him until he fell unconscious and caused recurring knee problems)

- Hygh v. Jacobs, 961 F.2d 359, 361, 366 (2d Cir. 1992) (affirming a $216,000 compensatory damages award in a police excessive force case where plaintiff was struck in the cheekbone with a flashlight or blunt object, requiring surgery with general anesthesia, leaving the left side of his face permanently numb).

- Ismail v Cohen, 899 F.2d 183, 185-187 (2d Cir. 1990) (Second Circuit  reinstated a jury compensatory award of $650,000, which it referred to as a "large compensatory damages award," and a $150,000 punitive damages award, where the police officer struck plaintiff in the back of the head without warning, causing the plaintiff to fall unconscious; and also, while handcuffed, an officer firmly implanted his knee into plaintiff's back causing two displaced vertebrae, a cracked rib and serious head trauma.  Other evidence, including medical expert testimony, also showed plaintiff suffered from chronic pain in his arms, torso and head.  Id. at 185, 186.)

Finally, the DiSorbo Court also cited to two cases where it found that the jury awards were excessive and needed to be reduced:

- 30 -

- <u>Bender v. City of New York</u>, 78 F.3d 787, 792-793 (2d Cir. 1996) (plaintiff punched in the mouth resulting in no bruise or cut or permanent injury and confined for a brief period resulting in emotional distress manifested by nightmares and occasional loss of sleep. There, the Court reduced the compensatory award from $300,000 to $150,000).

- <u>Wheatley v. Ford</u>, 679 F.2d 1037 (2d Cir. 1982) (plaintiff struck by an officer with a "slapjack", had his bare feet stomped on and was struck in the ear, producing temporary injury; the Court reduced the award from $55,000 to $25,000).

The <u>DiSorbo</u> court considered the fact that the attack was brutal and the incident was traumatic in nature for DiSorbo, likely to cause significant psychological harm (a claim which she pursued) and that the jury took this into consideration in calculating damages. <u>DiSorbo</u>, 343 F.3d at 184-185. In ordering remittitur, <u>DiSorbo</u> specifically noted that plaintiff's injuries did not require surgery and were not of the permanent variety as plaintiff's bruises all healed. <u>Id</u>. at 185. Based on all these factors and the comparable cases described above, the court reduced the compensatory award to $250,000.

An examination of other comparable cases also reflects the excessive nature of the jury's award in this case. In <u>Ivan Benjamin v. City of N.Y.</u>, 15-CV-2319 (FB) (E.D.N.Y. June 7, 2017), plaintiff alleged that, following a vehicle traffic stop, defendant officers pulled him out of the window of his car, threw him roughly on the ground, and punched and struck him with a blunt object in the head while on the ground. (<u>See</u> Lulich Decl., Ex. K, Amended Complaint at ¶¶16-18.) Plaintiff's short-term injuries included: pain, swelling, impaired vision, disfiguration and discomfort due to blunt force trauma to his face, head, neck, eye and arm along with the

subdural hematoma (brain bleed).  (Id. at ¶ 26.)  His long-term alleged injuries were post-traumatic seizures and epilepsy, as a result of which he was unable to work.  (Id. at ¶ 27.)  The jury awarded $150,000 in compensatory damages and $5,000 in punitive damages on June 7, 2017.  (See Lulich Decl., Ex. K, Jury Verdict)

In Edmin Alicea v. City of N.Y., 13-CV-7073 (JGK) (S.D.N.Y. August 11, 2016), the plaintiff alleged that he was lawfully walking when he was choked from behind by an officer as well as slapped on his chest and neck.  (Lulich Decl., Ex. L, Third Amended Complaint at ¶¶ 13-15.)  Plaintiff further alleged that after he was handcuffed, he was gratuitously pushed into a police vehicle, and had his handcuffs excessively tightened and then his arms were pulled back and up several times, resulting in permanent injuries to his rotator cuff and wrist.  (Id. at ¶15.)  The jury returned a verdict for plaintiff on an excessive force claim in the amount of $150,000 in compensatory damages and $25,000 in punitive damages.  (Lulich Decl., Ex. L, Judgment)

