UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

THOMAS JENNINGS,                                    :
                                                    :
                              Plaintiff,            :        MEMORANDUM
                                                    :        & ORDER
       -against-                                    :        14-CV-6377 (SMG)
                                                    :
POLICE OFFICER ANDREW YURKIW, POLICE                :
OFFICER AMBER LAGRANDIER, POLICE OFFICER            :
JOSEPH SOLOMITO,                                    :
                                                    :
                              Defendants.           :
-------------------------------------------------------------------- :
                                                    x

GOLD, STEVEN M., U.S. Magistrate Judge:

## INTRODUCTION

Plaintiff Thomas Jennings brings this action pursuant to 42 U.S.C. § 1983 alleging that

New York City Police Officers Andrew Yurkiw, Amber LaGrandier, and Joseph Solomito

(collectively, "Defendants") used excessive force when taking him into custody on April 23,

2014.[1]  The case was tried before a jury in this Court from May 29 through June 1, 2018.  After

deliberating, the jury returned a verdict finding Defendants jointly and severally liable for

$500,000 in compensatory damages and imposed punitive damages of $1,000,000 against

defendant Yurkiw and $750,000 each against defendants LaGrandier and Solomito, for a total of

$2,500,000 in punitive damages.  Defendants now move for judgment as a matter of law under

Federal Rule of Civil Procedure 50, for a new trial under Federal Rule of Civil Procedure 59, and

for remittitur of the damages award.  Notice of Mot. 1, Docket Entry 129.

---

[1] Plaintiff's complaint also named as a defendant New York Police Sergeant Shaun Brown, and included various other claims under both federal and New York state law.  Am. Compl., Docket Entry 16.  Plaintiff withdrew all claims except his claim for excessive force pursuant to § 1983 prior to trial, Docket Entry 54, and voluntarily dismissed his excessive force claim against Sergeant Brown during trial, Trial Tr. 674:2–13.

**FACTUAL BACKGROUND**

Plaintiff's § 1983 claim arises out of events that took place on April 23, 2014. Plaintiff alleges that on that day, pursuant to a child custody order, he picked up his son from a day care facility and then proceeded to the apartment of his son's mother, Daquanna Henry ("Ms. Henry"), to get his son's diapers and clothes. Trial Tr. 467:2–12. Plaintiff testified that, after he arrived at Ms. Henry's apartment, an argument ensued and Ms. Henry struck him. *Id.* at 472:3–8. Plaintiff then returned to the lobby of the apartment building and called 911 to report the assault. *Id.* at 472:15–16. Ms. Henry also called 911 to report that Plaintiff was at her apartment in violation of an order of protection. *Id.* at 301:24–302:9.

The defendant officers responded to the scene. Defendants Yurkiw and Solomito were the first officers to arrive. *Id.* at 473:25–474:5. Defendant LaGrandier and Sergeant Brown arrived shortly thereafter. *Id.* at 120:11–18. Plaintiff waited outside the apartment with Yurkiw and Solomito while LaGrandier and Brown entered the apartment for an unspecified period of time. *Id.* at 476:19–477:1.

At this point, the parties' respective narratives sharply diverge. Plaintiff testified that, after LaGrandier emerged from the apartment, he showed the officers a family court order granting him and Ms. Henry joint custody of their son, but that they "just like tossed it around," refusing to look at it. *Id.* at 479:5–19, 482:11–19. Yurkiw and Solomito denied ever being shown this document. *Id.* at 112:11–113:3, 322:14–25. Plaintiff stated that LaGrandier next "snatche[d]" his son away from him and directed the boy to go inside Ms. Henry's apartment. *Id.* at 477:20–478:1. LaGrandier's version is that she placed her hands on the child's shoulders and guided him into his mother's apartment so that he would not witness the officers taking his father into custody. *Id.* at 378:13–16, 379:1–2.

After that, according to Plaintiff, LaGrandier grabbed him by the vest while Yurkiw, without warning and for no apparent reason, punched him twice in the face; Plaintiff then "stumbled down to the ground" and "was just out of it from there." *Id.* at 478:24–480:1. Defendants' testimony, in contrast, is that Plaintiff assaulted Yurkiw, *id.* at 54:13–21, 307:6–16, and attempted to flee, *id.* at 122:12–123:3; 307:22–25. Defendants each testified that Yurkiw threw punches only in self-defense. *Id.* at 179:20–180:1, 307:9–13, 308:9–10, 356:11–23. For his part, Defendant Solomito admitted tackling Plaintiff to prevent him from fleeing and avoiding arrest. *Id.* at 287:10–288:15; 327:1–5.

Plaintiff testified that, after he fell to the floor, he "curled up," but that defendants nevertheless "continuously beat me in front of my son," *id.* at 481:4–5, and there were "all kind of blows coming from everywhere," *id.* at 481:20–21. Plaintiff's narrative is that from the moment Yurkiw struck him, he was in and out of consciousness, and had to be carried out of the building by Defendants. *Id.* at 605:8–606:1. While Plaintiff's contention that he was in and out of consciousness was apparently corroborated by a video recording showing Defendants dragging Plaintiff through the lobby of the apartment building and outside to a police vehicle, Defendants' testimony was to the effect that Plaintiff was conscious and able to walk but chose not to after the altercation. *Id.* at 76:13–77:18, 417:9–22.

With respect to damages, it is uncontroverted that Plaintiff suffered a right eye hematoma, a bilateral nasal fracture, a deviated septum, and an inflamed ethmoid sinus, injuries that Dr. Hussein Matari ("Dr. Matari") recorded after reviewing Plaintiff's CT scan at Woodhull Hospital on the day of Plaintiff's arrest. *Id.* at 337:24–339:13, 342:16–21; Lulich Decl. Ex. F, at DEF 59, Docket Entry 131-6. Dr. Frank Flores ("Dr. Flores"), an emergency medicine physician at Rikers Island Correctional Center ("Rikers Island") who examined Plaintiff two days later, on

April 25, substantially confirmed these injuries. Trial Tr. 556:9–24. Dr. Flores noted that the area around Plaintiff's eye was ecchymotic, or bruised, and had a hematoma, or "blood swelling." *Id.* at 559:17–561:2; Lulich Decl. Ex. G, at DEF 652, Docket Entry 131-7. Dr. Flores also observed Plaintiff's nasal bone fracture. Trial Tr. 563:12–17; Lulich Decl. Ex. G, at DEF 653. Mugshots of Plaintiff clearly depicting his right eye bruised and swollen shut were also received in evidence at trial. Lumer Decl. Ex. 4, Docket Entry 136-4.

Plaintiff alleges that the long-term impact from these injuries is that his nose is permanently crooked and that he suffers from "definitely painful" headaches. Trial Tr. 487:18–488:10. Plaintiff did not offer any evidence of ongoing medical care to treat these conditions, and acknowledged on cross-examination that the last time he sought treatment with respect to his nose was around May 3, 2014, roughly ten days following his arrest. *Id.* at 630:14–17. As for emotional distress, Plaintiff did not allege anything other than the distress he was in during and following the altercation, arising largely from being beaten in front of his son. *Id.* at 484:21–24. Defendant Yurkiw confirmed that, at the time of the arrest, Plaintiff was actually in tears and asking Defendants, "Why are you doing this?" *Id.* at 189:19–20, 210:13–20, 215:7–14. Plaintiff did not offer evidence of any psychological treatment.

The jury, apparently having found Plaintiff's testimony credible, returned a verdict holding all three Defendants jointly and severally liable for using excessive force. Verdict Form at 1, Docket Entry 106. The jury awarded Plaintiff $500,000 in compensatory damages and $2,500,000 in punitive damages—$1,000,000 against Defendant Yurkiw and $750,000 each against Defendants LaGrandier and Solomito. *Id.* at 2–3. The jury also answered special interrogatories posed at Defendants' request. *See* Trial Tr. 529:23–530:8. In their responses to these interrogatories, the jury stated that it did not find by a preponderance of the evidence that

Plaintiff attempted to flee, resist arrest, or assault Defendant Yurkiw.  Special Interrogs. Form, Docket Entry 107.

Before the case was submitted to the jury, Defendants moved under Rule 50(a) for judgment as a matter of law on qualified immunity grounds.  Trial Tr. 677:25–678:22. Defendants now (a) renew their motion for judgment as a matter of law under Rule 50, (b) move in the alternative for a new trial pursuant to Rule 59, and (c) move in the alternative for remittitur of the damages award.[2]  For the reasons that follow, Defendants' motions for judgment as a matter of law and for a new trial as to liability are denied.  However, the Court grants Defendants' motion for remittitur.

DISCUSSION

## I.    Excessive Force

The analysis of excessive force claims "begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."  *Graham v. Connor*, 490 U.S. 386, 394 (1989) (citation omitted).  An excessive force claim that arises out of an arrest invokes the Fourth Amendment prohibition against unreasonable seizures.  *Id.*  To determine whether the force an officer uses to effectuate an arrest is reasonable under the Fourth Amendment, "[a court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

---

[2] Defendants do not assert qualified immunity as the basis of any of their post-trial motions.  Rather, Defendants argue that the jury's finding of excessive use of force as to Defendants LaGrandier and Solomito is not supported by the evidence and that the damages awarded against all three Defendants are excessive.

