Docket No.: 14-CV-6377 (SMG)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

THOMAS JENNINGS,

Plaintiff,

-against-

Police Officer ANDREW YURKIW Shield No. 13610,
Police Officer JOSEPH SOLOMITO Shield No. 14389,
Police Officer AMBER LAGRANDIER Shield No. 5373,

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' POST-TRIAL MOTION PURSUANT TO RULE 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

***ZACHARY W. CARTER***
*Corporation Counsel of the City of New York*
*Attorney for Defendants Andrew Yurkiw,*
*Joseph Solomito, and Amber LaGrandier*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Christopher G. Arko*
*Tel:  (212) 356-5044*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

PROCEDURAL HISTORY ........................................................................................ 2

EVIDENCE PRESENTED .......................................................................................... 3

STANDARD OF REVIEW .......................................................................................... 4

ARGUMENT

       POINT I

            THE EVIDENCE AT THE SECOND TRIAL
            SUPPORTS THE JURY'S AWARD OF
            COMPENSATORY DAMAGES IN AN
            AMOUNT LOWER THAN THE COURT'S
            REMITTITUR ........................................................................6

       POINT II

            PUNITIVE DAMAGES MUST BE REDUCED
            COMMENSURATE WITH THE REDUCED
            COMPENSATORY DAMAGES AWARD ...............................................13

            A. The punitive damages award was excessive and
               must be remitted.............................................................14

            B. The Gore factors favor a reduction of punitive
               damages commensurate with the reduction in
               compensatory damages. ..................................................15

            C. Plaintiff's counsel's misconduct unfairly
               resulted in the increased punitive damages
               award, which further militates in favor of
               reducing it commensurate with the
               compensatory award. ......................................................18

CONCLUSION........................................................................................................ 22

## TABLE OF AUTHORITIES

**Cases**                                                                                                                                    **Pages**

Alla v. Verkay,
   979 F. Supp. 2d 349 (E.D.N.Y. 2013) ................................................................................16

BMW of North America, Inc. v. Gore,
   517 U.S. 559 (1996).............................................................................15, 16, 17, 18

DiSorbo v. Hoy,
   343 F.3d 172 (2d Cir. 2003)...............................................................................17, 18

Earl v. Bouchard Transp. Co.,
   917 F.2d 1320 (2nd Cir. 1990)............................................................................ 4-5, 6

Guzman v. Jay,
   303 F.R.D. 186 (S.D.N.Y. 2014) .........................................................................4, 5

Jennings v. Yurkiw,
   2018 U.S. Dist. LEXIS 186602 (E.D.N.Y. 2018)...................................6, 10, 13, 15, 16, 17, 19

Kirsch v. Fleet St. Ltd.,
   148 F.3d 149 (2d Cir. 1998)................................................................................4, 5

Munafo v. Metropolitan Transp. Auth.,
   381 F.3d 99 (2d Cir. 2004)..................................................................................4

Newton v. City of N.Y.,
   171 F. Supp. 3d 156 (S.D.N.Y. 2016)....................................................................5

Payne v. Jones,
   711 F.3d 85 (2d Cir. 2013)...............................................................13, 14, 16, 18

Shu-Tao Lin v. McDonnell Douglas Corp.,
   742 F.2d 45 (2d Cir. 1984)..................................................................................5

State Farm Mut. Auto Ins. Co. v. Campbell,
   538 U.S. 408 (2003)..........................................................................................17

**Statutes**

42 U.S.C. § 1983.............................................................................................2, 18

Fed. R. Civ. Proc. 50........................................................................................2

Fed. R. Civ. Proc. 59........................................................................................2

Fed. R. Civ. Proc. 59(e) ....................................................................................4

**<u>Statutes</u>**                                                                                       **<u>Pages</u>**

Fed. R. Civ. Proc. 403 ................................................................................................19

N.Y. P.L. § 120.06 .....................................................................................................19

N.Y. P.L. § 120.07 .....................................................................................................19

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------- x

THOMAS JENNINGS,

                                  Plaintiff,

             -against-

                                         14-CV-6377 (SMG)
Police Officer ANDREW YURKIW Shield No. 13610,
Police Officer JOSEPH SOLOMITO Shield No. 14389,
Police Officer AMBER LAGRANDIER Shield No. 5373,

                                  Defendants.

---------------------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' POST-TRIAL MOTION PURSUANT TO RULE 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE

### PRELIMINARY STATEMENT

        During the second trial of this matter, plaintiff failed to establish that he is entitled to damages in excess of the remittitur amount. He presented virtually no new evidence beyond what was presented during the first trial. Rather, plaintiff presented fewer witnesses and elicited testimony that was less favorable to him, justifying a compensatory damages award that is 22% less than the remittitur amount. The weakness of the evidence at the second trial as reflected in the reduced compensatory damages award must be followed by a commensurate reduction in punitive damages. It would be unjust for plaintiff to present less favorable evidence at his damages trial yet collect an equal or greater amount of punitive damages than the remittitur.

        Moreover, plaintiff's counsel repeatedly engaged in egregious acts of misconduct that flew in the face of Court Orders and served no purpose other than to inflame the jury. Given the complete lack of new evidence, counsel's misconduct is the only factor that could support the

second jury's award of punitive damages in excess of the remittitur amount. Punitive damages therefore must commensurately be remitted to 22% less than the remittitur, or $93,600 against Officer Yurkiw and $7,800 each against Officers LaGrandier and Solomito.

