UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
THOMAS JENNINGS,

                  Plaintiff,                                                                               MEMORANDUM & ORDER

        -against-                                                                          14-CV-6377 (SMG)

POLICE OFFICER ANDREW YURKIW, POLICE
OFFICER AMBER LAGRANDIER, and POLICE
OFFICER JOSEPH SOLOMITO,

                  Defendants.
------------------------------------------------------------------- x
GOLD, STEVEN M., U.S. Magistrate Judge:

## INTRODUCTION

       Plaintiff Thomas Jennings brings this action pursuant to 42 U.S.C. § 1983 alleging that New York City Police Officers Andrew Yurkiw, Amber LaGrandier, and Joseph Solomito (collectively, "Defendants") used excessive force when taking him into custody on April 23, 2014. The case was first tried before a jury from May 29 through June 1, 2018. After trial, the Court issued a Memorandum and Order granting defendants a new trial unless plaintiff accepted remittitur of the first jury's verdict. Mem. & Order dated October 31, 2018 ("Order of Remittitur"), Dkt. 141.[1] Plaintiff declined, and a retrial on damages was conducted from April 1 through 3, 2019.

       The second jury returned a verdict finding defendants jointly and severally liable for $90,000 in compensatory damages and imposing punitive damages of $250,000 against defendant Yurkiw, $75,000 against defendant LaGrandier, and $30,000 against defendant Solomito, for a total of $355,000 in punitive damages. Dkt. 190. Defendants now move pursuant to Rule 59 of the Federal Rules of Civil Procedure for remittitur of the punitive damages

---

[1] The Order of Remittitur is reported at *Jennings v. Yurkiw*, 2018 WL 5630454 (E.D.N.Y. Oct. 31, 2018).

awarded by the jury after the damages trial. Dkt. 193. For the reasons that follow, defendants' motion is denied.

## FACTUAL BACKGROUND

*A. The First Verdict and Order of Remittitur*

The Court held a jury trial in this action from May 29 through June 1, 2018. The evidence presented at the first trial is set forth in detail in the Order of Remittitur, with which the Court presumes familiarity. Based on the evidence presented, the jury found that defendants subjected plaintiff to excessive force; responding to special interrogatories, the jury also declined to find that plaintiff attempted to flee from defendants or resist their efforts to arrest him, or that plaintiff struck or attempted to strike defendant Yurkiw. Verdict at 1–3, Dkt. 106; Special Interrogs. at 1–2, Dkt. 107. The jury awarded plaintiff (1) $500,000 in total compensatory damages against all defendants jointly and severally, (2) $1,000,000 in punitive damages against defendant Yurkiw individually, (3) $750,000 in punitive damages against defendant Solomito individually, and (4) $750,000 in punitive damages against defendant LaGrandier individually. Verdict at 1–3.

On July 9, 2018, defendants moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure and for a new trial or remittitur of damages under Rule 59. Dkt. 129. The Court denied defendants' Rule 50 motion and denied defendants' motion for a new trial under Rule 59, but granted defendants' motion for remittitur. The Court ordered a new trial on damages unless plaintiff accepted an award of compensatory damages of $115,000, and of punitive damages of $120,000 against defendant Yurkiw, $10,000 against defendant Solomito, and $10,000 against defendant LaGrandier. Order of Remittitur at 32, 39–40. By letter dated November 20, 2018, plaintiff rejected the remittitur, electing a new trial instead. Dkt. 145.

The Court scheduled a retrial on damages for April 1, 2019. Order dated Dec. 10, 2018. At a pretrial conference held on March 15, 2019, the Court addressed the parties' pretrial motions concerning the scope of the damages trial, in particular with respect to punitive damages. Plaintiff contended that because the first jury found that punitive damages were appropriate and the Order of Remittitur took issue only with the amount of punitive damages awarded, only the proper amount of punitive damages to be awarded should be at issue in the retrial. Pl.'s Mot. in Lim. at 4–7, Dkt. 158. In contrast, defendants contended that the second jury should be asked to decide whether to award punitive damages at all. Defs.' Mot. in Lim. at 2–3, Dkt. 156. The Court ruled in favor of plaintiff and held that the jury at the retrial would not be asked to reconsider whether a punitive damages award was warranted, but would instead be called upon to determine only the amount of punitive damages to award. *See* Min. Entry dated Mar. 15, 2019, Dkt. 163; Tr. of Civil Cause for Proceedings dated Mar. 15, 2019 ("Tr. of 3/15/19") at 5:5–8, Dkt. 167.