In Karen Brim v. City of N.Y., 13-CV-1082 (SJ) (RER), 2016 U.S. Dist. LEXIS 109534 (E.D.N.Y., August 16, 2016) (Report & Recommendation),  plaintiff alleged that the defendant officers had a face-to-face encounter with her resulting in the defendant officer throwing her from a first-floor landing, injuring her knee and causing a 23-day hospitalization during which plaintiff was diagnosed with a left knee fracture, more specifically described as a "severely comminuted and impacted, depressed fracture of the lateral tibeal plateau involving the articular surface with displacement of the fracture fragments."  Id. at **15-17.  The surgery to repair this injury involved internal fixation of plates and screws.  There was testimony that plaintiff rarely left her apartment for the next several months due to the injury, was in physical therapy for months and was still using crutches and a brace 8-10 months after the injury.  Id.  There was also evidence presented that plaintiff suffered permanent injury to her knee, including a significant

loss in the range of motion and that, as a result of the injury, plaintiff would likely suffer early onset arthritis and would require a full knee replacement.  Id.  The jury returned a verdict for plaintiff on two claims: excessive force and intentional infliction of emotional distress.  Id. at *2.  With respect to the excessive force only, the jury assessed $30,000 in compensatory damages.  Id.  Plaintiff moved for a new trial on damages pursuant to Rule 59.  Magistrate Judge Ramon Reyes issued a Report and Recommendation (ultimately adopted by Judge Sterling Johnson) in which he recommended a new trial on damages.  In so finding, the Court found that the damages for the above described knee injury should be in the range of $300,000 (with the low end of damages being $200,000).  Id.  Prior to a new trial, the parties agreed to settle plaintiff's claims for $250,001, plus attorneys' fees.

In Sean Thomas v. City of New York, No. 09-CV-3162 (ALC) (S.D.N.Y. Mar. 18, 2015), plaintiff alleged that he was pushed up against a fence and then his right hand was struck with a flashlight.  Plaintiff was then thrown to the ground and kicked and punched several times.  (Lulich Decl., Ex. M, Third Amended Complaint at ¶¶20-21.)  Plaintiff was transported to the hospital where he was treated for a fracture to the fifth metacarpal in his right hand as well pain in his face and throughout his body from where he was beaten by the police.  (Id. at ¶22.)  Portions of plaintiff's hair were also yanked out by the defendants during the incident.  (Id.) The jury found for plaintiff on his excessive force claim and awarded compensatory damages of $40,000 and punitive damages of $60,000, for a total award of $100,000.  (See Lulich Decl., Ex. M, Jury Verdict)

In Mark Fullerton v. City of N.Y., 14-CV-6029 (BMC) (E.D.N.Y. Apr. 1, 2015),  the plaintiff alleged that during the course of a vehicle stop, the defendant officer slammed a car door on plaintiff's leg above the ankle and then continued pushing on the door, causing plaintiff

pain in his leg.  (Lulich Decl., Exhibit N at Preliminary Statement and ¶¶ 30-31.)  Plaintiff then alleged that he was sprayed in the face with mace and punched in the head twice and in the left arm.  (Id. at ¶¶ 35-36.)  Plaintiff reported severe pain in his head, arm, left leg and eyes and was diagnosed with eye irritation, conjunctivitis and abrasions on various parts of his body.  See (Lulcih Decl., Ex. N, Jamaica Hospital Medical Records, Docket No. 28-5)  The jury returned a verdict for plaintiff on an excessive force claim in the amount of $1.00 in nominal damages and $15,000 in punitive damages.  (Lulich Decl., Ex. N, Jury Verdict.)

In Ronald Walker v. City of New York, No. 11-CV-0314, 2013 Jury Verdicts LEXIS 10892 (E.D.N.Y. Aug. 7, 2013), plaintiff alleged that he was falsely arrested, maliciously prosecuted, and subject to excessive force by police officers.  He alleged that he lost consciousness and was later diagnosed with a fractured nose, displacement of his two front teeth, and laceration on his lip.  He did not seek follow up care.  The jury found for plaintiff on all claims and awarded as follows: $25,000 compensatory damages for excessive force, $50,000 for assault and battery, $60,000 for false arrest and malicious prosecution, and $50,000 for emotional distress, and $75,000 in combined punitive damages against three defendants, for a total of $260,000 in damages.

In Alexander Spillman v. City of Yonkers, No. 07-CV-2164 (DAB) (KNF) 2011 Jury Verdicts LEXIS 197290 (S.D.N.Y. Oct. 10, 2011), plaintiff alleged that he was subject to excessive force following a traffic stop.  He sustained a fractured nose, lacerations on his head and leg, and bruises on his face, hands, head, legs, and ribs.  His lacerations were closed with staples and he alleged 2 months of pain.  His permanent damages included a misaligned nose and scars on his head and leg.  The jury awarded $160,000 in compensatory damages and $15,000 in

punitive damages against one defendant officer.  The parties settled for $190,000 prior to decision on post-trial motions.