Whether the force used to effectuate an arrest is lawful is determined from the perspective of "a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and thus not "every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," rises to the level of excessive force. *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028 (2d Cir. 1973)). The question is whether the officer's use of force was "objectively reasonable." *Id.*; *see also Graham v. City of New York*, 928 F. Supp. 2d 610, 617 (E.D.N.Y. 2013) (citing *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010)). The factfinder examining an excessive force claim considers at least these three factors: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy*, 623 F.3d at 96 (2d Cir. 2010) (first citing *Graham*, 490 U.S. at 396; then citing *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006)). Although these factors are important, "the Fourth Amendment excessive force analysis is a contextual one that . . . requires close examination of the totality of the circumstances in each particular case." *Adedeji v. Hoder*, 935 F. Supp. 2d 557, 566 (E.D.N.Y. 2013) (first citing *Graham*, 490 U.S. at 396; then citing *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000)).

## II.     Judgment as a Matter of Law

### A.  Legal Standards

When, as here, a party has moved for judgment as a matter of law during a trial, that party may renew the motion after the jury has rendered its verdict and seek entry of judgment as a matter of law. Fed. R. Civ. P. 50(b)(3). A motion brought under Rule 50, though, imposes "a heavy burden on a movant." *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011). "That burden is 'particularly heavy' where, as here, 'the jury has deliberated in the case and actually

returned its verdict' in favor of the non-movant." *Id.* (quoting *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005)). The motion may be granted only where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Id.* (quoting *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010)).

A court considering a motion brought pursuant to Rule 50(b), when reviewing the evidence presented at trial, "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). In addition, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151 (citation omitted). Thus, "a court may grant a motion for judgment as a matter of law 'only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been *compelled* to accept the view of the moving party.'" *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (quoting *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993)).

*B. Analysis*

As a threshold matter, Plaintiff asserts that Defendants, by basing their initial Rule 50 motion on qualified immunity, have waived their right to renew their Rule 50 motion on any other ground. Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for a New Trial ("Pl.'s Mem.") 5–8, Docket Entry 137. It is true that a party renewing a Rule 50 motion after trial may not add grounds that were not presented at the time the initial motion was made. *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997). However, "the purpose of requiring the moving party to

articulate the ground on which [judgment as a matter of law] is sought 'is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury.'" *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998) (quoting *Baskin v. Hawley*, 807 F.2d 1120, 1134 (2d Cir. 1986)).

Plaintiff misapplies the Rule 50(b) standard. A movant need not be held to the initial Rule 50 motion as to every specific detail. For instance, in *Galdieri-Ambrosini*, the court viewed the original motion "in the context of the ensuing colloquy between counsel and the trial court," allowing that colloquy to "flesh[] out the motion" to see whether it provided opposing counsel with fair notice of the legal and factual basis for the renewed motion. *Id.* at 287 (citations omitted). While Defendants here based their initial motion on the defense of qualified immunity, counsel supported the motion with assertions that "there was no testimony that [Defendant LaGrandier], in fact, used any force against the plaintiff" and that Defendant Solomito "tackle[d] the plaintiff, but [for the purpose of] assisting and affecting an arrest." Trial Tr. 678:3–9. In essence, then, Defendants have not *added* anything in their renewed Rule 50 motion that was not contained in the original motion; they have merely *subtracted* the qualified immunity foundation. In other words, Defendants' initial motion placed Plaintiff on notice of Defendants' contention that the evidence was insufficient to support a finding that either LaGrandier or Solomito used excessive force.

Although Defendants' motion might not be procedurally barred, their arguments for judgment as a matter of law do not satisfy their heavy Rule 50 burden of showing that no reasonable jury, viewing all the evidence in the light most favorable to Plaintiff, could find in his favor. Defendants' Rule 50 motion essentially rests on the assertion that Plaintiff's testimony did not establish that Defendants LaGrandier and Solomito were involved in any use of excessive

force. Defendants emphasize that Plaintiff's testimony tied *specific* blows only to Defendant Yurkiw, and described LaGrandier's and Solomito's involvement in any use of force more vaguely. Mem. of Law in Supp. of Defs.' Post-Trial Mots. Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure ("Defs.' Mem.") 6, Docket Entry 130. This means, Defendants argue, that the jury's finding that Defendants LaGrandier and Solomito subjected Plaintiff to excessive force "amounts to the sort of 'sheer surmise or conjecture' that Rule 50 prohibits." Defs.' Mem. 6 (quoting *Walker v. City of New York*, No. 11-cv-314, 2014 WL 12652345, at *5 (E.D.N.Y. Sep. 3, 2014), *aff'd*, 638 Fed. Appx. 29 (2d Cir. 2016) (summary order)).

Plaintiff did testify that, after being punched by Defendant Yurkiw, "I curled up so I couldn't tell exactly who was throwing the extra blows at the time." Trial Tr. 481:21–22. But Plaintiff's testimony—particularly when considered with all inferences drawn in his favor—is that he endured a collective assault at the hands of the three Defendants once he was on the ground. *Id.* at 481:4–22. Plaintiff also testified that Defendants LaGrandier and Solomito each were substantial contributors to the assault against him. For instance, his testimony with respect to Defendant LaGrandier is that she initiated the confrontation by grabbing him and holding him by his vest against the wall. *Id.* at 478:25–479:1, 479:20–480:9. Moreover, Defendant Solomito himself admitted tackling Plaintiff, testifying that he did so because Plaintiff was attempting to flee. *Id.* at 287:10–288:15; 327:1–5. LaGrandier also claimed that Plaintiff was attempting to flee and that he took at least one swing at Defendant Yurkiw. *Id.* at 414:19–415:3. LaGrandier acknowledged that she too participated in the effort to subdue Plaintiff, and that she ended up on the ground with Plaintiff, Yurkiw and Solomito. *Id.* at 415:5–6.

As noted above, the jury indicated in its answers to special interrogatories that it did not believe Plaintiff was attempting to flee when the Defendant officers used force against him. The

jury was free to believe Solomito with respect to tackling Plaintiff while discrediting his testimony that Plaintiff was fleeing. *See Zellner*, 494 F.3d at 371 ("[T]he jury is free to believe part and disbelieve part of any witness's testimony." (citations omitted)).

In sum, the jury had sufficient evidence to find that each of the three Defendants used excessive force, and it did not engage in "sheer surmise or conjecture." Defendants consequently fail to carry the heavy burden Rule 50 imposes on them. Accordingly, Defendants' motion for judgment as a matter of law is denied.

## III. New Trial

### A. Legal Standards

Under Rule 59, a court may grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "The decision whether to grant a new trial under Rule 59 'is committed to the sound discretion of the trial judge.'" *Crews v. Cty. of Nassau*, 149 F. Supp. 3d 287, 292 (E.D.N.Y. 2015) (quoting *Stoma v. Miller Marine Servs., Inc.*, 271 F. Supp. 2d 429, 431 (E.D.N.Y. 2003)). Accordingly, a trial court may at its discretion grant a new trial under Rule 59 "when the jury's verdict is against the weight of the evidence." *Id.* (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998)). Yet, despite the trial court's discretion to grant a new trial "even if there is substantial evidence supporting the jury's verdict," the Second Circuit has made clear that such a motion may be granted only "when the jury's verdict is egregious." *DLC Mgmt.*, 163 F.3d at 134 (quoting *Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 158 (2d Cir. 1992)). Thus, a motion for a new trial should be denied "unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a

miscarriage of justice." *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (quoting *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998)).

This standard is notably more flexible than that for a motion for judgment as a matter of law, because a court deciding whether to grant a motion for a new trial "is free to weigh the evidence [itself] and need not view it in the light most favorable to the verdict winner." *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992) (quoting *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978)). But despite a court's broadened Rule 59 discretion, it is a disfavored practice in this Circuit to upset a jury verdict that was based largely on the jury's credibility determinations. *See Raedle v. Credit Agricole Indosez*, 670 F.3d 411, 418 (2d Cir. 2012) ("[W]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992))); *see also Dunlap-McCuller*, 980 F.2d at 158 ("[W]e caution that the jury is empowered and capable of evaluating a witness's credibility, and this evaluation should rarely be disturbed.").