### Procedural History

Plaintiff Thomas Jennings brought this action pursuant to 42 U.S.C. § 1983 against defendants Police Officers Andrew Yurkiw, Joseph Solomito, and Amber LaGrandier, alleging that he was subjected to excessive force on April 23, 2014.[1] The first trial of this matter commenced before the Honorable Steven M. Gold on May 29, 2018. On June 1, 2018, the jury returned a verdict in favor of plaintiff, awarding $500,000 in compensatory damages, $1 million in punitive damages as to Officer Yurkiw, and $750,000 in punitive damages each as to Officers LaGrandier and Solomito. Judgment was entered on June 11, 2018. Defendants thereafter filed motions pursuant to Rules 50 and 59. On October 31, 2019, the Court denied defendants' motion pursuant to Rule 50 and their motion for a new trial pursuant to Rule 59. The Court granted defendants' Rule 59 motion for remittitur, and ordered a new trial on damages unless plaintiff accepted remittitur of the award of compensatory damages from $500,000 to $115,000, the award of punitive damages against Officer Yurkiw from $1,000,000 to $120,000, and the awards of punitive damages against each of Officers Solomito and LaGrandier from $750,000 to $10,000. Plaintiff rejected the remittitur on November 20, 2018 and opted for a new trial on damages. The damages trial commenced before the Honorable Steven M. Gold on April 1, 2019. On April 3, 2019, the jury returned a verdict awarding $90,000 in compensatory damages, $250,000 in punitive damages against Officer Yurkiw, $75,000 in punitive damages against

---

[1] Plaintiff's false arrest, malicious prosecution, denial of right to fair trial, and municipal liability claims, and his claims pursuant to New York State Law, were dismissed with prejudice prior to the first trial.

Officer LaGrandier, and $30,000 in punitive damages against Officer Solomito.  Judgment was entered on April 11, 2019.

## Evidence Presented

The relevant evidence pertaining to plaintiff's damages from the second trial is contained in his own trial testimony, his medical records, and the testimony of Officer Yurkiw, Dr. Richard Francisco, and Dr. Frank Flores.  Dr. Francisco was the attending physician in the Woodhull Hospital emergency room.  (Ex. A [Trans. 4/1/19] at 50: 1-5)  Dr. Flores worked in the urgent care center of Rikers Island.  (Ex. B. [Trans. 4/2/19] at 352: 6-7)  Plaintiff testified that he called 911 following an argument and physical confrontation with the mother of his son, Daquanna Henry, at her apartment at 1560 Fulton Street in Brooklyn.  (Ex. B [Trans. 4/2/19] at 251: 5 – 252: 6)  During the argument, Ms. Henry repeatedly struck plaintiff in the head causing him to feel lightheaded and dizzy.  (Id. at 251: 19 – 252: 6, 330: 4-17)  Four police officers responded, including Officers Yurkiw, Solomito, and LaGrandier.  (Id. at 255: 22-24, 258: 3-8)  As plaintiff stood with the officers in the hallway outside of Ms. Henry's apartment, Officer LaGrandier took his son away from him.  (Id. at 270: 1-4, 317: 9-21, 319: 13-25)  Plaintiff threw his hands up and was immediately punched twice in the face by Officer Yurkiw, then plaintiff fell to the floor.  (Id. at 270: 16-19, 272: 2 – 273: 3. 331: 17-22)  He was then stomped, pummeled, and kicked by all three officers.  (Id. at 273: 7-17)  He denied being informed that he was under arrest or attempting to flee or strike the officers.  (Id. at 273: 21 – 274: 6)

Plaintiff was taken to a police precinct and from there to Woodhull Hospital, where he was treated by several medical professionals, including Dr. Francisco, who diagnosed a broken nose and a swollen right eye.  (Id. at 281: 15-16, 285: 1-5, 288: 22-25; Ed. D [Woodhull Recs.])  Plaintiff was subsequently treated on Rikers Island between April 23 and April 28 by several medical professionals including Dr. Flores, but he neither complained of nor was

diagnosed with any additional injuries.  (Ex. B [Trans. 4/2/19] at 295: 7-24; Ex. E [CHS Recs.])

Plaintiff was next treated at Brookdale Hospital on May 3, 2014, where he neither complained of

nor was diagnosed with any additional injuries, and he had no visible injuries anywhere on his

body.  (Ex. A [Trans. 4/1/19] at 101: 2-10; Ex. F [Brookdale Recs.])  Since May 3, 2014,

plaintiff did not receive any medical treatment other than taking over-the-counter pain relievers

until approximately one month before the damages trial.  (Id. at 320: 16 – 322: 18, 323: 10-13)

       Plaintiff claims that as a result of the injury his nose is crooked and he still

experiences headaches and difficulty breathing through his nose.  (Ex. B [Trans. 4/2/19] at 304:

23 – 306: 5)  While plaintiff testified that he did not seek follow-up medical treatment in part due

to lack of insurance, he has been eligible for Medicaid every year since 2014 but simply

neglected to fill out the paperwork some years.  (Id. at 297: 8-12, 303: 3 – 304: 4, 323: 25 – 325:

4)  Plaintiff presented no evidence of economic damages such as loss of income or payment of

medical bills.  The only evidence of emotional damages was plaintiff's testimony that he was

anxious, distressed, hurt, scared, and confused during the incident.  (Id. at 281: 11-14, 282: 24 –

283: 1, 284: 19-22)  Accordingly, plaintiff's damages consist entirely of garden variety

emotional damages and temporary physical injuries to his nose and right eye.