At the same pretrial conference, there was also discussion about whether defendants themselves would testify and, if so, the appropriate scope of their testimony. The Court ruled that the officers could testify but that plaintiff could not admit the first jury's verdict as evidence of the officers' dishonesty. Tr. of 3/15/19 at 23:13–17, 39:8–12. Along the same lines, the Court clarified that because the first jury did not find that plaintiff fled or struck defendants or attempted to do so, defendants could not relitigate those particular questions before the second jury. Tr. of 3/15/19 at 36:6–18, 40:24–41:3. By joint letter dated March 25, 2019, the parties notified the Court that "neither side intends to affirmatively elicit testimony concerning defendants' version of facts relating to the liability question answered in the first trial." Letter dated Mar. 25, 2019, Dkt. 169. At a subsequent telephone conference before trial, plaintiff's

3

counsel clarified that plaintiff intended to call defendant Yurkiw but not the other defendant officers, and that plaintiff's questioning would not address "whether or not he struck Thomas Jennings, why he struck Thomas Jennings, you know, the whole . . . did he or did he not resist and so forth." Tr. of Civil Cause for Telephonic Conference dated Mar. 28, 2019 ("Tr. of 3/28/19") at 3:5–9, 5:1–5, Dkt. 175.

B. *Evidence Presented on Retrial*[2]

At the second trial on damages, plaintiff called four witnesses: Richard Francisco ("Dr. Francisco"), Tr. at 49:1–119:12, defendant Yurkiw, Tr. at 155:1–244:2, plaintiff, Tr. at 245:1–260:2, 268:6–348:16, and Frank Flores ("Dr. Flores"), Tr. at 351:1–385:16. After plaintiff rested, defendants elected to rest without presenting additional evidence. Tr. at 386:7–12. A summary of the evidence presented at the second trial follows.

Plaintiff's interaction with defendants arose out of an altercation between plaintiff and Daquanna Henry, the mother of plaintiff's son, at Henry's 1560 Fulton Street apartment (the "apartment") on April 23, 2014. *See generally* Tr. at 246:9–252:15. Plaintiff testified that when he arrived at Henry's apartment with their son that day, Henry struck him numerous times in the back of the head, rendering him light-headed; plaintiff then went to the apartment lobby, dialed 911, and waited for police officers to arrive. Tr. at 251:16–253:10, 330:2–15. Defendants Yurkiw and Solomito were the first two officers to respond. Tr. at 255:9–24. Defendant LaGrandier and nonparty Sergeant Brown arrived later. Tr. at 258:3–259:5.

---

[2] The transcript of the second trial was submitted by defendants as three separate exhibits to their motion for remittitur. *See* Tr. of Civil Cause for Trial dated Apr. 1–3, 2019, Decl. of Christopher G. Arko in Supp. of Defs.' Post-Trial Mots. ("Arko Decl.") Exs. A–C, Dkt. 194-1 through 194-3. Transcripts of the proceedings held on the second and third days of trial are separately docketed. Dkt. 201, 202. Throughout this opinion, "Tr." is used to refer to the transcript of the damages trial.

4

Plaintiff returned with defendants to the floor of the building where Henry's apartment was located and remained in the hallway with his son while some of the officers went into Henry's apartment. Tr. at 256:18–257:11, 269:2–14. After some time, defendant LaGrandier approached plaintiff and aggressively grabbed him and pinned him against the wall, forcibly removing his son from him. Tr. at 269:15–270:6, 331:10–16, 344:20–345:1.[3] While plaintiff remained with his back to the wall, defendant Yurkiw "sideline punch[ed]" plaintiff once, Tr. at 270:21, and immediately struck plaintiff a second time, both strikes landing on the side of plaintiff's face in the area of his nose, Tr. at 270:16–271:5, 272:9–17, 331:20–22. Plaintiff fell to the ground and "curled up," while all three defendant officers "stomped," "pummeled," and "kicked" him. Tr. at 272:22–273:15; 334:2–13. According to plaintiff, this assault occurred without defendants informing plaintiff he was being arrested and without plaintiff making any effort to resist arrest, assault defendants, or flee. Tr. at 273:21–274:6.[4] Plaintiff testified that his son witnessed the assault; plaintiff recalled his son crying, screaming, and saying "Daddy." Tr. at 269:10–270:15, 275:22–276:8. Defendants ultimately handcuffed plaintiff, dragged him to the elevator, and removed him from the building. Tr. at 274:12–275:8, 277:8–13.