In <u>Morales v. City of N.Y.</u>, No. 99-CV-10004 (DLC), 2000 U.S. Dist LEXIS 18711 (S.D.N.Y, January 2, 2001), the Court reduced a jury award of $2.75 million in compensatory damages in an excessive force claim.  There, calling the jury's award "completely unsupported by the evidence presented at trial", the Court reduced the award to $50,000 after comparing it to other similar cases.  <u>Id</u>. at *20-21.  The Court noted that Morales' injuries consisted of deep bruises and that she required no serious medical treatment, her bruises healed, and she had no permanent injury.  <u>Id</u>. at 21.  The Court found that $2.75 million was far beyond any reasonable compensation for the injuries sustained from the excessive force and noted that awards in analogous cases involving mild, non-permanent injuries are usually below $100,000.  <u>Id</u>. at 23-24.

In <u>King v. City of N.Y.</u>, No. 92-CV-7738 (JGK), 1996 U.S. Dist. LEXIS 19017 (S.D.N.Y. Dec. 24, 1996), one plaintiff was beaten, kicked and hit with a walkie-talkie by a police officer, and had his head forced back with a nightstick.  He received bruises, black eyes, abrasions, a gash in the head, and "other multiple blunt trauma."  He was given medication that evening but required no further medical attention and suffered no permanent physical injuries. <u>Id.</u> at *4.  The jury awarded compensatory damages of $300,000, which included compensation for 30 minutes' wrongful confinement and two months' malicious prosecution, and emotional injury from the entire incident.  The Court ordered remittitur of $100,000, bringing the total award down to $200,000. <u>Id</u>.

Based on the cases outlined above, it is patently obvious that the jury award in this case is grossly disproportionate.  With respect to the jury's $500,000 dollar compensatory award, there

is simply no rational basis on which to justify the assessed amount.  Here, the alleged force consisted of two punches to the face resulting in bilateral fractures of the nasal walls and a black eye, and "piling on" while he was on the ground which resulted in no injury.  The black eye and nose injury healed with minor treatment.  Interestingly, plaintiff never introduced any before and after photos of his injuries.  While plaintiff alleges that his nose is "crooked", there was no evidence adduced at trial that further treatment had been recommended or that plaintiff pursued any further treatment after May 3, 2014.  Plaintiff did not allege any financial damages or specific emotional damages.

Plaintiff has no permanent physical injuries, and the injuries he claims — temporary black eye and broken nose — are much less serious than the injuries described in some of the other cases cited above where the awards were far less.  The far more serious injuries in Hygh (injury to the cheekbone requiring surgery with general anesthesia and permanent facial numbness), Hogan (nerve damage and permanent loss of sensation in hand), Benjamin (brain bleed, hemorrhage in the eye, post-traumatic seizures, epilepsy and loss of the ability to work) and Brim (fracture to the left knee requiring 23-day hospitalization and surgery with plates and screws and permanent injury) resulted in significantly lower compensatory awards of $216,000, $200,000, $150,000 and $30,000 (which the Court determined should have been in the range of $300,000), respectively.[5]

---

[5] Even allowing for inflation, the numbers the jury reached in this case are well out of proportion to any reasonable comparable case.  In DiSorbo at *33-34 the Court considered the impact of inflation in its analysis of cases from 10-15 years prior and concluded:

In addition, when considering the sizes of the awards in earlier cases, we must take into account inflation, as the reasonable range for Rebecca DiSorbo's injuries today is higher than what it would have been ten years ago. Even so, our caselaw simply does not allow for a $400,000 compensatory damages award for Rebecca DiSorbo's injuries. The plaintiff in O'Neill suffered injuries similar in terms of severity to those endured by Rebecca DiSorbo, if not worse, yet that plaintiff received approximately one-fifth of the compensatory damages the jury awarded Rebecca

Of the cases described above, the highest compensatory award affirmed was in Ismail for $650,000, however, the injuries there were far worse than in this case – including a displaced vertebrae, cracked rib and head trauma.  The injuries in this case do not even come close to those in Ismail.  The Ismail Court even referred to the compensatory award in that case as "a large compensatory damage award," in a case involving far worse injuries than this one.  Based on a review of the cases, the appropriate range of compensatory awards for similar allegations of force, injuries and treatment is between $30,000 and $100,000.  The compensatory award in this case should fall into this range in order to be fair and proportionate with comparable cases and also to allow for accurate predictability in future cases with similar facts.