### B. Analysis

#### i. Sufficiency of the Evidence

In support of their motion for a new trial, Defendants first reprise their argument for judgment as a matter of law, asserting that the evidence is insufficient to support a finding of excessive force on the part of Defendants LaGrandier and Solomito. Defs.' Mem. 7–11. Perhaps mindful of the high deference to be accorded a jury's credibility determinations, Defendants rely on the medical records in evidence, arguing that they fail to corroborate Plaintiff's testimony. *Id.* at 7–8. Defendants chiefly rely on *Henry v. Brown*, No. 14-cv-2828, 2016 WL 3079798 (E.D.N.Y. May 27, 2016). Defs.' Mem. 8. There, the court ruled that "where

undisputed medical records '*directly and irrefutably* contradict a plaintiff's descriptions of his injuries' attributed to an alleged use of excessive force, 'no reasonable jury could credit plaintiff's account of the happening.'" *Henry*, 2016 WL 3079798, at *2 (quoting *Davis v. Klein*, No. 11-cv-4868, 2013 WL 5780475, at *4 (E.D.N.Y. Oct. 25, 2013)). Plaintiff in that case alleged injuries that, according to the relevant medical records, were either nonexistent or not remotely as severe as claimed. More specifically, plaintiff in *Henry* alleged a leg injury "so severe that his leg was nearly lost" and a head injury that left him unconscious in a pool of his own blood for seventy-five minutes. *Id.* at *3. Medical personnel, though, could not locate any head injury at all, the leg injury turned out to be only a scab, and medical records revealed that the bleeding on plaintiff's left leg resulted from his picking at the scab. *Id.* Thus, the relevant medical records "directly and irrefutably contradicted" plaintiff's testimony and rendered "incredible [the claim] that any injury sustained by Plaintiff resulted from unlawful force by Defendant." *Id.* at *2–3.

That is not the case here, nor do Defendants claim it to be. Rather, Defendants' primary argument in this case is that the medical records undercut Plaintiff's account of the *degree of force used*. Defendants' argument, essentially, is that (1) Plaintiff attributed his eye and nose injuries to the first two punches by Defendant Yurkiw, (2) the medical evidence does not reveal any additional injuries, and (3) therefore, the medical evidence contradicts Plaintiff's testimony that LaGrandier and Solomito used excessive force. Defendants' argument is not convincing.

The distinction between this case and *Henry* is stark.[3] Plaintiff Jennings does not claim specific injuries that the medical records belie, nor does he attribute to Defendants' use of force injuries that he acquired some other way. Defendants are correct that the medical witnesses who

---

[3] In addition to the distinctions noted in the text, *Henry* was decided in the context of a defense motion for summary judgment. *Id.* at *1.

testified during trial primarily described injuries to Plaintiff's nose and eye.  Dr. Matari, for example, testified that he observed no fracture to Plaintiff's orbit or injury to his cheekbone or jaw.  Trial Tr. 346:18–347:14.  Dr. Flores, who examined Plaintiff after he arrived at Riker's Island, testified that Plaintiff did not describe losing consciousness or complain about parts of his body other than his head, and that he did not observe contusions or lacerations on other parts of Plaintiff's body.  *Id.* at 570:17–571:21.  Finally, Sade Noel, an EMT who arrived at the precinct on the day of Plaintiff's arrest, reported that Plaintiff's only complaints of injury concerned his nose and eye, and that she did not observe any other injuries.  *Id.* at 648:23–649:5.  There was, however, some medical testimony describing additional injuries.  Medical records shown to Dr. Matari reflected that Plaintiff had swelling on the left side of his head.  *Id.* at 351:15–17.  Other records presented at trial reflected injuries to Plaintiff's neck and scalp.  *Id.* at 566:21–567:1.

The evidence at trial of injuries in addition to Plaintiff's swollen eye and broken nose was minimal, at best.  While the jury might have been persuaded by this lack of evidence that Plaintiff was not struck further after being punched by Yurkiw, they were not required to do so.  Plaintiff testified that, after being punched by Yurkiw, he fell and curled himself up on the ground.  *Id.* at 481:4–5.  Plaintiff further testified that he "curled up so [he] couldn't tell exactly who was throwing the extra blows."  *Id.* at 481:21–22.  The jury could reasonably have found that, as Plaintiff testified, LaGrandier and Solomito struck him as he lay on the ground, but without causing him to sustain additional injuries significant enough to have been noted in his medical records.  Given Rule 59's requirement that courts defer to the jury's assessments of credibility, the tension between Plaintiff's testimony and the absence of additional findings of injury in the medical records is insufficient to set aside the jury's verdict and order a new trial.

Defendants further argue on similar grounds that they are entitled to a new trial under Rule 59 on the issue of punitive damages as to all three Defendants. Defs.' Mem. 11–12. In an action under § 1983, a jury may award punitive damages "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). The matter of punitive damages requires an "individualized determination. . . . [P]unitive damages should be assessed on an individual basis." *McFadden v. Sanchez*, 710 F.2d 907, 913 (2d Cir. 1983). Thus, to secure punitive damages from joint tortfeasors, "[a] plaintiff . . . must 'establish that each defendant against whom punitive damages are sought engaged in conduct which was sufficiently aggravated to justify the imposition of those damages.'" *Id.* (quoting J. Ghiardi & J. Kircher, *Punitive Damages* § 9.09 (1981)).

To prevail on their motion, Defendants must show that the evidence that one or more of them possessed at least a callous indifference to Plaintiff's Fourth Amendment rights is so lacking that the punitive award as to that Defendant or those Defendants constitutes a miscarriage of justice. To carry their burden, Defendants endeavor to diminish Plaintiff's injuries, both physical and emotional. *See* Defs.' Mem. 11–12 ("[T]he medical records reflect only a black eye and broken nose, with no bruising, abrasions, or other injury to the rest of his body. . . . Plaintiff did not allege emotional damages."). The extent of a plaintiff's injuries is certainly critical to determining whether the damages awarded are excessive. As *Smith v. Wade* makes clear, though, whether an award of some amount of punitive damages is appropriate at all depends on a defendant's animus, regardless of the resulting injuries; "[t]he focus [when considering whether to award punitive damages] is on the character of the tortfeasor's conduct." 461 U.S. at 54. *See also Payne v. Jones*, 711 F.3d 85, 102 (2d Cir. 2013) (noting that on

occasion substantial punitive awards are warranted when conduct is reprehensible, even though only nominal compensatory damages have been awarded). Here, the jury could reasonably have found that Defendants LaGrandier and Solomito joined in the assault. Under these circumstances, it was by no means a miscarriage of justice for the jury to have found that each of the Defendants demonstrated a callous indifference to Plaintiff's Fourth Amendment rights. Therefore, the jury's verdict imposing punitive damages on all three Defendants does not warrant a new trial.

ii. Plaintiff Counsel's Conduct

In addition to their substantive objections, Defendants contend that misconduct by Plaintiff's counsel caused sufficiently serious error to warrant a new trial. Defs.' Mem. 12–17. To successfully move for a new trial on this basis, Defendants must show that Plaintiff's counsel engaged in misconduct that "cause[d] prejudice to the opposing party and unfairly influence[d] the] jury's verdict." *Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118, 144 (E.D.N.Y. 2013) (quoting *In re Fosamax Prods. Liab. Litig.*, 742 F. Supp. 2d 460, 477 (S.D.N.Y. 2010)). A court deciding a new trial motion based upon opposing counsel's conduct should consider "the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, and the manner in which the parties and the court treated the comments." *Id.* (quoting *Levitant v. N.Y.C. Human Res. Admin.*, 914 F. Supp. 2d 281, 311 (E.D.N.Y. 2012), *aff'd*, 558 Fed Appx. 26 (2d Cir. 2014)). When a court is tasked with making this determination, "[g]reat discretion is to be given the judge who was present throughout the trial and is best able to determine the effect of the conduct of counsel on the jury." *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1289 (2d Cir. 1990) (citation omitted).

Defendants first find objectionable the "inflammatory argument" in counsel's opening statement. Defs.' Mem. 12. Defendants specifically point to counsel's statement that "[t]he evidence will show that the defendants made a conscious decision not to tell the truth about what happened here. . . . They will take the stand and they will claim ignorance. They will mislead you . . . ." *Id.* at 12 (quoting Trial Tr. 22:20–22, 23:1–3). Defendants could have, but did not, object to these statements. The statements, while argumentative, were not prejudicial; this case clearly involved conflicting versions of events, and that was plain to the jury from the outset.

Defendants next take issue with Plaintiff's counsel beginning to speak about the contentious nature of Plaintiff and Ms. Henry's relationship, *id.* at 12–13 (quoting Trial Tr. 23:12–17), details of which this Court ruled inadmissible prior to trial, Tr. of Civil Cause for Pretrial Conference ("Pretrial Conf.") 53:23–54:6, Docket Entry 80. In response, the Court initiated a sidebar and directed Plaintiff's counsel to move beyond this portion of her statements. Trial Tr. 25:1–28:9. Defendants contend, though, that the comments of Plaintiff's counsel opened the door to facts that would contextualize the Defendants' conduct, and that their inability to present evidence to that effect prejudiced them. Defs.' Mem. 13.

Prior to the opening statements, the Court instructed the jury that "these remarks are not evidence but just an introduction to what each side hopes to be able to prove with evidence." Trial Tr. 16:9–11. In light of this instruction, and given the Court's prompt intervention when Plaintiff's counsel began to describe Plaintiff's prior relationship with Ms. Henry, the brief remarks of Plaintiff's counsel during opening statements did not unfairly prejudice Defendants.