## STANDARD OF REVIEW

       Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, a court can grant a

motion to alter or amend a judgment "to correct a clear error of law or prevent manifest

injustice."   Guzman v. Jay, 303 F.R.D. 186, 197 (S.D.N.Y. 2014) (quoting Munafo v.

Metropolitan Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004)).  Pursuant to this authority, the trial

court is empowered to "enter a conditional order of remittitur, compelling a plaintiff to choose

between reduction of an excessive verdict and a new trial."  Kirsch v. Fleet St. Ltd., 148 F.3d

149, 165 (2d Cir. 1998); See also Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1328 (2nd Cir.

1990); Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 49 (2d Cir. 1984). In calculating a remittitur of an excessive jury award, a district court should remit the jury's award to the maximum amount that would be upheld by the district as not excessive. See Earl, 917 F.2d at 1330.

"While calculating damages is traditionally the province of the jury, the Second Circuit has held that an award can be amended or set aside as 'excessive'" in at least two circumstances:

> (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, . . . and (2) more generally, where the award is "intrinsically excessive" in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.

Guzman, 303 F.R.D. at 197 (quoting Kirsch, 148 F. 3d at 165). In the case of the latter, "where there is no particular discernable error, [the Second Circuit has] generally held that a jury's damage award may not be set aside as excessive unless the award is so high as to shock the judicial conscience and constitute a denial of justice. A verdict shocks the judicial conscience only if it surpasses an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable persons may differ, but a question of law." Newton v. City of N. Y., 171 F. Supp. 3d 156, 164-165 (S.D.N.Y. 2016)

**ARGUMENT**

**POINT I**

**THE EVIDENCE AT THE SECOND TRIAL SUPPORTS THE JURY'S AWARD OF COMPENSATORY DAMAGES IN AN AMOUNT LOWER THAN THE COURT'S REMITTITUR**

The second jury's compensatory damages award underscores the efficacy of the Court's substantial remittitur. The Court remitted compensatory damages from $500,000 to $115,000, establishing the latter as the *maximum* permissible award in light of the evidence presented during the first trial. See Earl, 917 F.2d at 1330. The evidence as to damages presented at the second trial was not identical to the evidence presented at the first trial, and the second jury found that the evidence supported a compensatory damages award in the amount of $90,000, approximately 22% less than the remittitur. While this is within range of the remittitur, it cannot be considered a fluke; rather, the evidence of damages presented at the second trial was less favorable to plaintiff and provides ample support for the substantial reduction in compensatory damages. Specifically, the testimony of plaintiff, Dr. Francisco, and Dr. Flores supports the reduced compensatory damages award. Moreover, it is significant that plaintiff did not seek to reopen discovery or present any new evidence during the second trial other than the testimony of Dr. Francisco, which for the reasons set forth below strongly supported the diminished compensatory damages award.

In considering its remittitur of compensatory damages following the first trial, the Court identified the evidence of plaintiff's injuries that was presented to the jury. Jennings v. Yurkiw, 2018 U.S. Dist. LEXIS 186602, *42 (E.D.N.Y. 2018). As for physical injuries, plaintiff "presented testimony from medical doctors that he sustained a hematoma to his right eye, a bilateral nasal fracture, a deviated nasal septum, swelling to the left side of his head, and certain

6

nondescript injuries to the neck, scalp, and face. The only permanent injuries plaintiff described, though, [were] frequent 'definitely painful' headaches and a crooked nose...plaintiff offered no evidence of ongoing treatment" for these injuries. Id. at *43 - *44 (internal citations to trial record omitted). The Court characterized plaintiff's physical injuries as "relatively modest," though based on the testimony of Dr. Matari, who did not testify at the second trial, it found the fracture to plaintiff's nose was severe. Id. at *44. The Court found plaintiff's emotional damages were "no more than garden-variety." Id. at 45. The evidence consisted of plaintiff's vague testimony about being "'emotional' as a result of being beat in front of his son," with "no evidence of treatment for his emotional distress, or any general expert testimony on the likely psychological impact of the attack at issue." Id.

At the second trial, plaintiff presented no new evidence of physical or emotional injuries beyond what was presented at the first trial. Rather, he presented less evidence, which was less favorable to his claim of injuries. Dr. Francisco testified, consistent with the evidence at the first trial, that plaintiff had no injuries to his body except a nasal fracture, a hematoma to his right eye, and some swelling to the left side of his head. (E. A [Trans. 4/1/19] at 83: 25 – 84: 84: 23, 89: 24 – 90: 2, 93: 7-13) Moreover, Dr. Francisco testified that if plaintiff had complained at Woodhull Hospital of pain anywhere other than his face, nose, and back he would expect that to be documented in the medical records, but no such complaint is noted.[2] (Id. at 76: 5-9, 86: 1-17, 87: 1-11) He further testified that if medical staff had observed injuries anywhere on plaintiff's body beyond his nose and right eye he would expect them to be documented in the