Plaintiff claims that, as a result of being assaulted by defendants, he sustained injuries to his face, nose, head, and body. Tr. at 274:21–24. Plaintiff also recalled losing consciousness

---

[3] Plaintiff's testimony at trial regarding his interaction with LaGrandier was not entirely consistent with his deposition testimony prior to trial. *See* Tr. at 319:11–320:5 (reading plaintiff's deposition testimony that defendant LaGrandier "walked up to me and grabbed my son like she's trying to pull him out of my hands"); Tr. at 317:7–318:6 (reading plaintiff's deposition testimony that, after defendant LaGrandier gave him a stern look and said, "just give me him," plaintiff gave her his son). Defendant Yurkiw likewise testified that defendants took plaintiff's son without force, and simply so that the child could be brought inside Henry's apartment before plaintiff was arrested. Tr. at 230:2–231:4.

[4] As noted above, the first jury explicitly so found, and the jury at the damages trial was not asked to reconsider that finding.

during the assault and described being "like in a daze in and out." Tr. at 278:2–10.[5] Plaintiff testified that he felt "hurt, confused, [and] scared," and was experiencing "anxiety." Tr. at 281:8–14. Defendant Yurkiw also testified that plaintiff was in tears after being placed in the back of the police car, but attributed plaintiff's crying to the circumstances of his arrest rather than to any physical pain. Tr. at 238:7–15, 243:11–18.

Plaintiff was brought to the police precinct and placed in a cell and chained to a bar. Tr. at 282:20–283:7. Plaintiff recalled defendant Yurkiw "taunting" him while plaintiff waited in the cell. Tr. at 284:4–9. Defendant Yurkiw testified that while he and plaintiff were at the precinct, defendant Yurkiw gave an account of what had transpired between defendants and plaintiff to Pelocka Binns, the police officer who prepared the report of plaintiff's arrest, and that Binns prepared the arrest report based on the information she received from defendant Yurkiw. Tr. at 165:4–17, 168:16–24, 169:4–7. Defendant Yurkiw denied telling Binns that no force was used in arresting plaintiff, Tr. at 165:20–166:2, and testified to the contrary that he affirmatively reported to Binns that force was used, Tr. at 169:8–170:1. Defendant Yurkiw, however, acknowledged upon being shown the arrest report that it indicated that no force was used. Tr. at 168:3–13.[6] Defendant Yurkiw further told Binns that plaintiff had assaulted him. Tr. at 174:13–15.

At some point after being placed in a cell at the precinct, plaintiff was transported to the emergency room at Woodhull Hospital. Tr. at 284:12–285:5. The records from Woodhull Hospital are internally inconsistent with respect to whether plaintiff reported a loss of consciousness. *Compare* Tr. at 82:17–24, 83:4–7 *with* Tr. at 114:6–11.

---

[5] Defendant Yurkiw testified that plaintiff never lost consciousness. Tr. at 206:2–5.

[6] Although defendant Yurkiw was shown the arrest report to refresh his recollection, the arrest report was entered into evidence thereafter. Tr. at 170:9–20.

Dr. Francisco, an attending doctor at the Woodhull emergency room when plaintiff arrived there on April 23, 2014, testified at plaintiff's trial. Tr. at 50:3–5. A record of plaintiff's visit to Woodhull was received in evidence. Tr. at 51:4–20; Arko Decl. Ex. D ("Woodhull Records"), Dkt. 194-4. The triage nurse noted swelling around plaintiff's nose and a hematoma—what Dr. Francisco confirmed was "bleeding under the skin"—on plaintiff's right eye. Tr. at 57:8–18; Woodhull Records at DEF45. Plaintiff described his pain to the triage nurse as a "six" on a scale of one to ten. Tr. at 58:2–12; Woodhull Records at DEF45. Plaintiff indicated to the Woodhull trauma center staff that he had pain in his head, back, and nose, as well as throughout his body more generally. Tr. at 110:13–22, 111:3–16; Woodhull Records at DEF46. Plaintiff also complained of dizziness and blurry vision. Tr. at 110:23–111:2; Woodhull Records at DEF47. A second report made once plaintiff arrived at the ER trauma area at Woodhull indicated "swelling and discolo[]ration to right eye" and "swelling and deformity to nose, swelling to left head," and that plaintiff reported a pain level of "five" on a scale of one to ten. Tr. at 60:20–61:4, 85:14–22; Woodhull Records at DEF46. Woodhull medical staff determined there to be "no evidence of facial bone fracture," but that plaintiff had sustained a "comminuted fracture involving the bilateral nasal walls" and "deviation of the nasal septum." Tr. at 67:4–68:21; Woodhull Records at DEF59. Dr. Francisco explained that a comminuted, bilateral nasal fracture occurs when the two bones on either side of the bridge of the nose are broken into "multiple pieces." Tr. at 68:7–14. Dr. Francisco further explained that the septum, or division between the nostrils, is said to be deviated when it is pushed to one side. Tr. at 68:19–25. Woodhull medical staff concluded that plaintiff did not require surgery to address his injuries. Tr. at 71:14–16, 99:9–15; Woodhull Records at DEF62.