**B.**          **Punitive Damages**

It is well established that there are procedural and substantive constitutional limitations on punitive damage awards arising out of the Due Process Clause of the Fourteenth Amendment.  See, e.g. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. *416 (2003); Philip Morris USA v. Williams, 549 U.S. 346, 352 ("Unless a State insists upon proper standards that will cabin the jury's discretionary authority, its punitive damages system may… threaten 'arbitrary punishments,' i.e., punishments that reflect not an 'application of law' but 'a decisionmaker's caprice.'").  Courts reviewing punitive damages awards must consider (1) the degree of reprehensibility of the defendant's misconduct;[6] (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between

---

DiSorbo. See O'Neill, 839 F.2d at 10, 13. Even taking into account that O'Neill was decided approximately fifteen years ago, the disparity between the two compensatory damages awards is considerable.

[6] A detailed description regarding the amount of force and injuries alleged by plaintiff in the context of the punitive damages award is set forth in Point II, *supra*.

the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Id. at * 418 (quoting BMW of N. Am. V. Gore, 517 U.S. 559, 575 (1996). "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." Id. at *417.

As a preliminary matter, defendants address one of the two questions set forth by the Court on June 1, 2018. (Lulich Decl., Ex. D at 807:16 – 808:17)  First, the Court asked "whether the sustaining of a punitive damages award can take into account the jury's conclusion that the officers were untruthful or whether at trial or whether a punitive damages award has to be based upon the evaluation of the conduct that was tried."  (Id.)  Consistent with the Due Process Clause, a defendant must have had an opportunity to defend against the charge for which they are being assessed punitive damages. Philip Morris USA v. Williams, 549 U.S. 346 353-54 (2007) (holding that punitive damage awards may not be awarded as punishment for injuring nonparties because the defendant would not have the opportunity to "present every available defense.") Punitive damages should reflect the harm caused to *the plaintiff*, and should be reflective of the *claims that were at issue during the trial*. Id. at 354.  Accordingly, the punitive damages, if any, should be limited to the damages sustained by plaintiff as a result of excessive force.  Second, the Court asked "[c]an I take [the jury's] answers [to the special interrogatories] into account when I assess the verdict and the judgment?" (Lulich Decl., Ex. D at 808:09-13)  In completing the survey of comparable cases contained in this motion, defendants found no case in which a Court considered answers to the Special Interrogatories in determining the amount of the damage awards.  Further, Special Interrogatories should not be used to "look behind the verdict"

and are thus intended specifically for the purpose of adjudicating a motion on Qualified Immunity.  Finally, given the factors considered in determining the appropriate punitive damages award, and the need for it to be proportionate to the plaintiff's injury, the particular Special Interrogatories in this matter are not instructive as to the amount of punitive damages.

As it did when it awarded compensatory damages, the jury made an award unsupported by the evidence when it assessed $2.5 million in punitive damages – a number previously unseen in comparable cases.  As with compensatory awards, in determining whether a punitive award is excessive or not, courts have found it instructive to compare it to other cases with analogous facts.  See Payne v. Jones, 711 F.3d 85, 104-105 (2d Cir. 2012) ("Courts have often found it helpful in deciding whether a particular punitive award is excessive to compare it to court rulings on the same question in other cases.") See also Mathie v. Fries, 121 F.3d 808, 817 (2d Cir. 1997) (reviewing a punitive award for excessiveness is a "task [that] requires comparison with awards approved in similar cases"); Lee, 101 F.3d at 812 (in deciding whether a punitive award is excessive, "it is appropriate for us to examine punitive damage awards in similar cases"); Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990) (in determining whether a damages award exceeds the reasonable range, "[r]eference to other awards  in similar cases is proper").

Comparing this case to analogous cases unambiguously demonstrates that the jury's punitive damage award, like its compensatory award, is simply unsustainable.  In DiSorbo, for example, the Court ordered remittitur of the $1.275 million award ($625,000 for excessive force and $650,000 for abuse of process) down to $75,000 total.  As noted above, the officer's conduct in DiSorbo was described by plaintiff as having stemmed from her rejecting the officer's advances in a bar while he was off-duty, which would seemingly justify a high punitive damage award.  See DiSorbo, 343 F.3d at 176-178.  In reaching the reduced punitive number, the

- 39 -

DiSorbo Court reviewed its decision in Lee v. Edwards, 101 F.3d 805 (2d Cir. 1996), where it noted that the defendant officer struck the plaintiff, who was handcuffed, 8 or 9 times in the head with his police baton (worse than the alleged conduct in this case), to the point where plaintiff was knocked unconscious and had to be hospitalized.  In Lee, the Court reduced the $200,000 punitive damages award to $75,000.