Defendants also contend that Plaintiff's counsel posed numerous inflammatory questions while examining the Defendants. Defs.' Mem. 13–15. While Defendants point out that the Court consistently sustained objections to these lines of questioning, they assert that "it is highly

likely that the jury believed counsel had some basis for asking the questions, assumed there was some truth to them, and factored these fabrications by counsel into their assessment of the defendants' credibility, depriving them of a fair trial." *Id.* at 14–15. The most egregious example Defendants offer is counsel's suggestively asking Defendant Yurkiw if he was "afraid of the population that [he] police[s]," Trial Tr. 100:5–6, and if "the New York City Police Department wasn't [his] first choice" of job, *id.* at 100:11–12. The record makes clear that the Court was frustrated by these questions and sustained objections, with sharp wording, to both. *See id.* at 100:8–10, 13–15, 21-23. Defendants' contention that the jury was influenced by any improper questioning by Plaintiff's counsel falls flat, particularly in light of the prompt rulings sustaining Defendants' objections.

Defendants next assert that Plaintiff's counsel acted frequently as an unsworn witness, both by inserting interpretations of the evidence and by asking Plaintiff leading questions. For instance, Defendants take issue with counsel asking Defendant Solomito if he was present when Defendant Yurkiw testified that Ms. Henry admitted to striking Plaintiff. Defs.' Mem. 15–16 (citing Trial Tr. 269:18–23). While Yurkiw did not testify to that, any potential prejudice was neutralized by Defendant Solomito's response, "I don't recall that," Trial Tr. 269:21, and by the immateriality of Ms. Henry's conduct to the central issue in the case—Defendants' use of force.

As for counsel's use of leading questions, it is of course well-established that they "should not be used on direct examination except as necessary to develop the witness's testimony." Fed. R. Evid. 611(c). Nevertheless, "[a]n almost total unwillingness to reverse for infractions has been manifested by appellate courts. The matter clearly falls within the area of control by the judge over the mode and order of interrogation and presentation and accordingly is

phrased in words of suggestion rather than command." Fed. R. Evid. 611(c) advisory committee's note on 1972 proposed rules (citation omitted).

Here, the Court overruled defense counsel's leading objections on two occasions because they were aimed at questions designed to develop Plaintiff's testimony—first, with respect to counsel asking if the apartment building's stairwell was between the elevator and Ms. Henry's apartment, Trial Tr. 471:12–14, and second, with respect to counsel asking Plaintiff where he was positioned when Defendant LaGrandier and Sergeant Brown arrived, *id.* at 477:2–6. Neither question went to the disputed issues in the case. Moreover, while overruling the objections, the Court exhorted Plaintiff's counsel to do less leading. *Id.* at 471:14. The Court also overruled a third defense objection, raised when counsel asked Plaintiff, "Who makes contact with you [first]?" *Id.* at 478:19–23. This question was not in fact leading, particularly because plaintiff had just been asked, without objection, "At some point, did one of these officers make physical contact with your body," and plaintiff had answered, "Yes." *Id.* at 478:12–15. Moreover, each of the three Defendants had already testified at that point in the trial, and even under their versions of the events, they each made contact with Plaintiff in an effort to subdue him and prevent him from fleeing. To the degree that Plaintiff's direct testimony was guided by leading questions, any impact on the fairness of trial was no more than *de minimis*.

Defendants lodge additional objections concerning counsel's use of a video screen, arguing that (1) when connected to the computer belonging to counsel's paralegal, it displayed material not admitted into evidence, and (2) the screen was placed in front of the jury box, such that defense counsel had to walk across the room to see it. Defs.' Mem. 17. With respect to the former contention, Defendants' objections were promptly made and immediately sustained, *see, e.g.,* Trial Tr. 292:13–18, 296:21–297:3, 365:14–18, while the Court also acted unilaterally when

18

necessary to ensure that material not admitted into evidence was not displayed for the jury, *see,* *e.g., id.* at 126:3–9, 367:20–25. In any event, there is no indication in Defendants' moving papers or the record of the trial that Plaintiff's counsel ever displayed anything of material importance that had not been received in evidence, nor does the Court recall that ever having taken place. Rather, the only examples that can be gleaned from the trial transcript are of immaterial matters being visible, such as an indication of whether the television monitor was on or off. Tr. 365:16–18. The Court's best recollection is that most objections concerned exhibits remaining on display after testimony concerning them had been completed. As for the screen's placement, the determination of how to position the screen was made in service of visibility to the jury—the top priority during the presentation of evidence—and the Court invited Defendants' counsel on the first day of trial to move about the courtroom when necessary to see what was displayed on the screen. *Id.* at 65:21–22.

While Defendants' complaints regarding Plaintiff's counsel's conduct are voluminous, none are sufficient to warrant a new trial. The degree of the alleged misconduct is slight, even in comparison to the conduct involved in other cases where a new trial was held not to be warranted. *See, e.g., In re Fosamax*, 742 F. Supp. 2d at 478, 483–84 (finding that conduct that included treating defense witnesses in a "disparaging and insulting manner" and engaging in "outrageous behavior and accusations in summation"—conduct the court described as falling "far shy of the standards for professional conduct to which members of the bar in this district are expected to conform"—nevertheless did not warrant a new trial in light of protective steps taken by the court). In addition, the examples Defendants provide tend to concern peripheral facts or issues, rather than the excessive force question before the jury. Furthermore, it is not at all clear, even when there is egregious conduct by one party's counsel, that such misconduct does not

"inure[] to the detriment of his client" rather than to that of the other party. *Id.* at 483. In light of the steps taken by the Court to prevent and cure impropriety and the considerable discretion afforded this Court in evaluating the degree of prejudice caused, this aspect of Defendants' new trial motion is unavailing.

      iii. <u>Evidentiary Rulings</u>

Defendants' final ground in support of their Rule 59 motion is based upon a series of evidentiary rulings that they urge resulted in an unfair trial. Defs.' Mem. 18–26. Defendants primarily challenge the Court's rulings with respect to the relevance of certain evidence.

The Federal Rules of Evidence provide that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Even if relevant, though, "[t]he court may exclude [the] evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "This balancing is 'a matter generally left within the wide, and wise, discretion of the trial court.'" *United States v. Medico*, 557 F.2d 309, 317 (2d Cir. 1977) (quoting *United States v. Robinson*, 544 F.2d 611, 616 (2d Cir. 1976)). Against the Court's latitude when conducting this balancing, Defendants lodge three grievances, complaining that the Court: (1) improperly precluded Defendants from offering certain evidence concerning the circumstances of Plaintiff's arrest, Defs.' Mem. 18–22, (2) unfairly precluded Defendants from impeaching Plaintiff with evidence of his criminal history, *id.* at 23–24, and (3) improperly allowed Plaintiff's counsel to engage in gamesmanship and deviate from the witness list in the Joint Pretrial Order, *id.* at 24–26.

Turning first to the circumstances of Plaintiff's arrest, Plaintiff's counsel expressed concern at a pretrial conference that Plaintiff would be unfairly prejudiced if the order of protection in force against him at the time of his arrest were received in evidence. Pretrial Conf. 28:1–8. At the same time, though, Plaintiff sought to introduce evidence of other aspects of the relationship between Plaintiff and Ms. Henry, including evidence that Ms. Henry was arrested for threatening Plaintiff, thus suggesting that Plaintiff was not the only aggressor in the relationship. *Id.* at 26:12–27:1. The Court warned Plaintiff's counsel that if any aspect of the relationship were admitted, it would open the door to a broad range of evidence about Plaintiff's relationship with Ms. Henry, likely lengthening the trial and injecting confusion and distraction into the proceedings. *Id.* at 27:2–28:16. Plaintiff ultimately decided not to offer evidence about Ms. Henry's arrest or aspects of the relationship between Plaintiff and Ms. Henry not directly relevant to the events of April 23, 2014. Letter dated May 18, 2018, Docket Entry 84. In a related pretrial ruling, the Court held that Defendant LaGrandier could testify that her title was "domestic violence officer," finding LaGrandier's title no more prejudicial than the fact that an order of protection was in place. Pretrial Conf. 26:1–8.

Defendants now take issue with what they characterize as a revision of the Court's pretrial rulings. Defs.' Mem. 19. Defendants' characterization is not accurate. Defendants made clear in the pretrial conference what they intended to bring out about LaGrandier's background: "We don't plan on saying what [the character of the domestic disputes was] or saying there was any violence or anything like that, just that that's why [LaGrandier] was familiar with the names and the location and the background of this family and the order of protection." Pretrial Conf. 25:12–16. The Court's ruling at trial did not deviate significantly from what Defendants represented prior to trial; the Court ruled that LaGrandier could testify

"that she had been to the premises before, but not why she was there, who called for her help, or what she observed." Trial Tr. 49:7–9. Defendants contend that this limitation on LaGrandier's prior interactions with Plaintiff prejudiced them by "prevent[ing LaGrandier] from giving the jury a clear picture of what they knew while they were interacting with plaintiff." Defs.' Mem. 19. Defendants nowhere explain what Defendants knew that might have justified their use of force as described by Plaintiff. In fact, LaGrandier was asked on cross-examination, without objection, whether she knew Plaintiff before April 23, 2014, and testified she was unsure she had ever seen him before. Trial Tr. 413:2–3. In any event, the jury did hear evidence that Defendant LaGrandier was a domestic violence officer who was responding to a 911 call involving an alleged violation of a protective order. *Id.* at 166:24–167:18, 366:21–24, 411:1–11, 589:2–14, 591:4–13. This provided the jury with ample context for the officers' response. Accordingly, the Court's rulings in this regard were well within its broad discretion.