---

[2] There is a single reference to "musculoskeletal pain" in the Woodhull records. (Ex. D [Woodhull Recs.] at DEF46) Dr. Francisco testified that the musculoskeletal region includes the neck, back, chest, and extremities. (Ex. A [Trans. 4/1/19] at 111: 6-8) However, he also testified if plaintiff had complained of pain to his neck, chest, stomach, ribs, torso, or legs, he would expect to see that documented in the "pain screening" section of DEF 46, but only back pain is noted. (Id. at 86: 4-17)

medical records, but no such injuries are noted.  (Id. at 81: 6-11, 83: 11 – 84: 23)  The records state that plaintiff was in no apparent distress, which Dr. Francisco testified means he was "comfortable" and "quiet" and not exhibiting shortness of breath or outward signs of pain or anxiety. (Id. at 109: 1-6)  He testified that according to the records, a physical examination of plaintiff's skin revealed no bruising, abrasions, or lacerations.  (Id. at 89: 17-23)  He also testified that despite plaintiff's claim of back pain, the records show his entire spine was touched during a physical examination but he reported no tenderness.  (Id. at 88: 13 – 89:1)  According to the records, plaintiff reported no difficulty breathing through his nose and he was also able to move his arms and legs without limitation and walk unassisted.  (Id. at 85: 7-13, 89: 2-16)  Dr. Francisco explained that the pain scale in the medical records is from zero to ten, with zero being no pain and ten being the highest level of pain.  (Id. at 58: 2-12)  Plaintiff rated his pain at a level six upon arriving at the hospital several hours after the use of force, but then it decreased to a level five.  (Id. at 81: 14-25, 85: 14-25)  The only pain reliever given was ibuprofen, which is the same as Motrin.  (Id. at 90: 20 – 91: 11)

Dr. Francisco also demonstrated that plaintiff's physical injuries were less significant than the Court found them to be based on testimony from the first trial.  For example, he testified that swelling to the eye can be a side effect of a broken nose.  (Id. at 93: 14-18)  He further testified that the records show plaintiff was not in need of surgery while he was at the emergency room, though Woodhull Hospital has the facilities to perform surgery had it been necessary.   (Id. at 99: 9-24)   He also provided testimony that undermines the Court's characterization of plaintiff's nasal fracture as "severe."   Dr. Francisco testified that a nasal fracture "usually heal[s] by itself," and a comminuted fracture with minor displacement such as plaintiff's would "heal no problem" on its own without treatment.  (Id. at 115: 14 – 24, 118: 12-

23) Dr. Francisco also cast significant doubt on the Court's conclusion that the deviated septum was one of plaintiff's injuries resulting from the use of force and any supposition that the deviation would be permanent.  He testified that the radiology report does not state plaintiff's deviated septum resulted from the nasal fracture, and it would be difficult to determine if the two were causally related based on the CT scans that were performed.  (Id. at 94: 20 – 95: 13) Moreover, he explained that if the "deviated septum is secondary to the swelling, we expect when the swelling is improved the septum [will] go back to the normal size."  (Id. at 116: 4-6) Furthermore, he testified that the records state there was no bleeding in the nose or septum.  (Id. at 97: 10-16)  The records also do not mention a "reduction" being performed, which Dr. Francisco testified is a procedure to straighten out a broken nose if it is crooked, indicating that no such procedure was done.  (Id. at 97: 17 – 98: 20)

Dr. Francisco also testified about the May 3, 2014 Brookdale Hospital medical records.  While these records were received into evidence at the first trial, Dr. Francisco answered numerous questions about them that further underscored the relatively minor nature of plaintiff's injuries and his apparent speedy recovery.  According to those records, ten days after his encounter with the defendants, plaintiff was not complaining of pain anywhere on his body except his nose.  (Id. at 104: 4-17)  Moreover, according to the records plaintiff had no visible injuries anywhere on his body or tenderness to his musculoskeletal system.  (Id. at 104: 20 – 107: 2)  Further, the records state that plaintiff's head was "normocephalic and atraumatic," meaning it was normal with no deformities or evidence of trauma.  (Id. at 105: 18-25)  Perhaps most significantly, the records reflect that plaintiff's nose and eyes appeared normal.  (Id. at 106: 10-21)  The records also show that plaintiff was not prescribed any pain medication and he was discharged in good condition after less than 30 minutes of critical care.  (Id. at 107: 3-23)

9

Dr. Flores' testimony actually highlighted the limited scope of plaintiff's injuries. A "thorough examination" of plaintiff's entire body by Dr. Flores and other Rikers Island medical staff two days after the incident revealed no injuries beyond those to his nose and eye that were documented in the Woodhull records. (Ex. B [Trans. 4/2/19] at 355: 17-21, 356: 15-18, 358: 19-22, 375: 25 – 376: 8, 377: 6-9, 377: 25 – 378: 5, 380: 9-20)  During this thorough physical exam on April 25, on a scale of one to ten plaintiff rated his pain at a level two. (Id. at 381: 8-14)  Additionally, Dr. Flores testified that as of April 26, the records reflect that plaintiff reported no worsening headaches or neck pain. (Id. at 381: 18-21)  The only treatment Dr. Flores rendered was extra-strength Tylenol. (Id. at 361: 2-19)  Dr. Flores also denied the existence of some minor injuries that the Court attributed to the use of force in its remittitur decision.  The Court found that plaintiff had "certain nondescript injuries to the neck [and] scalp" which were documented in the Rikers Island records. Jennings, 2018 U.S. Dist. LEXIS 186602 at *43.  However, during his direct examination of Dr. Flores, plaintiff's counsel elicited testimony that the diagnosis of contusions to the scalp and neck was "wrong," and that the only injuries were the nasal fracture and contusion to the face. (Ex. B [Trans. 4/2/19] at 370: 25 – 371: 14)