7

Plaintiff was next seen by medical professionals one or two days later at Rikers Island. Tr. at 290:1–6. Dr. Flores, who was practicing emergency medicine at Rikers Island at that time, treated plaintiff and testified at the damages trial. Tr. at 351:25–352:10. Records from Rikers Island indicate that the medical staff conducting plaintiff's initial intake reported facial injuries and requested that Dr. Flores conduct an evaluation. Tr. at 355:15–21. Upon examining plaintiff, Dr. Flores observed "significant swelling and ecchymosis" around plaintiff's right eye, causing plaintiff's eye to be "almost closed shut," as well as swelling along the bridge of plaintiff's nose. Tr. at 358:17–22. Dr. Flores called for an X-ray of plaintiff's facial bones, and the X-ray revealed a "significant nasal bone fracture." Tr. at 359:18–360:6. Dr. Flores provided plaintiff with pain medication and concluded that plaintiff should be examined by an ear, nose, and throat (ENT) specialist, who could determine whether surgery was needed. Tr. at 360:25–361:6. Medical staff at Rikers documented the level of pain plaintiff reported as a "two" on a scale of one to ten. Tr. at 381:8–14.

On May 3, 2014, plaintiff went to the emergency room at Brookdale Hospital ("Brookdale") complaining of pain and issues with his breathing. Tr. at 295:7–15; Arko Decl. Ex. F ("Brookdale Records"), Dkt. 194-6.[7] The only diagnosis indicated in the Brookdale Records is nose pain, for which plaintiff was discharged to "home/self care." Tr. at 107:15–21; Brookdale Records at P064. The Brookdale Records also document that the plan for plaintiff's care going forward involved him following up with an ENT clinic. Brookdale Records at P067.

Plaintiff never had surgery to repair his nose, citing as reasons periods of time when he lacked health insurance coverage, an unspecified period of homelessness, and anxiety about

---

[7] Although plaintiff could not recall the exact date of his visit to Brookdale, the Brookdale Records indicate a date of service of May 3, 2014, or ten days after the assault. Brookdale Records at P054.

8

undergoing surgery. Tr. at 297:5–12, 303:18–304:20.[8] Plaintiff testified that he still has headaches around the area of his eyebrows and difficulty breathing as a result of his injuries, and that his nose is still crooked. Tr. at 304:23–306:5. However, plaintiff did not see a doctor for the injuries to his face and head after his May 2014 visit to Brookdale until about a month before the damages trial in April of 2019; plaintiff testified that he essentially treated himself by taking over-the-counter pain medications such as Tylenol during that time. Tr. at 320:20–23, 321:9–16, 322:15–18.

*C. The Verdict and Post-Trial Relief Sought by Defendants*

As noted above, the jury in the damages trial returned a verdict awarding plaintiff (a) $90,000 in total compensatory damages, jointly and severally against all three defendants, (b) $250,000 in punitive damages against defendant Yurkiw, (c) $75,000 in punitive damages against defendant LaGrandier, and (d) $30,000 in punitive damages against defendant Solomito, for a total of $355,000 in punitive damages. Verdict Form, Dkt. 183. Defendants now move for remittitur of the jury's punitive damage award. *See* Defs.' Mem. at 1–2, Dkt. 195. Defendants do not take issue with the jury's compensatory award, and they in fact argue, as a basis for requesting remittitur of the punitive award, that the compensatory award is "amply support[ed]" by the evidence presented. Defs.' Mem. at 13.