        In Ismail, where the officer's gratuitous punch to the head and knee in the back caused major injuries including broken vertebrae and ribs, the Circuit upheld a $150,000 punitive damages award.  Further, in O'Neill, the Court upheld a $185,000 punitive damage award where, as described above, several officers were accused of brutally beating a defenseless plaintiff inside the police station, including repeated strikes to the face and head while handcuffed, with at least one blow using a blackjack, and then being dragged across the floor by the throat while bleeding.  The conduct in these cases is worse than the conduct in this case.

        In Payne, the Court ordered plaintiff to remit $200,000 of a $300,000 punitive damage award, bringing the total punitive award down to a total of $100,000.  See 711 F.3d at 87.  There, the defendant officer was said to have punched the plaintiff in the face and neck 7-10 times and kneed him in the back several times, all while plaintiff was handcuffed on a bed.  Id. at 88.  A nurse had to step in to stop the officer's assault on plaintiff, and the assault was said to have caused a bloody, swollen face and aggravated a pre-existing back condition as well as plaintiff's (a decorated Vietnam veteran), post-traumatic stress disorder.  Id.  The police department internal investigation found that the officer had brutally assaulted plaintiff and had lied to investigators about the incident.  Id.  The officer's employment was terminated as a result.  On these facts, the Court still found that a $300,000 punitive award was too high based on comparable cases and

reduced it to $100,000. In comparing other cases where punitive awards were made, the court observed:

> Our survey shows that we have never approved a punitive award against an individual police officer as large as the $300,000 award here. We have described awards ranging from $125,000 to $175,000 as "substantial," King v. Macri, 993 F.2d 294, 299 (2d Cir. 1993), and we have ordered remittitur of awards as low as $75,000, see id. (reducing the award to $50,000); see also DiSorbo v. Hoy, 343 F.3d 172, 189 (2d Cir. 2003) (reducing a $1.275 million award to $75,000); Lee, 101 F.3d at 813 (reducing a $200,000 award to $75,000); King, 993 F.2d at 299(reducing a $175,000 award to $100,000). Moreover, in police misconduct cases in which we sustained awards around $150,000, see, e.g., Ismail, 899 F.2d at 187, the wrongs at issue were more egregious than the misconduct of Jones.

Payne, 711 F.3d at 105.

Here, the jury awarded punitive damages of $1 million against Andrew Yurkiw and $750,000 each against Amber LaGrandier and Joseph Solomito. The jury came back with these numbers despite the fact that plaintiff did not allege any specific use of force, or injuries caused, by LaGrandier or Solomito. Moreover, Yurkiw's alleged use of force consisted of two punches to the face. The conduct described in Payne, where the Court reduced the $300,000 to $100,000, was far more egregious than that described in this case. The Payne Court noted in its review of prior cases that the Court had never approved a $300,000 punitive damages award before, and yet, in this case, the jury assessed respective punitive damage awards of $750,000 and $1 million against the defendants. The punitive damages awards in this matter far exceed the punitive awards between $125,000 and $175,000 which the Payne Court described as "substantial."

After a review of these cases, it is clear that the amount of the punitive damage award shocks the judicial conscience and works a manifest injustice to the defendants if upheld. In comparable cases, the punitive damages were in the range of $10,000-$50,000. The punitive damages award must be reduced to an amount within this range. Plaintiff's injuries and the

alleged force articulated by plaintiff at trial did not warrant a punitive award even remotely approaching the $2.5 million-dollar windfall the jury awarded to plaintiff. Such a verdict simply defies all reason and logic and finds no analog in comparable cases. Defendants would clearly suffer a manifest injustice if the Court did not exercise its duty to ensure a "fair, reasonable, predictable and proportionate" award and reduce both the compensatory and punitive damage awards by significant measures.

## **<u>CONCLUSION</u>**

For the foregoing reasons, defendants respectfully request that the Court grant the aforementioned motions and any such further relief as the Court deems just and proper.

Dated:    New York, New York
July 9, 2018

ZACHARY W. CARTER
Corporation Counsel of the
City of New York
*Attorney for Defendants Andrew Yurkiw, Joseph
Solomito, and Amber LaGrandier*
100 Church Street, 3rd Floor
New York, New York 10007
(212) 356-2345
By:    ___/s/_____
Aimee Lulich
*Senior Counsel*