Defendants also assert that they were unfairly prejudiced by the Court's decision to limit Defendant Yurkiw's testimony regarding statements Plaintiff made shortly before the use of force at issue took place. Defs.' Mem. 21–22. Defendant Yurkiw proposed to testify that Plaintiff said "that he could not go back to Rikers Island because he had 'too many beefs there.'" Defs.' Opp'n to Pl.'s Pretrial Submission Concerning Matters to Be Resolved in Lim. 4, Docket Entry 70. Defendants posited that this statement was admissible under Federal Rule of Evidence 404(b) as probative of Plaintiff's motive to flee or resist arrest. *Id.* at 5–8; Pretrial Conf. 13:5–7. Plaintiff objected on Rule 403 grounds, arguing that the statement's probative value did not substantially outweigh its prejudicial effect. Pretrial Conf. 5:22–6:5. The Court ruled essentially in Plaintiff's favor, allowing Defendant Yurkiw to testify only to a redacted form of Plaintiff's statement: Yurkiw was permitted to testify that Plaintiff expressed some fear about going to

Rikers and said, "I'm not going to Rikers." Pretrial Conf. 15:10–19. Defendants now claim both that this redaction impaired Yurkiw's credibility in the jury's eyes and that Plaintiff's counsel took unfair advantage of the redaction. Defs.' Mem. 21–22.

The Court's ruling on this point again comes within its broad discretion. Rule 404(b) is discretionary, providing only that such evidence "*may* be admissible" for one of the purposes enumerated in the rule. Fed. R. Evid. 404(b)(2) (emphasis added). And Rule 404 is subject, not superior, to Rule 403. *See United States v. Flom*, 256 F. Supp. 3d 253, 266 (E.D.N.Y. 2017) (requiring that relevant evidence, offered for a proper purpose, be "substantially more probative than prejudicial" (citing *United States v. Moran-Toala*, 726 F.3d 334, 345 (2d Cir. 2013)); *United States v. Carneglia*, 08-cr-76, 2009 WL 10674183, at *6 (E.D.N.Y. Feb. 24, 2009) ("[T]he Second Circuit has adopted an 'inclusionary approach' under Rule 404(b), permitting admission of evidence of prior crimes, wrongs, or acts 'unless it is introduced for the sole purpose of showing defendant's bad character, *or unless it is overly prejudicial under Fed. R. Evid. 403* or not relevant under Fed. R. Evid. 402.'" (emphasis added) (quoting *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996))).

The Court had three options with respect to Yurkiw's testimony regarding Plaintiff's statement about Riker's Island: admit it *in toto*, admit it in redacted form, or exclude it *in toto*. To exclude the statement *in toto* would likely have been unfair to Defendants, who planned to argue that Plaintiff's concern about going to Rikers motivated him to flee. To admit it *in toto*, however, would have unduly prejudiced Plaintiff by alerting the jury to his prior criminal history, which was not otherwise admissible, and possibly causing the jury to infer that on April 23, 2014, he acted in accordance with violent acts he had committed prior to that date. Allowing the testimony about Plaintiff's statement in redacted form permitted Defendants to argue Plaintiff's

motive without prejudicing Plaintiff by alerting the jury that Plaintiff had a prior criminal history that included spending time in custody on Riker's Island.[4] The ruling was not erroneous, and clearly does not warrant a new trial.

Defendants next assert that the Court let Plaintiff imply that there was no probable cause for his arrest, despite Plaintiff's decision not to proceed with his false arrest claim, while at the same time preventing defense counsel from questioning Defendants about the protective order and arrest circumstances. Defs.' Mem. 20–21. The Court was careful in this regard to limit all parties' inquiries into matters attenuated from the use of force. *See* Trial Tr. 116:21–119:5 (sustaining Defendants' objection to Plaintiff's inquiry into the officers' degree of care in reading the order of protection and their purported bias against men); *id.* at 170:20–21 (precluding defense counsel from asking Defendant Yurkiw what Ms. Henry communicated to him about Plaintiff); *id.* at 219:9–220:4 (precluding Plaintiff's counsel from inquiring into whether probable cause to arrest Plaintiff existed); *id.* at 280:15–21 (sustaining Defendants' objection to Plaintiff's inquiry into why Ms. Henry wanted Plaintiff arrested); *id.* at 411:16–19 (sustaining an objection to Defendant LaGrandier beginning to speak about why she was familiar with Ms. Henry's address).

Defendants also find prejudicial the Court's preclusion of Plaintiff's prior arrest for striking an officer and misdemeanor conviction for resisting arrest. Defs.' Mem. 23–24; Reply Mem. of Law in Further Supp. of Defs.' Post-Trial Mots. Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure ("Defs.' Reply") 6, Docket Entry 139. Defendants argue that

---

[4] Although Defendants complain that requiring redaction inevitably comprimised Yurkiw's credibility, Defs.' Mem. 21, requiring witnesses to redact information is a common practice, particularly in criminal cases, where it may be required by *Bruton v. United States*, 391 U.S. 123 (1968). There, the Supreme Court established that, in a joint criminal trial, instructing the jury not to consider one co-defendant's incriminating statement as implicating the other co-defendant was insufficient to protect the non-declarant co-defendant's Sixth Amendment confrontation rights, since "the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors." *Id.* at 126, 129.

Plaintiff's testimony—"I never would, never put my hands on a police officer," Trial Tr. 483:6—opened the door for impeachment purposes. Defs.' Mem. 23–24; Trial Tr. 490:14–22, 497:10–498:8. The Court found the evidence of prior convictions too prejudicial to Plaintiff to warrant admission, but alerted Plaintiff's counsel that if Plaintiff made more such statements, the ruling might be revisited. Trial Tr. 499:6–9. This, too, was within the Court's wide discretion under Rule 403.

Finally, Defendants claim that the Court failed to intervene in what they call "gamesmanship" by Plaintiff's counsel. Defs.' Mem. 24–26. They say first that counsel's gaining permission from the Court in the middle of trial to call new witnesses only to elect later not to call them prejudiced Defendants. *Id.* at 24–25. The worst harm Defendants assert on this ground is time spent in the evening hours deposing the new witnesses and having to present summations earlier than expected. *Id.* at 25. More specifically, the parties rested and the Court was prepared to hear closing arguments at a point in the day a little before 12:30 p.m. Despite the relatively early hour, Defendants asked to break for the day and be permitted to present their summation the following morning. Although the Court denied that request, it did adjourn for more than two hours to afford counsel adequate time to prepare her closing argument. Trial Tr. 674:21–676:15. Particularly given the brevity of the trial, this should have been ample time to prepare, and these events therefore could not possibly have unfairly prejudiced Defendants' case.

Defendants next assert that allowing Plaintiff's witness, Dr. Matari, to testify by telephone, and his continuing to answer questions when he could not hear sustained objections, allowed the jury to hear impermissible opinion evidence. Defs.' Mem. 25. It seems highly unlikely the jury heard anything of the sort, though, as even the court reporter was unable to hear the doctor's answers over the Court's and counsel's vigorously urging him to stop speaking.

25

Trial Tr. 342:1–13. Dr. Matari's testimony, moreover, was quite brief, taking up only twenty pages of the trial transcript, *id.* at 333–353, and the problem that is the subject of Defendants' complaint was apparently solved when Dr. Matari picked up the telephone receiver and stopped communicating via speakerphone, *id.* at 342:4–10. Lastly, Defendants urge that Dr. Flores being permitted to testify after direct examination of Plaintiff allowed Plaintiff to tailor his testimony on cross-examination to conform with Dr. Flores's testimony that Plaintiff had not lost consciousness. Defs.' Mem. at 26; *see* Trial Tr. 570:17–22. The Court fails to see a meaningful difference, though, between Plaintiff's testimony on direct examination, before Dr. Flores testified—"I was just out of it from there," Trial Tr. 480:1—and Plaintiff's testimony on cross-examination, after Flores' testimony, that he was "passed out" while feeling Defendants' kicks and punches, *id.* at 605:14–16, that he was "in and out of consciousness" on the elevator, *id.* at 605:19–20, and that he "fell out again" in the lobby, *id.* at 606:6–7. It is, in any event, common practice to take non-party witnesses out of turn to accommodate their schedules.

In sum, the evidence presented at trial was sufficient for the jury to find Defendants, including LaGrandier and Solomito, liable for excessive force, and to impose punitive damages on them as well. Defendants have not alerted the Court to any conduct of Plaintiff's counsel, nor to any evidentiary rulings of this Court, that warrant a new trial. Defendants' motion for a new trial as to liability is therefore denied.