Plaintiff's testimony differed in several material respects from his testimony at the first trial providing further support for the significant reduction in compensatory damages. Regarding the intensity of pain and discomfort he felt in the hours after the incident, plaintiff testified that he was relaxing and napping at the precinct before and after he went to the hospital. (Id. at 334: 14-18, 340: 20-25)  He did not dispute the Woodhull record's statement that he reported a moderate level of pain. (Id. 336: 3-5)  He testified that the only permanent effects of his injury were headaches (of which he did not specify a frequency or intensity), difficulty

breathing from "clogged airways" (a complaint which is not reflected in any of the medical records), and his belief that his nose appears crooked (though he submitted no evidence, such as pre-incident photos of his face, to corroborate this).  (Id. at 305: 5-10, 306: 2-8).

Plaintiff admitted that during the nearly five years between the time he went to Brookdale Hospital on May 3, 2014 and the month before his damages trial which commenced on April 1, 2019, he neither sought nor received any medical treatment for his injuries.  (Id. at 321: 14 – 323: 13)  The only relief he sought during this time period was from over-the-counter pain relievers.  (Id. at 320: 16-23)  While he attempted to attribute this in part to a lack of health insurance, he admitted that he was eligible for Medicaid during that entire period of time, but simply neglected to fill out the application paperwork some years.  (Id. at 323: 16 – 325: 6) Moreover, he testified that if he had applied for Medicaid health insurance during this time, he would have received it.  (Id. at 324: 4 – 325: 4)

Plaintiff also admitted that Ms. Henry punched him numerous times with a closed fist on his head before the police arrived.  (Id. at 252: 25 – 253: 10, 330: 2-10)  This assault caused him to feel lightheaded and dizzy.  (Id. at 330: 2-16)  Plaintiff denied that Ms. Henry ever punched him in the face.  (Id. at 252: 25 – 253: 10)  In light of Dr. Flores' testimony that plaintiff had no contusions to his scalp or neck, plaintiff's only remaining injury aside from those to his face is the swelling to the left side of his head noted in the Brookdale records.  It stands to reason that if Ms. Henry punched plaintiff so many times and so hard that she caused him to feel lightheaded and dizzy, it would be bound to leave some physical injury, which could only be the swelling to the side of his head.  Such causation issues further justify the reduced compensatory damages award.

Plaintiff also made numerous claims that were contrary to his prior sworn testimony and the medical records.  For instance, he was impeached on the fact that he lifted his shirt for the Woodhull medical staff to examine his back, stomach, and sides (Id. at 316: 1-12).[3] He claimed he was unconscious after being beat by the officers, but previously testified that he recalled being handcuffed and lifted to his feet moments after force was used.  (Id. at 338: 10 – 340: 340: 7)  He claimed to have asked for medical treatment while still at 1560 Fulton Street, but previously testified that he believes he first asked for treatment at the precinct.  (Id. at 309: 5 – 313: 5)  Plaintiff claimed he went to Brookdale Hospital on May 3 in part due to "breathing problems" and was told by medical staff that "they can only treat the breathing right now."  (Id. at 295: 14-15, 296: 13)  However, this is wholly contradicted by the testimony of Dr. Francisco and the Brookdale medical records, which show that plaintiff did not complain of difficulty breathing, nor did he receive any such treatment.

As for emotional damages, plaintiff's only evidence consisted of his testimony that he was generally anxious, distressed, hurt, scared, and confused during the incident.  (Id. at 281: 11-14, 282: 24 – 283: 1, 284: 19-22)  Plaintiff presented no evidence of treatment or ongoing psychological turmoil from this incident.  Contrary to the Court's findings from the first trial, plaintiff did not specifically attribute any of his emotions to his son's presence during the use of force.  However, to the extent his son's presence may be relevant to emotional damages, plaintiff testified that the child had already been crying that day because plaintiff was holding the child's hand when the child's mother punched plaintiff in the head repeatedly to the point that he felt dizzy and lightheaded.  (Id. 326: 24 – 327: 5, 330: 4-17, 347: 18 – 348: 1)

---

[3] However, as demonstrated above, this examination revealed no injury to these areas.

In sum, plaintiff presented no new evidence to show heightened severity or permanence of his physical or emotional injuries. Rather, he presented less evidence, and less favorable evidence, as to his damages than he did at the first trial. The only new witness, Dr. Francisco, provided testimony that significantly undermined several of the Court's findings in its remittitur decision as to plaintiff's injuries. The testimony of Dr. Flores and plaintiff further undermined the Court's findings regarding plaintiff's injuries, and combined with Dr. Francisco's testimony amply support the 22% reduction in compensatory damages. This therefore sets a new standard from which the Court should compute punitive damages.