## DISCUSSION

*A. Legal Standards*

"Punitive damages are available in a section 1983 case 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous

---

[8] Plaintiff testified that, based on his income, he qualified for Medicaid at all relevant times, but that he did not have it at the time of the assault and his initial treatment because he had not filled out the required paperwork. Tr. at 323:16–324:7. Plaintiff eventually did complete the required documents and began receiving Medicaid coverage, but could not recall when that occurred. Tr. at 324:13–325:6.

indifference to the federally protected rights of others.'" *Mathie v. Fries*, 121 F.3d 808, 815 (2d Cir. 1997) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). When awarded, they are meant "to punish what has occurred and to deter its repetition." *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992) (quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21 (1991)).

"Awards of punitive damages are by nature speculative, arbitrary approximations. No objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct." *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013). Nevertheless, courts "bear the responsibility to ensure that judgments as to punitive damages conform, insofar as reasonably practicable, to [principles of fairness and judicial norms] and are not excessive." *Id.* at 96. Accordingly, "a district court may modify a punitive damage award when the amount is so high as to 'shock the judicial conscience and constitute a denial of justice.'" *Milfort v. Prevete*, 3 F. Supp. 3d 14, 24 (E.D.N.Y. 2014) (quoting *Payne*, 711 F.3d at 96).

When deciding whether punitive damages are excessive, courts follow the guideposts enumerated in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575–85 (1996). The first of these guideposts is the degree to which the conduct at issue is reprehensible, which the Supreme Court considers "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. For instance, "nonviolent crimes are less serious than crimes marked by violence." *Id.* at 576 (quoting *Solem v. Helm*, 463 U.S. 277, 292–93 (1983)).

The second guidepost is the ratio of punitive damages to the actual harm suffered by a plaintiff, although there is no controlling "simple mathematical formula." *Id.* at 582. "In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis. When the ratio is a breathtaking 500 to 1, however, the award must surely

10

'raise a suspicious judicial eyebrow.'" *Id.* at 583 (quoting *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 481 (1993) (O'Connor, J., dissenting)). Nevertheless, the Supreme Court has upheld an award of punitive damages more than 500 times the amount of compensatory damages awarded, at least where the compensatory damage award did not fully reflect the risk of loss posed by the conduct. *See TXO Prod. Corp.*, 509 U.S. at 460–62.

The Second Circuit has generally been reluctant to place much weight on the ratio of punitive to compensatory damages, particularly when only a small amount of compensatory damages has been awarded. *See, e.g., Payne*, 711 F.3d at 103. As stated by the Court in *Payne*, "[t]he ratio, without regard to the amounts, tells us little of value . . . but given the substantial amount of the compensatory award, the punitive award five times greater appears high." *Id.*; *see also Anderson v. Cty. of Suffolk*, 621 Fed. App'x 54, 55 (2d Cir. 2015) (summary order) (affirming a compensatory award of $20,000 and punitive award of $75,000[9]); *DiSorbo v. Hoy*, 343 F.3d 172, 185–87, 189 (2d Cir. 2003) (concluding that "the use of a multiplier to assess punitive damages is not the best tool here," and remitting a $1,275,000 punitive damages award to $75,000 after remitting the $400,000 compensatory damages award to $250,000); *Mathie*, 121 F.3d at 816 (deeming the two-to-one ratio assessed by the jury "not unreasonable" in the case of a sexual assault by a corrections officer, but finding the punitive award excessive on other grounds, and in particular when compared with awards approved in similar cases); *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996) (finding that examining the ratio of punitive to compensatory damages to be "not the best tool" in a case where only nominal compensatory damages were awarded).

---

[9] The compensatory and punitive awards are reported in the district court's decision. *Anderson v. Aparicio*, 25 F. Supp. 3d 303, 305 (E.D.N.Y. 2014).

Finally, "[c]omparing the punitive damages award and the civil and criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *Gore*, 517 U.S. at 583. The principles underlying this guidepost appear to be notice to the defendant that he or she may become subject to punitive consequences for his or her conduct, *see id.* at 584 (noting that none of the civil penalties applicable to the conduct "would provide an out-of-state distributor with fair notice that the first violation . . . of its provisions might subject an offender to a multimillion dollar penalty"), and deterrence of similar conduct by others, *see id.* ("The sanction imposed in this case cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal."). The Second Circuit has noted, however, that "criminal penalties understate the notice [requirement] when the misconduct is committed by a police officer." *DiSorbo*, 343 F.3d at 188; *see Lee*, 101 F.3d at 811 (assuming that defendant's "training as a police officer gave him notice as to the gravity of misconduct under color of his official authority, as well as notice that such misconduct could hinder his career").