## IV. Remittitur

### A. Legal Standards

Remittitur offers Defendants another option for post-trial relief. "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)

(citations omitted). The Second Circuit has identified two types of cases in which remittitur may be employed. The first is "where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken." *Id.* at 49 (citation omitted). The second is "where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." *Id.* (quoting *Lanfranconi v. Tidewater Oil Co.*, 376 F.2d 91, 96–97 (2d Cir. 1967)). In the latter circumstance, "a jury's damage award may not be set aside as excessive unless 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988)). In making this determination, "[i]t is appropriate to review the awards in comparable cases." *Jackson v. Tellado*, No. 11-cv-3028, 2018 WL 4043150, at *2 (E.D.N.Y. Aug. 24, 2018) (citing *Martinez v. Port Auth. of N.Y. & N.J.*, No. 01-cv-721, 2005 WL 2143333, at *19 (S.D.N.Y. Sept. 2, 2005), *aff'd*, 445 F.3d 158 (2d Cir. 2006)).[5] Where remittitur is appropriate to correct a damage award deemed excessive, "the court should reduce the award 'only to the maximum amount that would be upheld by the district court as not excessive." *Rangolan v. Cty. of Nassau*, 370 F.3d 239, 244 (2d Cir. 2004) (quoting *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir. 1990)).

B. *Compensatory Damages*

This case clearly falls into the second category described above, in that the error claimed by Defendants does not concern a particular, quantifiable amount erroneously included by the

---

[5] While the Second Circuit has held that a district court "improperly limited its frame of reference" in a § 1983 case to comparable § 1983 cases, *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990), its authority on that point was a 1978 case that noted the "relative paucity of [§ 1983] cases" to which to compare the award at issue, *Zarcone v. Perry*, 572 F.2d 52, 54–55 (2d Cir. 1978). As Defendants have made clear, there is no longer a shortage of § 1983 cases with which to compare the award in this case. Defs.' Mem. 28–35, 39–41.

jury in its damages award. Indeed, Plaintiff did not offer evidence of any specific costs incurred or losses sustained as a result of the Defendants' use of force. Moreover, in instructing counsel before and during trial, this Court applied the Second Circuit's teaching in *Consorti v. Armstrong World Industries, Inc.* that "specifying target amounts for the jury to award is disfavored," 72 F.3d 1003, 1016 (2d Cir. 1995), *vacated on other grounds*, 518 U.S. 1031 (1996), and directed counsel not to mention any specific amount to the jury at trial, Pretrial Conf. 33:14–25.

The Court's task, then, is to canvass comparable cases to determine whether the compensatory award of $500,000 shocks the conscience. The first step in this task is to identify the evidence of plaintiff's injuries that was placed before the jury. Physical injuries are typically classified as either permanent (thus deserving of greater damages awards) or non-permanent (thus deserving of lesser damages awards). *See Dancy v. McGinley*, No. 11-cv-7952, 2015 WL 13214324, at *6–7 (S.D.N.Y. 2015) (noting that "awards in the middle to higher end on the spectrum of compensatory damages . . . for excessive force claims have involved cases in which plaintiffs suffered permanent injuries," while "[a]t the low end of the spectrum are the cases that typically involve non-permanent injuries"), *aff'd*, 843 F.3d 93, 113 (2d Cir. 2016). As for emotional distress damages, under Second Circuit precedent, these may be classified as either garden-variety, significant, or egregious, with the amount of damages reasonably awarded increasing depending upon the classification. *Graham v. City of New York*, 128 F. Supp. 3d 681, 714 (E.D.N.Y. 2015). Garden-variety emotional damages are those "where the evidence of the harms comes from the plaintiff's testimony alone." *Id.* (citations omitted). Significant emotional distress claims "are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." *Olsen v. Cty. of Nassau*,

615 F. Supp. 2d 35, 46–47 (E.D.N.Y. 2009) (quoting *Khan v. HIP Centralized Lab. Svcs., Inc.*, No. 03-cv-2411, 2008 WL 4283348, at *11 (E.D.N.Y. Sep. 17, 2008)).  Finally, egregious emotional distress claims are those involving "either 'outrageous or shocking' discriminatory conduct or a significant impact on the physical health of the plaintiff."  *Id.* at 47 (quoting *Khan*, 2008 WL 4283348, at *12).

Here, Plaintiff's alleged physical injuries occupy a middle ground between non-permanent and permanent.  Plaintiff presented testimony from medical doctors that he sustained a hematoma on his right eye, Trial Tr. 338:8–12, 559:23–25, a bilateral nasal fracture, *id.* at 338:14–339:6, 563:12–17, a deviated nasal septum, *id.* at 339:8–13, swelling on the left side of his head, *id.* at 351:15–17, and certain nondescript injuries to the neck, scalp, and face, *id.* at 566:21–567:4.  The only permanent injuries Plaintiff described, though, are frequent "definitely painful" headaches and a crooked nose.  *Id.* at 487:18–488:10.  These injuries are relatively modest ones, and Plaintiff offered no evidence of ongoing treatment for them.  Plaintiff's nose was broken, though, and it seems the break was severe; Dr. Matari testified at trial that Plaintiff's nasal bones were broken into multiple fragments and displaced.  *Id.* at 338:22–339:6.  Plaintiff's badly broken nose is significant in light of how courts addressing non-permanent injuries often note the absence of fractures to distinguish more egregious cases.  *See Poulos v. City of New York*, No. 14-cv-3023, 2018 WL 3750508, at *7 (S.D.N.Y. July 13, 2016) (Report and Recommendation) ("Compensatory damage awards for single incidents involving strikes by police officers that result in loss of consciousness and associated lacerations—but do not cause further injuries requiring surgery, or *broken bones*—frequently run between $50,000 and $100,000." (emphasis added) (citing *Dancy v. McGinley*, 843 F.3d 93, 113 (2d Cir. 2016))), *adopted*, 2018 WL 3745661 (S.D.N.Y. Aug. 6, 2018).  Here, because the force used was

substantial enough to fracture Plaintiff's nose, Plaintiff's injuries are properly compensated by an amount at the very high end of awards for non-permanent injuries.

As for Plaintiff's emotional damages, they can be no more than garden-variety. The extent of Plaintiff's testimony in this regard is that he was "emotional" as a result of being beaten in front of his son. *Id.* at 484:21–22. Plaintiff offered no evidence of treatment for his emotional distress, or any general expert testimony on the likely psychological impact of the attack at issue.[6]

Comparable cases, then, are those involving sustained beatings resulting in either substantial non-permanent or mild permanent physical injuries, and no more than garden-variety emotional distress. There are some such cases that resulted in damages awards of $100,000 or less (in 2018 dollars).[7] In *Poulos*, the court conducted a damages inquest after defendants' default and recommended a $100,000 award where a single punch resulted in a two-centimeter deep gash above the plaintiff's eyebrow, a loss of consciousness, a permanent one-inch scar, and ongoing complaints of eye pain. 2018 WL 3750508, at *1, 6. The resulting emotional distress was quintessentially garden-variety, supported only by one sentence of testimony from the plaintiff. *Id.* at *7. In *Dancy*, an assault similar to the one described by Plaintiff here resulted in temporary bruising, headache pain, and pain while urinating, as well as a claim of emotional

---

[6] Plaintiff does point in his opposition to a diagnosis of adjustment disorder with mixed anxiety and depressed mood. Pl.'s Mem. 31. While this diagnosis is memorialized in health records admitted into evidence at trial, Lumer Decl. Ex. 5, at DEF 647, Docket Entry 136-5, Plaintiff did not present any testimony at trial with respect to that diagnosis, either from Plaintiff himself or from any healthcare professional. Nor, again, is there evidence of subsequent treatment for this condition. Absent evidence that this condition was caused by the use of force at issue in this case, and absent any evidence of treatment for it, Plaintiff's reference to an adjustment disorder diagnosis in his medical records is insufficient to support a finding that Plaintiff sustained more than garden-variety emotional distress damages.

[7] When comparing the award in this case to awards in similar cases from years ago, it is proper to make adjustments for inflation. *Jackson*, 2018 WL 4043150, at *4 n.4. As has been done in other cases, *see, e.g., Palmer v. Molina Meneses*, No. 12-cv-4741, 2016 WL 7191668, at *2 (E.D.N.Y. Dec. 12, 2016), I use the Bureau of Labor Statistics Consumer Price Index Inflation Calculator located at https://www.bls.gov/data/inflation_calculator.htm to adjust awards from the date of entry of the verdict or conclusion of the appeal to June 2018, when Plaintiff's trial concluded.

distress supported only by testimonial evidence of the plaintiff's decreased academic drive. No. 11-cv-7952, 2015 WL 13214324, at *2–6 (S.D.N.Y. May 11, 2015), *aff'd*, 843 F.3d 93, 113 (2d Cir. 2016). The trial court in that case remitted a verdict of $100,000 in compensatory damages to $81,500. *Id.* at *9–10. Finally, in *Wheatley v. Ford*, where the only injuries convincingly caused by the assault were temporary, the court remitted a $55,000 compensatory damage award to $25,000 (roughly $66,000 in 2018). 679 F.2d 1037, 1039–40 (2d Cir. 1982). While there are similarities between these cases and the present case, most notably the scant evidence of emotional distress, Plaintiff's physical injuries here are somewhat more severe, in that the injuries in *Poulos*, *Dancy*, and *Wheatley* did not include fractures.