## POINT II

### PUNITIVE DAMAGES MUST BE REDUCED COMMENSURATE WITH THE REDUCED COMPENSATORY DAMAGES AWARD

As the Court noted in granting remittitur, "'awards of punitive damages are by nature speculative, arbitrary, approximations,'" yet "'courts bear the responsibility to ensure that judgments as to punitive damages conform, insofar as reasonably practicable, to [principles of fairness and judicial norms] and are not excessive.'" Jennings, 2018 U.S. Dist. LEXIS 186602 at *48 (quoting Payne v. Jones, 711 F.3d 85, 93 (2d Cir. 2013)) (alterations in original). Moreover, "an excessive verdict that is allowed to stand establishes a precedent for excessive awards in later cases." Payne, 711 F.3d at 94. These considerations are particularly important here given that the Court's remittitur identified the *maximum* amount of punitive damages the evidence from the *first* trial would support. Now that a second trial was held during which plaintiff presented less favorable evidence of damages, punitive damages must be reduced commensurate with the jury's compensatory damages award. It would be unjust for plaintiff to reject the remittitur, present substantially less favorable evidence at his damages trial, yet collect an equal or greater amount of punitive damages than he rejected in the remittitur. In the context of an

excessive force claim, evidence supporting compensatory damages is inextricably intertwined with the evidence supporting punitive damages. Principles of fairness and judicial norms thus demand that the second jury's reduction of compensatory damages be followed by a proportional reduction of punitive damages.

Given the quality of evidence presented at the second trial, the only factor that could explain the second jury's excessive punitive damages award is plaintiff's counsel's brazen misconduct. Unquestionably, counsel's repeated defiance of Court rulings and attempts to present impermissible evidence unjustly inflamed the passions of the jury. It would be a miscarriage of justice for plaintiff to reap a significant pecuniary benefit from such underhanded tactics.[4]

### A.     The punitive damages award was excessive and must be remitted.

The second jury's award of $355,000 in punitive damages – $250,000 against Officer Yurkiw, $75,000 against Officer LaGrandier, and $30,000 against Officer Solomito – is "so high as to shock the judicial consciousness and constitute a denial of justice" requiring a remittitur. Payne, 711 F.3d at 96. The Second Circuit has "never approved a [$300,000] punitive award against an individual defendant police officer" and has "described awards ranging from $125,000 to $175,000 as substantial." Id. at 105 (internal quotation marks and citation omitted). Accordingly, it is highly likely that the Second Circuit would find $250,000 against Officer Yurkiw to be excessive. Given that the Court previously remitted punitive damages against Officers LaGrandier and Solomito to $10,000 each, the Circuit would also likely find the second jury's punitive damages award against these officers to be excessive.

---

[4] Defendants asserted during the first trial of this matter and in post-trial motions that plaintiff's counsel committed similar acts of misconduct and engaged in inappropriate tactics. To be clear, defendants reassert and do not in any way waive these same arguments here, as well as all previous arguments and challenges to the first verdict in this case as to liability and damages.

Additionally, the disparity in punitive damages between Officer LaGrandier and Officer Solomito defies reason.  Plaintiff was not specific about what force was used by Officer LaGrandier versus Officer Solomito; rather, he testified very generally that they both participated in the force after Officer Yurkiw threw the first two punches.  (Id. at 273: 14-17)  The only explanation for the jury's apportionment of punitive damages between these two officers would appear to be the testimony about how Officer LaGrandier removed plaintiff's son from his grasp. However, Officer LaGrandier is only liable for excessive force.  The manner in which she took control of the child, which is not an act of force (particularly in this factual scenario), cannot justify an increased award of punitive damages against her vis-à-vis Officer Solomito. Moreover, plaintiff was impeached on this point.  He claimed at the trial that Officer LaGrandier "snatched" the child out of his arms, but he previously testified under oath that in fact he handed his son to her.  (Ex. B [Trans. 4/2/19] at 270: 1-6, 316: 16 – 319: 25)  As the Court found in its remittitur decision, there is an "absence of indications in the medical records that plaintiff sustained significant injuries in addition to those caused by Yurkiw."  Jennings, 2018 U.S. Dist. LEXIS 186602 at *58-*59.  As detailed above, the medical witnesses' testimony further limited the possible injuries that could be attributable to Officer LaGrandier and Officer Solomito. Accordingly, the punitive damages against each of these officers should be equal, but less than the remitted $10,000 amount supported by the evidence from the first trial.

> **B.    The Gore factors favor a reduction of punitive damages commensurate with the reduction in compensatory damages.**

In calculating the remittitur, the Court's analysis of the factors from BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996) must be adjusted in light of the evidence presented at the damages trial that resulted in a diminished compensatory award.  Considering the first Gore factor, as set forth in Point I above, the evidence at the second trial showed

15

plaintiff's injuries were less significant and thus compensable at a lower rate than what the evidence supported at the first trial.  In the context of excessive force, this undoubtedly affects the reprehensibility of defendants' conduct; force inflicting less severe injury must be deemed less reprehensible.  As the Gore Court noted, "some wrongs are more blameworthy than others." 517 U.S. at 575.  The Second Circuit has also considered "mitigating factors" when analyzing the degree of a defendant's reprehensibility.  See Payne, 711 F.3d at 102.  A notable reduction in the severity of injury as reflected in the compensatory damage award certainly must be considered a mitigating factor reducing the degree of reprehensibility.[5]

Moreover, plaintiff's counsel spent much of her cross-examination of Officer Yurkiw exploring subjects that the Court had already ruled in advance of trial were irrelevant to punitive damages, but were obviously an improper attempt to show reprehensibility (discussed in more detail in Point II(C) below).  For example, plaintiff asked multiple questions regarding Officer Yurkiw's purportedly false prior testimony and efforts to "frame" plaintiff.  (Ex. B [Trans. 4/2/19] at p. 164 – 180, 219)  The Court specifically instructed the second jury that "there is no evidence of framing anybody in this case," (Ex. C [Trans. 4/3/19] at 412: 20-21), but by then the cat was already out of the bag.  Moreover, the Court found that false testimony cannot be used to support a punitive damages award.  Jennings, 2018 U.S. Dist. LEXIS 186602 at *50 n.10 (citing Alla v. Verkay, 979 F. Supp. 2d 349, 373 n.11 (E.D.N.Y. 2013)).  Ultimately, plaintiff presented no new evidence beyond what the Court considered in its remittitur decision to support a heightened degree of reprehensibility.  Given the diminished compensatory