Even after considering the *Gore* guideposts, courts "retain . . . responsibility to review punitive awards for excessiveness in applying federal statutes such as section 1983. That task requires comparison with awards approved in similar cases." *Mathie*, 121 F.3d at 817 (internal citations omitted)*; see also DiSorbo*, 343 F.3d at 188.

*B. Analysis*

The Court discussed the *Gore* factors in the Order of Remittitur. In that Order, the Court concluded that the facts of this case support a finding of "great reprehensibility" and a "significant punitive award." Order of Remittitur at 34. The same or similar facts supporting a finding of great reprehensibility were presented at the retrial on damages. Accordingly,

application of the first *Gore* guidepost supports the jury's punitive damages award. The ratio of punitive to compensatory damages awarded by the jury in the second trial is less than four to one,[10] and therefore does not raise constitutional concerns. *See Gore*, 517 U.S. at 581 (noting that "even though a punitive damages award of 'more than 4 times the amount of compensatory damages' might be 'close to the line,' it did not 'cross the line into the area of constitutional impropriety.'" (quoting *Haslip*, 499 U.S. at 23–24)). Finally, as discussed in the Order of Remittitur, the criminal statute that most closely fits defendants' conduct in this case is assault in the third degree, N.Y. Pen. L. § 120.00. Order of Remittitur at 35. Although the penalties for assault in the third degree are no more than one year of imprisonment and a fine of no greater than $1,000, the Second Circuit has held that comparisons to misdemeanor penalties are of limited value in police misconduct cases brought under section 1983. *See DiSorbo*, 343 F.3d at 188.

In short, application of the guideposts in *Gore* provides no reason to conclude that the punitive damages awarded by the jury in the second trial are excessive. I turn, then, to punitive damage awards in comparable cases. The evidence of defendants' use of force and plaintiff's injuries in the second trial was for the most part similar to the evidence presented in the first trial. After considering awards in comparable cases when reviewing the verdict reached by the first jury, I concluded that the punitive damages imposed on defendant Yurkiw should be reduced from $1,000,000 to $120,000, and that the punitive damages of $750,000 imposed on defendants LaGrandier and Solomito should be reduced to $10,000 each. The amounts awarded by the jury after the retrial—$250,000 as to Yurkiw, $75,000 as to LaGrandier, and $30,000 as to

---

[10] As noted above, the jury in the damages trial awarded $90,000 in compensatory damages and a total of $355,000 in punitive damages.

Solomito—while higher than the reduced amounts in the Order of Remittitur, are much closer to those amounts than to the amounts awarded in the first trial.

Defendants argue that any award of punitive damages must be reduced to amounts less than those set by the Court in the Order of Remittitur because the jury at the damages trial awarded less in compensatory damages than the amount of compensatory damages set in that Order. Defs.' Mem. at 13 *et seq*. However, as discussed above, the ratio of punitive damages to compensatory damages awarded at the second trail provides no basis for remittitur. Nor have defendants pointed to any authority supporting their argument that the jury's verdict in the second trial must be remitted to match the ratio of punitive to compensatory damages in the Court's Order of Remittitur. In fact, relevant precedent is to the contrary; as the Supreme Court held in *Gore,* there is no controlling "simple mathematical formula." 517 U.S. at 582.

The jury's decision to award punitive damages in excess of those determined to be proper by the Court in its Order of Remittitur presents a more compelling, although ultimately unconvincing, argument. In its Order of Remittitur, this Court concluded that a reasonable jury could not impose more that $120,000 in punitive damages on defendant Yurkiw and no more than $10,000 each on defendants LaGrandier and Solomito. Order of Remittitur at 39–40. Awards of punitive damages, though, "are by nature speculative, arbitrary approximations," and "[n]o objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct." *Payne*, 711 F.3d at 93. Having heard the evidence presented in support of plaintiff's claims at both the original trial and the retrial on damages, and having had the benefit of observing the verdicts returned by two juries after what presumably were careful deliberations, I cannot say that the second trial jury's punitive damages

award "is so high as to shock the judicial conscience and constitute a denial of justice." *Milfort*, 3 F. Supp. 3d at 24 (internal quotations and citation omitted).