Courts in this Circuit have awarded damages in excess of $100,000 (in 2018 dollars) despite the absence of well-documented permanent injuries on at least two occasions. In *Rodick v. City of Schenectady*, a plaintiff who was "beaten repeatedly" and fell down the stairs of his house, and then handcuffed and removed from his house naked, was awarded compensatory damages of $150,000 (roughly $266,000 in 2018). 1 F.3d 1341, 1343–44 (2d Cir. 1993).[8] In *Blissett v. Coughlin*, where a plaintiff inmate was subjected to multiple punches, kicking, choking, and baton strikes by corrections officers, evidence of his damages was limited to his own testimony of a recurring knee problem and garden-variety emotional distress. 66 F.3d 531, 533–34 (2d Cir. 1995). The Second Circuit upheld the $75,000 (roughly $123,000 in 2018) excessive force portion of the plaintiff's compensatory award. *Id.* at 536. While these cases are factually comparable in some ways, Plaintiff's emotional harm probably does not rise quite to the level of that in *Rodick*, given that plaintiff's removal from his home while naked. Similarly,

---

[8] The compensatory damages attributable to excessive force were not challenged on appeal.

the permanent knee injury alleged in *Blissett*, while supported only by plaintiff's testimony, would likely result in a greater impairment to functioning than Plaintiff's crooked nose.

The severity of the injuries sustained by Plaintiff in this case fall in the middle ground between those at issue in *Blissett* ($123,000) and *Poulos* ($100,000). The Court therefore finds $115,000 to be the maximum amount the jury could reasonably have awarded as compensation for Plaintiff's injuries.

### C. *Punitive Damages*

As already noted, "[p]unitive damages are available in a section 1983 case 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Mathie v. Fries*, 121 F.3d 808, 815 (2d Cir. 1997) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). When defendants' misconduct involves such a state of mind, punitive damages are available "to punish what has occurred and to deter its repetition." *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992) (quoting *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21 (1991)). As with compensatory damages, by way of remittitur, "a district court may modify a punitive damage award when the amount is so high as to 'shock the judicial conscience and constitute a denial of justice.'" *Milfort v. Prevete*, 3 F. Supp. 3d 14, 24 (E.D.N.Y. 2014) (quoting *Payne v. Jones*, 711 F.3d 85, 96 (2d Cir. 2013)).

"Awards of punitive damages are by nature speculative, arbitrary approximations. No objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct." *Payne*, 711 F.3d at 93. Nevertheless, "courts . . . bear the responsibility to ensure that judgments as to punitive damages conform, insofar as reasonably practicable, to [principles of fairness and judicial norms] and are not excessive." *Id.*

at 96. When exercising this responsibility, courts follow the three guideposts set forth by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575–585 (1996)—degree of reprehensibility, ratio of punitive to compensatory damages, and comparable civil and criminal penalties. *See Payne*, 711 F.3d at 96–97.[9]

i. Reprehensibility

The degree of reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. The *Gore* Court noted that "nonviolent crimes are less serious than crimes marked by violence." *Id.* at 576 (quoting *Solem v. Helm*, 463 U.S. 277, 292–93 (1983)). Following this guidance, the court in *Alla v. Verkay* found that a single punch strong enough to break the plaintiff's cheekbone was "highly reprehensible" and "support[ed] a substantial punitive damages award." 979 F. Supp. 2d 349, 378 (E.D.N.Y. 2013). Here, the jury was entitled, on the evidence before it, to find the officers' conduct similarly reprehensible. The jury expressly found that Plaintiff made no attempt to flee, did not resist arrest, and did not strike Defendants. Special Interrogs. Form 1–2, Docket Entry 107. Furthermore, the evidence was sufficient to support a finding that Defendant Yurkiw delivered two unprovoked and violent punches that rendered Plaintiff semiconscious, and that all Defendants then engaged in administering further strikes to an already subdued arrestee. Under the reprehensibility analysis, the jury could also have reasonably considered the fact that Plaintiff had called for help as the victim of an assault, only to find himself subjected to excessive force

---

[9] The *Payne* Court noted that the Supreme Court crafted the *Gore* guideposts for evaluating *state* court decisions upholding punitive damages awards, "recognizing that it had no authority to overturn such a state court judgment unless it violated the Due Process Clause of the Constitution." *Id.* at 96–97 (citing *Gore*, 517 U.S. at 568). But the court clarified that "[a] federal trial court reviewing a jury's punitive award for excessiveness . . . [has] considerably more supervisory authority than the Supreme Court has over the decisions of the highest courts of a state." *Id.* at 97 (citation omitted). In other words, a federal court reviewing a jury's punitive damages award with respect to a *federal* claim need not find the award so "grossly excessive" as to violate due process before granting a motion seeking remittitur. *Id.*

by the responding officers. That Defendants engaged in this behavior while exercising their responsibilities and pursuant to their authority as public servants and law enforcement officers further supports a finding of great reprehensibility. Accordingly, the first prong of *Gore* supports a significant punitive award.[10]

      ii.  <u>Ratio of Punitive Damages to Compensatory Damages</u>

Generally, *Gore* marks a ten-to-one ratio as the due process ceiling of punitive to compensatory damages, while rejecting a categorical or formulaic approach. 517 U.S. at 581–83. The Second Circuit, nonetheless, has been hesitant to approve a punitive award approaching even a five-to-one ratio. *See, e.g., Payne*, 711 F.3d at 103 ("[G]iven the substantial amount of the compensatory award [of $60,000], the punitive award five times greater appears high."); *DiSorbo v. Hoy*, 343 F.3d 172, 185–86, 189 (2d Cir. 2003) (remitting a $1,275,000 punitive damages award to $75,000 after remitting the $400,000 compensatory damages award to $250,000); *Anderson v. Cty. of Suffolk*, 621 Fed. Appx. 54, 55 (2d Cir. 2015) (summary order) (affirming a compensatory award of $20,000 and punitive award of $75,000); *Mathie*, 121 F.3d at 816 (deeming the two-to-one ratio assessed by the jury "not unreasonable" in the case of a sexual assault by a corrections officer, but finding the punitive award excessive on other grounds). In any event, in line with *Gore*'s rejection of a formulaic approach, the *Payne* court strongly cautioned against weighing this second prong too heavily in the analysis:

> The ratio, without regard to the amounts, tells us little of value in this case to help answer the question whether the punitive award was excessive. Had the facts of the harm . . . been such that the jury appraised [the plaintiff's] compensable loss at only $10,000 based on the same conduct . . . and the jury had imposed a punitive award on [the defendant] of $100,000, we would not consider the punitive award

---

[10] Plaintiff urges that Defendants' dishonesty following the events of April 23, 2014, and throughout trial, contributed to their reprehensibility. Pl.'s Mem. 40. Without taking a position on Defendants' veracity during trial, the Court finds persuasive the *Alla* court's response to a similar assertion: "to say that a jury could award punitive damages based on trial perjury would be to authorize punitive damages in almost every case in which the jury credits the plaintiff over the defendant." 979 F. Supp. 2d at 373 n.11.

excessive, even though the ratio of 10-to-1 would have been twice as high as the 5-to-1 ratio that actually resulted.

Payne, 711 F.3d at 103. *See also Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996) (finding the second *Gore* prong completely inapplicable where the jury awarded only nominal compensatory damages for a malicious prosecution claim).

Here, at least as far as the ratio to actual harm is concerned, a punitive award of up to $1,150,000 would be *permissible* if called for by an analysis of the other factors. As discussed herein, however, those factors counsel against an award approaching that magnitude.