---

[5] Furthermore, plaintiff was impeached with his prior sworn testimony that after Officer LaGrandier took his son away, he threw his arms up and he was punched immediately thereafter.  (Ex. B [Trans. 4/2/19] at 331: 17-22)  This arguably mitigating fact was not presented at the first trial.

damages, the first <u>Gore</u> factor accordingly weighs in favor of commensurately reducing punitive damages.

Under the second <u>Gore</u> guidepost, the Court considers the ratio of punitive damages to compensatory damages. 517 U.S. at 581-81. While the Court found that this factor did not provide much guidance after the first trial, it is much more applicable here given the unique posture of this case. The second jury's award of 22% less in compensatory damages strongly militates in favor of a corresponding reduction in punitive damages, particularly since plaintiff presented no new evidence at the second trial to support an increased punitive award. "'The proper inquiry [under the second <u>Gore</u> factor] is whether there is a reasonable relationship between the punitive damage award and the harm likely to result from the defendant's conduct *as well as the harm that has occurred*.'" <u>DiSorbo v. Hoy</u>, 343 F.3d 172, 187 (2d Cir. 2003) (quoting <u>Gore</u>, 517 U.S. at 581) (emphasis added). "This consideration requires courts to 'ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.'" <u>DiSorbo</u>, 343 F.3d at 187 (quoting <u>State Farm Mut. Auto Ins. Co. v. Campbell</u>, 538 U.S. 408 (2003)). The second jury clearly found that the harm that actually occurred was substantially less than the first jury, which is reflected in the diminished compensatory damages award. The Court must give the second jury's finding significant weight in considering a reasonable ratio between the two types of damages by reducing punitive damages proportional to compensatory damages.

The third <u>Gore</u> guidepost considers comparable civil and criminal penalties. The Court found this to be of "questionable utility" in its remittitur decision. <u>Jennings</u>, 2018 U.S. Dist. LEXIS at *53. Nevertheless, in applying this factor it reasoned that defendants' conduct based on the evidence at the first trial was comparable to Assault in the Third Degree. <u>Jennings</u>,

2018 U.S. Dist. LEXIS 186602, *52. It further noted that the Second Circuit has found conduct even more egregious than defendants' to be comparable to the same offense. Id. (citing Payne, 711 F.3d at 88, 103; DiSorbo v. Hoy, 343 F.3d 172, 177, 187-88 (2d Cir. 2003)). Given the diminished evidence of injury at the second trial, there is no reason to depart from that finding here.

The Gore factors are much more useful in determining the appropriate amount of punitive damages than other § 1983 cases analyzing remittitur. In its remittitur decision, this Court relied heavily on such § 1983 cases in fixing the appropriate amount of punitive damages. However, since then this case has proceeded down an entirely novel path. Thus to the extent this case can be compared to other § 1983 cases, the analysis must be adjusted to account for the substantially reduced compensatory damages award. Certainly, the evidence at the second trial would not support an increased punitive damages award relative to the remittitur, and an equal award would not give due consideration to the compensatory reduction.

### C. Plaintiff's counsel's misconduct unfairly resulted in the increased punitive damages award, which further militates in favor of reducing it commensurate with the compensatory award.

Counsel's misconduct undoubtedly resulted in improper and unjust inflation of the punitive damages award. She repeatedly flouted the Court's directives and deliberately engaged in behavior that served no purpose other than to inflame the jury. Plaintiff must not be permitted to benefit from such gamesmanship.

Counsel's examination of Officer Yurkiw was replete with improper and outright false insinuations about possible criminal penalties. She asked Officer Yurkiw "when a police officer lies and denies using excessive force when he, in fact, did use excessive force, he commits yet another crime, correct?" (Ex. B [Trans. 4/2/10] at p. 158: 25 – 159: 2). The Court sustained an objection to this question. (Id. at p. 159: 4) Counsel started asking another

question, then the Court specifically clarified that it was sustaining the objection.  (Id. at p. 159: 5-7)  Nevertheless, in defiance of the Court's clear ruling, counsel then began to ask another question about gang assault.  (Id. at p. 159: 11)  During an ensuing sidebar,[6] the Court expressly ruled it was excluding any such references pursuant to Rule 403.  (Ex. B [Trans. 4/2/19] at 160: 20 – 161: 1)  Despite this clear ruling, counsel continued asking Officer Yurkiw numerous questions about criminal penalties, including misdemeanor assault, felony assault, and harassment.  (Id. at 163: 5-14)  She also asked "It's fair to say, sir, that you and your colleagues will never have to face the consequences of the criminal justice system."  (Id. at 163: 15-17) Despite the Court sustaining yet another objection to this question, she went on to ask about the statute of limitations.  (Id. at 163: 21 – 164: 3)  This prompted the Court to again admonish counsel about "asking questions…that are part of a line that I have sustained objections to."  (Id. at 164: 4-6)