Defendants next contend that it was irrational for the jury to impose a larger amount of punitive damages on LaGrandier than it did on Solomito. Defs.' Mem. at 15. The evidence, though, supports the jury's decision to distinguish between these defendants. As discussed above, plaintiff testified that LaGrandier was the first of the officers to become physically aggressive with him, and that she did so by grabbing him, pinning him against the wall, and forcibly removing his son from him. It was at this point, while plaintiff had his back to the wall, that defendant Yurkiw punched him in his face; the jury may even have inferred that LaGrandier pinned plaintiff against the wall in anticipation of Yurkiw's blows.[11] Only then, according to plaintiff, did defendant Solomito join in with LaGrandier and Yurkiw and begin to strike him. Although defendants attempted to impeach plaintiff's trial testimony by confronting him with prior statements in which he described LaGrandier's conduct somewhat differently, it was surely within the province of the jury to decide to credit plaintiff's testimony at trial. Having apparently done so, the jury had a rational basis for imposing a larger punitive damages award on LaGrandier than on Solomito.

Defendants' final argument is that the jury's punitive damage awards should be reduced because of the improper inflammatory conduct of plaintiff's counsel. Defs.' Mem. at 18 *et seq*. There can be little doubt that plaintiff's counsel attempted to present arguments to the jury even after they were precluded by rulings of the Court. The most egregious example involves the efforts plaintiff's counsel made during her direct examination of defendant Yurkiw to suggest that the defendants' conduct violated certain criminal statutes, including the New York gang

---

[11] The evidence at the damages trial included plaintiff's testimony that "[s]he [LaGrandier] was aggressive. The next thing from there, Officer Yurkiw just like sidelines me in the face." Tr. at 270:18–19.

assault statute. Despite the Court's explicit ruling sustaining defendants' objection to this line of questioning, plaintiff's counsel persisted in pressing it. Tr. at 158:25–159:13, 160:3–161:2, 163:9–11. Moreover, when the testimony of plaintiff's final witness was completed and the Court asked whether plaintiff rested, plaintiff's counsel—in blatant disregard of the Court's prior rulings—blurted out, "given the testimony we heard, Your Honor, I ask that you take judicial notice of the gang assault statute." Tr. at 385:25–386:2. Defendants immediately objected, and the Court struck the offending statement. Tr. at 386:3–5. Although the Court afforded them the opportunity to do so, defendants declined to move for a mistrial. Tr. at 389:21–390:10; Defs.' Letter dated April 2, 2019, Dkt 180. When court proceedings resumed the following day, the Court instructed the jury that the comment made by plaintiff's counsel "was inconsistent with prior rulings about the admissibility of evidence that were made by the Court . . . you should disregard it and strike it from your minds and not entertain anything about it during your deliberations." Tr. at 401:11–19.

While the conduct of plaintiff's counsel was highly improper, the Court is confident that it had little if any impact on the deliberations of the jury. First, the remark was blurted out quickly and could barely be understood. *See* Tr. at 401:13–16. Second, the remark was the subject of an immediate objection and was promptly stricken, and a curative instruction was given to the jury the next day. Finally, with no evidence, argument, or other explanation of the gang assault statute or its relevance, it is likely that, even if any jurors heard the remark and were inclined not to follow the Court's instruction to disregard it, those jurors would not have any meaningful understanding of the point plaintiff's counsel was trying to make.

Having considered "the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, and the

manner in which the parties and court treated the comments," I conclude that the conduct of plaintiff's counsel, while highly improper, did not prejudice defendants or unfairly influence the jury's verdict. *Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118, 144 (E.D.N.Y. 2013) (internal quotations and citations omitted).

CONCLUSION

For the reasons discussed above, defendants' motion pursuant to Rule 59 of the Federal Rules of Civil Procedure for remittitur of the punitive damages award is denied.

**SO ORDERED.**

```
                            _____
                            STEVEN M. GOLD
                            United States Magistrate Judge
```

Brooklyn, New York
November 22, 2019


U:\#JEF 2018-2019\Jennings v. Yurkiw et al., 14-cv-6377\2019 Trial and Post Trial Motion\MO Trial 2 Remittitur Motion - FINAL.docx