### iii. Comparable Civil and Criminal Penalties

Comparable penalties properly considered when reviewing a punitive damages award include those imposed under analogous criminal laws, including state criminal statutes. "The rationale for [considering comparable criminal penalties under state law] is that, if the penalties for comparable misconduct are much less than a punitive damages award, the tortfeasor lacked fair notice that the wrongful conduct could entail a sizable punitive damages award." *DiSorbo*, 343 F.3d at 187 (citing *Lee*, 101 F.3d at 811). The Second Circuit has considered conduct comparable or more egregious than that at issue here to amount to assault in the third degree under New York's criminal assault statute. *See, e.g., Payne*, 711 F.3d at 88, 103 (finding the defendant punching the plaintiff in the face and neck and kneeing him in the back multiple times likely to amount to assault in the third degree); *DiSorbo*, 343 F.3d at 177, 187–88 (deeming allegations of intentionally choking and repeatedly striking the plaintiff to amount to assault in the third degree). Under New York's criminal assault statute, assault in the third degree occurs either when, "[w]ith intent to cause physical injury to another person, [a person] causes such injury to such person," or when a person "recklessly causes physical injury to another person." N.Y. Pen. L. § 120.00. The offense is a class A misdemeanor, *id.*, and thus carries penalties of

no more than one year of imprisonment, *id.* § 70.15, and a fine no greater than $1,000, *id.* § 80.05. Plaintiff urges that the conduct in this case amounts to assault in the second degree, a felony. Pl.'s Mem. 41. For assaults not involving a weapon, assault in the second degree requires the "intent to cause *serious* physical injury." N.Y. Pen. L. § 120.05. A "serious physical injury" is one that carries a substantial risk of death, or results in protracted disfigurement, impairment of health, or damage to an organ. *Id.* § 10.00(10); *see also Payne,* 711 F.3d at 103 n.16. The force used by Defendants and the injuries sustained by Plaintiff here do not rise to this level. In any event, there is no basis to conclude that Defendants' mental state in this case was any more malicious than that of the defendants in *Payne* and *DiSorbo*.[11]

Moreover, the Second Circuit has found comparisons to misdemeanor offenses in police misconduct cases under § 1983 to be of questionable utility. *See DiSorbo,* 343 F.3d at 188 ("[C]riminal penalties understate the notice when the misconduct is committed by a police officer."); *Lee*, 101 F.3d at 811 ("[A]lthough [the defendant] did have some notice as to the gravity of his conduct, nothing could conceivably have prepared him for a punitive damage award amounting to the sacrifice of the better part of a policeman's after-tax pay for a decade."). The *Payne* court did find some usefulness in the analysis, but ultimately determined that the misdemeanor classification of the offense "strongly supports the imposition of some punitive award, but it tells very little about whether the particular award was excessive." 711 F.3d at 104. The same is true in the present case.

---

[11] The defendant in *Payne* allegedly initiated the altercation by uttering a vulgar insult with respect to the plaintiff's Marine Corps tattoo. 711 F.3d at 88. Similarly, the defendant in *DiSorbo* allegedly initiated the plaintiff's arrest and later attacked her because she spurned his advances at a bar. 343 F.3d at 176–77. No such malicious animus appears from the evidence in this case.

### iv. Comparable § 1983 Cases

With only the first prong of *Gore* providing much guidance—and even that guidance being fairly unspecific and conjectural—it is appropriate to turn to comparable § 1983 cases. *See DiSorbo,* 343 F.3d at 188 ("[T]o determine the appropriate level of punitive damages, we assess such awards in other police misconduct cases."); *Mathie*, 121 F.3d at 817 (noting that even if a punitive award comes within *Gore*'s outer limits, it is still necessary to conduct a "comparison with awards approved in similar cases to determine, as with compensatory awards, whether the punitive award is 'so high as to shock the judicial conscience and constitute a denial of justice.'" (quoting *Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir. 1978))). It is prudent in making this comparison to focus on those cases decided since *Gore*, in which courts have been able to take *Gore*'s guidance into account. It also bears keeping in mind, particularly in light of the requirement that damages be remitted only to the maximum reasonable award, that comparable cases in which the damages have been remitted "identify[] the upper end . . . of the appropriate punitive damages range for the conduct at issue." *Poulos*, 2018 WL 3750508, at *8 n.7.

As discussed above, the facts in two Second Circuit cases, *Payne* and *DiSorbo*, are comparable to those at issue here. Plaintiff in *Payne* suffered from post-traumatic stress disorder. 711 F.3d at 88. Plaintiff was in the hospital being treated for an injury to his thumb when he became combative, triggering a police response. *Id.* One of the responding officers made a vulgar remark about plaintiff's tattoo, and plaintiff responded by kicking the officer in the groin. *Id.* Although plaintiff was already in handcuffs, the officer responded by punching plaintiff in the face seven to ten times and kneeing him in the back several times. *Id.* A medical doctor then examined plaintiff and observed that his face was bloody and swollen and that his back was red. *Id.* Plaintiff testified that the officer's beating aggravated his preexisting back

condition and his post-traumatic stress disorder.  *Id.*  The jury awarded plaintiff $300,000 in punitive damages, which the Circuit remitted to $100,000 in 2013 (roughly $109,000 in 2018), taking into account that plaintiff's behavior provoked the defendant, that defendant's use of force lasted only thirty seconds and did not involve the use of a weapon, and that plaintiff did not sustain serious injuries.  *Id.* at 93, 101.

Plaintiff in *DiSorbo* alleged that she was arrested by an off-duty police officer after she rejected his advances in a bar.  Plaintiff alleged that, when she arrived at the precinct, "she was choked, slammed against the wall, thrown to the ground, and struck while defenseless on the floor."  343 F.3d at 174.  Plaintiff's injuries included two large hematomas on her head and bruises throughout her upper body, but none of her injuries required surgery or resulted in permanent injuries of any kind.  *Id.* at 179.  The jury awarded plaintiff $625,000 in punitive damages on her excessive force claim, which the *DiSorbo* court remitted to $75,000 (roughly $102,000 in 2018 dollars) after reviewing awards in other police misconduct cases.  *Id.* at 181, 188–89.

In terms of the force used specifically by Defendant Yurkiw, *Alla* is particularly instructive.  There, where "[the defendant] punched an unarmed, outnumbered and compliant suspect with enough force to break [his] cheekbone," the court upheld a punitive award of $150,000 in 2013 (roughly $164,000 in 2018).  979 F. Supp. 2d at 378–79.  The court justified a punitive award greater than the award in *DiSorbo* in light of the permanence of the plaintiff's injuries.  *Id.* at 378 (citing *DiSorbo*, 343 F.3d at 179).  Similarly, the *Alla* court noted the absence of mitigating factors, including provocation by the plaintiff, that were present in *Payne*.  *Id.* (citing *Payne*, 711 F.3d at 101–02).

Comparing the present case with *Payne*, *DiSorbo*, and *Alla*, the Court finds that the maximum punitive award a reasonable jury could have imposed on Defendant Yurkiw is $120,000, advancing past the amounts awarded in *Payne* ($109,000 in 2018 dollars) and *DiSorbo* ($102,000 in 2018 dollars) but not approaching the $164,000 (in 2018 dollars) awarded in *Alla*. Yurkiw's assault was more violent than that of the defendant officers in *Payne* and *DiSorbo*, as evidenced by the fact that it was found by the jury to be unprovoked and serious enough to knock Plaintiff into a state of semi-consciousness. As for *Alla*, while the degree of violence is similar to that in the present case, the *Alla* defendant delivered the blow once the plaintiff was *already in handcuffs*, and allegedly followed the blow by saying to the plaintiff, "That's how we do it," evidencing a more malicious mental state. 979 F. Supp. 2d at 378.

The jury's allocation of punitive damages also departs from reason, given the evidence Plaintiff offered at trial. The jury assessed 40% of its $2.5 million punitive award against Defendant Yurkiw, and 30% each against Defendants LaGrandier and Solomito. Verdict Form at 3, Docket Entry 106. The jury's finding of callous indifference to Plaintiff's rights was reasonable as to all three defendants. However, even according to Plaintiff's version of the underlying events, the conduct of LaGrandier and Solomito was substantially less egregious than the use of force by Yurkiw. First, Yurkiw's punches were, according to Plaintiff, unprovoked and gratuitous, and it seems likely that it was Yurkiw's punches to Plaintiff's head that caused Plaintiff's broken nose and swollen eye. In contrast, LaGrandier and Solomito used force against Plaintiff only after Yurkiw did, and the reprehensibility of their conduct is mitigated by the likelihood that their motivation included a desire to assist a fellow officer. Moreover, the absence of indications in the medical records that Plaintiff sustained significant injuries in

addition to those caused by Yurkiw's punches suggests that LaGrandier and Solomito were somewhat restrained in the amount of force they used on Plaintiff.

The Court's research has failed to uncover comparable cases involving officers who, like LaGrandier and Solomito, joined in misconduct initiated by a fellow officer. Absent such guidance, and in light of Yurkiw's primary role in using force against Plaintiff, the Court concludes that the maximum punitive damages award a reasonable jury could have imposed on Defendants LaGrandier and Solomito is $10,000 each.

## CONCLUSION

For the reasons discussed herein, Defendants' motions for judgment as a matter of law and for a new trial as to liability are denied. Defendants' motion for remittitur is granted. Because both the compensatory and punitive awards are so excessive as to shock the judicial conscience, the Court grants a new trial unless Plaintiff accepts a remittitur of the award of compensatory damages from $500,000 to $115,000, the award of punitive damages against Defendant Yurkiw from $1,000,000 to $120,000, and the awards of punitive damages against Defendants LaGrandier and Solomito from $750,000 to $10,000 each. Plaintiff's attorneys shall, by November 21, 2018, file with the Clerk of Court written notice of whether Plaintiff will accept the remitted awards. If Plaintiff elects a new trial, the Court will schedule a conference to set a trial date.

**SO ORDERED.**

_____/s/_____
STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
October 31, 2018