The most egregious example of counsel's misconduct fell within the ambit of the Court's exclusion of these questions.  After Dr. Flores' testimony and with the jury present in the courtroom, counsel stood up and blurted out "given the testimony we've heard, Your Honor, I ask that you take judicial notice of the gang assault statute…"  (Id. at 385: 25 – 386: 2)  Counsel continued her statement after that point, but the reporter was unable to capture it for the record. This statement before the jury was inconsistent with the Court's prior rulings and was clearly a deliberate, premeditated, and calculated move to emphasize plaintiff's improper theory that the officers' conduct was prosecutable as a crime.  Counsel cannot claim that it was done in the heat

---

[6] Also during the sidebar, counsel falsely stated to the Court that defendants' conduct "fits squarely within the definition – elements of the gang assault statute; two or more individuals acting in concert causing injury to another."  (Id. at 160: 10-11)  Gang assault is codified at N.Y. P.L. § 120.06, Gang Assault in the Second Degree, and N.Y. P.L. § 120.07, Gang Assault in the First Degree.  (Id. at 160: 6-12)  Both offenses require causing *serious* physical injury.  As Counsel must have known, the Court specifically found that plaintiff's injury falls short of that standard.  Jennings, 2018 U.S. Dist. LEXIS 186602 at *53.

of the moment or was a slip of the tongue; immediately before it happened, the Court asked if there was "anything further from the plaintiff," and counsel responded "Yes, Your Honor, I'll wait for [Dr. Flores] to leave." (Id. at 385: 17-19)  This conduct was so reprehensible that the Court later commented it "put at jeopardy the integrity of this trial." (Ex. C [Trans. 4/3/19] at 484: 23)

Counsel also asked numerous questions regarding claims that plaintiff either withdrew or never made in defiance of sustained objections.  Specifically, there were many questions about statements Officer Yurkiw made that insinuated a malicious prosecution or fabrication of evidence, even though the Court had instructed the jury that plaintiff's arrest was lawful.  For example, counsel asked "you understood once you made this accusation against [plaintiff] that he assaulted you that there would be a prosecution of [plaintiff] for assaulting you, correct?" (Id. at 189: 13-15)  She also asked "because of this accusation that you made against [plaintiff, he] was placed in jeopardy of having to serve several years in state prison." (Id. at 174: 22-24)  Counsel asked if Officer Yurkiw understood "it is illegal to frame members of the public for crimes they did not commit." (Id. at 219: 21-22)  She asked if "exaggerations were made in an attempt to put [plaintiff] at a disadvantage in terms of prosecution." (Id. at 180: 13-14)  She asked "it was because of what [Officer Yurkiw] told Officer Binns that [plaintiff] was charged with the crime of assault on a police officer" and whether it was a "mistake or error" on Officer Binns' part that there is no mention of force in the arrest report. (Id. at 170: 2-4, 174: 4-7)  She also asked numerous other questions, despite repeated sustained objections, about fabrication of evidence and denial of medical treatment. (Id. at 219: 3-24)

In her summation, counsel improperly referenced "framing" plaintiff twice. (Ex. C [Trans. 4/3/19] at 405: 19, 412: 16-18)  She argued that there are "fine police officers…Heroes

who put their lives on the line, full of integrity," which drew a sustained objection.  (<u>Id</u>. at 413: 5-9)  Despite this, moments later she said "Like I said before, some [police officers] are full of integrity, some are not," prompting the Court to instruct "No; I have already sustained an objection to that." (<u>Id</u>. at 413: 24 – 414: 1)  Counsel asked why, if Officer Yurkiw told his sergeant that force was used, it is not reflected in the arrest report – a hypothetical with absolutely no foundation, since there was no testimony that a sergeant had anything to do with the arrest report. (<u>Id</u>. at 419: 16 – 420: 1)  During her rebuttal, she personally attacked defense counsel.  (<u>Id</u>. ay 447: 11-17)  She also began to speculate why defendants did not call Officers LaGrander and Solomito, which drew a sustained objection and the admonition from the Court "don't even finish that thought."  (<u>Id</u>. at 449: 22-23)

It is clear that counsel's only motivation for repeatedly engaging in such tactics was to unfairly boost punitive damages.  These outrageous transgressions accomplished their objective – a punitive damages award that is grossly excessive and unsupportable by the admissible evidence.  Counsel's egregious misconduct must not result in unjust enrichment for plaintiff.[7]  The Court must remit punitive damages against each defendant by 22% from the remittitur commensurate with the jury's award of compensatory damages.  At a minimum, punitive damages must be remitted to the same amount as the remittitur because plaintiff can point to no new evidence justifying an increased amount.

---

[7] Moreover, counsel's conduct was so dismissive of the authority of the Court that it warrants sanctions.

## CONCLUSION

For the foregoing reasons, defendants Andrew Yurkiw, Joseph Solomito, and Amber LaGrandier respectfully request that the Court grant their motion for remittitur, together with such other and further relief as this Court may deem just and proper.

Dated:      May 9, 2019
            New York, NY

**ZACHARY W. CARTER**
Corporation Counsel of the
City of New York
*Attorney for defendants Andrew Yurkiw, Joseph Solomito, and Amber LaGrandier*
100 Church Street, Room 3-183
New York, New York 10007
(212) 356-5044

By:      _____/s/_____
         Christopher G. Arko
         Senior Counsel
         Special Federal Litigation Division

cc:    Amy Rameau, Esq. (by ECF)
       Michael Lumer, Esq. (By ECF)
       *Attorneys for plaintiff*